No. 25-7831

# United States Court of Appeals for the Ninth Circuit

ROBINHOOD DERIVATIVES, LLC,
*Plaintiff – Appellant*,

v.

MIKE DREITZER, IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF THE NEVADA
GAMING CONTROL BOARD, ET AL.,
*Defendants – Appellees*,

and

NEVADA RESORT ASSOCIATION,
*Intervenor – Defendant-Appellee*

—————————————

Appeal from the U.S. District Court
for the District of Nevada
The Honorable Andrew P. Gordon (No. 2:25-cv-01541-APG-DJA)

—————————————

## APPELLANT'S OPENING BRIEF

—————————————

Kevin J. Orsini
Antony L. Ryan
Brittany L. Sukiennik
CRAVATH, SWAINE & MOORE LLP
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

Todd L. Bice
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
(702) 214-2100

*Counsel for Appellant Robinhood Derivatives, LLC*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Robinhood Derivatives, LLC states that it is a wholly-owned subsidiary of Robinhood Markets, Inc. The Vanguard Group, Inc. owns 10% or more of Robinhood Markets, Inc.'s stock. There is no other publicly held corporation that owns 10% or more of Robinhood Derivatives, LLC's or Robinhood Markets, Inc.'s stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ..............................................i

TABLE OF AUTHORITIES ...............................................................iv

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUES ...........................................................1

STATUTORY PROVISIONS ................................................................2

INTRODUCTION .............................................................................2

I.    LEGAL BACKGROUND ...........................................................6

     A.    Overview of Derivatives ...........................................6

     B.    Event Contracts ......................................................7

     C.    Congressional and CFTC Understanding of Event
         Contracts ...............................................................9

II.    FACTUAL BACKGROUND ....................................................16

     A.    Robinhood Makes Available Certain Kalshi Event
         Contracts .............................................................16

     B.    The Letters from the Board ....................................20

III.    PROCEDURAL HISTORY AND RELATED ACTIONS ...............22

SUMMARY OF THE ARGUMENT .......................................................24

STANDARD OF REVIEW ..................................................................27

ARGUMENT ...................................................................................28

I.    ROBINHOOD DEMONSTRATED THAT IT IS LIKELY TO
   SUCCEED ON THE MERITS OR HAS AT LEAST RAISED
   SERIOUS QUESTIONS ..........................................................28

A. Section 2 of the CEA Expressly Preempts State Law With Respect to Derivatives Traded on DCMs.....................28

B. Sports-Related Event Contracts That Turn on the Outcome of a Game Are "Swaps." ..........................................34

C. Sports-Related Event Contracts Are Also Transactions in "Excluded Commodities." .................................................47

D. Sports-Related Event Contracts Are "Associated with a Potential Financial, Economic, or Commercial Consequence." ....................................................................50

E. The District Court's Ruling Constituted an Impermissible Collateral Attack on the CFTC's Exclusive Jurisdiction. .......................................................56

II. ROBINHOOD DEMONSTRATED THAT IT WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION..................60

III. ROBINHOOD DEMONSTRATED THAT THE BALANCE OF HARDSHIPS TIPS SHARPLY IN ITS FAVOR AND THAT AN INJUNCTION IS IN THE PUBLIC INTEREST.........64

CONCLUSION ......................................................................................71

CERTIFICATE OF SERVICE.............................................................73

CERTIFICATE OF COMPLIANCE

STATEMENT OF RELATED CASES

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

**Cases**                                                        **Page**

*Am. Agric. Movement, Inc. v. Board of Trade,*
   977 F.2d 1147 (7th Cir. 1992) .............................................. 18, 29, 30

*Am. Trucking Ass'ns v. City of Los Angeles,*
   559 F.3d 1046 (9th Cir. 2009) ......................................................... 71

*ARC of California v. Douglas,*
   757 F.3d 975 (9th Cir. 2014) .......................................................... 65

*Arizona v. Tohono O'odham Nation,*
   818 F.3d 549 (9th Cir. 2016) .......................................................... 52

*Armstrong v. Exceptional Child Ctr., Inc.,*
   575 U.S. 320 (2015) ........................................................................ 66

*Bennett v. Spear,*
   520 U.S. 154 (1997) ........................................................................ 58

*Big Lagoon Rancheria v. California,*
   789 F.3d 947 (9th Cir. 2015) (en banc) ...................................... 56, 60

*BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.,*
   904 F.3d 755 (9th Cir. 2018) .......................................................... 28

*Bostock v. Clayton Cnty., Ga.,*
   590 U.S. 644 (2020) ........................................................................ 54

*Bowles v. Russell,*
   551 U.S. 205 (2007) (Souter, J., dissenting) ................................... 63

*Cboe Futures Exch., LLC v. S.E.C.,*
   77 F.4th 971 (D.C. Cir. 2023) ........................................................... 6

*Commodity Futures Trading Comm'n v. Erskine,*
   512 F.3d 309 (6th Cir. 2008) .......................................................... 49

*Chi. Mercantile Exch. v. S.E.C.*,
  883 F.2d 537 (7th Cir. 1989)............................................................49

*Cothran v. Ellis*,
  16 N.E. 646 (Ill. 1888)........................................................... 6, 30, 70

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000).................................................................29, 33

*Danielson v. Inslee*,
  945 F.3d 1096 (9th Cir. 2019).......................................................63

*Dickson v. Uhlmann Grain Co.*,
  288 U.S. 188 (1933).......................................................................6

*Doe v. Horne*,
  115 F.4th 1083 (9th Cir. 2024) .....................................................26

*Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*,
  458 U.S. 141 (1982).................................................................29, 33

*FTC v. Ken Roberts Co.*,
  276 F.3d 583 (D.C. Cir. 2001) ....................................................7, 31

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015).........................................................64

*Idaho v. Coeur d'Alene Tribe*,
  794 F.3d 1039 (9th Cir. 2015).......................................................61

*In re Davis*,
  146 F.4th 710 (9th Cir. 2025) ...................................................41, 44

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987).......................................................................32

*Jones v. B.C. Christopher & Co.*,
  466 F. Supp. 213 (D. Kan. 1979)...................................................32

*KalshiEx LLC v. Commodity Futures Trading Comm'n,*
No. 23-3257, 2024 WL 4164694 (D.D.C. Sept. 12, 2024),
*stay denied*, 119 F.4th 58 (D.C. Cir. 2024) ............................ 14, 38, 48

*L ALD LLC v. Gray,*
No. 24-CV-02195-GPC-MSB, 2025 WL 319247 (S.D. Cal.
Jan. 28, 2025)....................................................................... 64

*Lamie v. U.S. Trustee,*
540 U.S. 526 (2004)............................................................. 53

*Lands Council v. McNair,*
537 F.3d 981 (9th Cir. 2008) (en banc)............................... 27

*Life Alert Emergency Response, Inc. v. LifeWatch, Inc.,*
601 F. App'x 469 (9th Cir. 2015)........................................ 62

*Loving v. IRS,*
742 F.3d 1013 (D.C. Cir. 2014) (Kavanaugh, J., concurring) ............ 40

*Marbury v. Madison,*
5 U.S. (1 Cranch) 137 (1803) .............................................. 56

*Miller v. Cal. Pac. Med. Ctr.,*
991 F.2d 536 (9th Cir. 1993)............................................... 64

*Mobil Oil Corp. v. Higginbotham,*
436 U.S. 618 (1978).............................................................. 53

*Morales v. Trans World Airlines, Inc.,*
504 U.S. 374 (1992)............................................................. 61

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n,*
145 S. Ct. 2658 (2025) (per curiam).................................... 61

*OG Int'l, Ltd. v. Ubisoft Ent.,*
No. C 11-04980 CRB, 2011 WL 5079552 (N.D. Cal.
Oct. 26, 2011) ...................................................................... 68

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser,*
945 F.3d 1076 (9th Cir. 2019)............................................. 35

*Pom Wonderful LLC v. Hubbard,*
  775 F.3d 1118 (9th Cir. 2014) ................................................. 28

*Prysmian Cables & Sys. USA LLC v. ADT Com. LLC,*
  665 F. Supp. 3d 236 (D. Conn. 2023) ...................................... 36

*Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.,*
  26 F.3d 1508 (10th Cir. 1994) ................................................. 36

*Rotkiske v. Klemm,*
  589 U.S. 8 (2019) ..................................................................... 48

*Shell Offshore, Inc. v. Greenpeace, Inc.,*
  709 F.3d 1281 (9th Cir. 2013) ................................................ 27

*Short v. Brown,*
  893 F.3d 671 (9th Cir. 2018) .................................................. 27

*Slaney v. Int'l Amateur Athletic Fed'n,*
  244 F.3d 580 (7th Cir. 2001) .................................................. 29

*Stuhlbarg Int'l Sales Co. v. John Doe Brush & Co.,*
  240 F.3d 832 (9th Cir. 2001) .................................................. 62

*Transwestern Pipeline Co. v. 17.19 Acres of Prop. Located in
  Maricopa Cnty.,* 627 F.3d 1268 (9th Cir. 2010) ................... 35

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025) ................................................................. 66

*Tulelake Irrigation Dist. v. U.S. Fish & Wildlife Serv.,*
  40 F.4th 930 (9th Cir. 2022) ............................................ 41, 44

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
  578 U.S. 590 (2016) ................................................................. 58

*United States v. California,*
  921 F.3d 865 (9th Cir. 2019) .................................................. 71

*United States v. Wilkinson,*
  986 F.3d 740 (7th Cir. 2021) .................................................. 47

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) ................................................................. 58

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ................................................................... 27

*Witzel v. Chartered Sys. Corp. of N.Y. Ltd.,*
  490 F. Supp. 343 (D. Minn. 1980) ......................................... 32

**United States Constitution**

U.S. Const. art. VI, cl. 2 .......................................................... 29

**Statutes**

5 U.S.C. § 551(13) ..................................................................... 58

5 U.S.C. § 702 .......................................................................... 57

5 U.S.C. § 703 .......................................................................... 57

7 U.S.C. § 1a(19)(iv) ........................................................ *passim*

7 U.S.C. § 1a(20) ..................................................................... 47

7 U.S.C. § 1a(27) ..................................................................... 50

7 U.S.C. § 1a(47)(A)(ii) .................................................... *passim*

7 U.S.C. § 1a(47)(A)(iii) .......................................................... 38

7 U.S.C. § 2(a)(1)(A) ..................................................... 7, 29, 50

7 U.S.C. § 5(b) ......................................................................... 46

7 U.S.C. § 6(c)(1) ..................................................................... 40

7 U.S.C. § 7a-2(c)(1) ................................................................ 19

7 U.S.C. § 7a-2(c)(2) .......................................................... 19, 57

7 U.S.C. § 7a-2(c)(4)(A) ........................................................... 19

7 U.S.C. § 7a-2(c)(5)(B) ........................................................ 19, 57

7 U.S.C. § 7a-2(c)(5)(C) .......................................................... *passim*

7 U.S.C. § 8(b) .................................................................... 19

7 U.S.C. § 16(e)(1)(B)(ii) ........................................................ 46

28 U.S.C. § 1292(a)(1) ............................................................. 1

28 U.S.C. § 1331 .................................................................. 1

Commodity Exchange Act .......................................................... *passim*

Commodity Futures Modernization Act of 2000 ................................... 11

Commodity Futures Trading Commission Act of 1974 .................. *passim*

Dodd-Frank Wall Street Reform and Consumer Protection
    Act of 2010 ................................................................. *passim*

Nev. Rev. Stat. § 463.360(3) .................................................... 68

**Rules and Regulations**

17 C.F.R. § 1.10(b) ............................................................. 17

17 C.F.R. § 1.10(d) ............................................................. 17

17 C.F.R. § 1.11(c)(1) ......................................................... 17

17 C.F.R. § 1.11(e) ............................................................ 17

17 C.F.R. § 1.12(a) ............................................................ 17

17 C.F.R. § 1.14(a) ............................................................ 17

17 C.F.R. § 1.15 ............................................................... 17

17 C.F.R. § 1.17(a) ............................................................ 17

17 C.F.R. § 1.18 .............................................................. 17

17 C.F.R. § 1.55(k) .................................................................. 17

17 C.F.R. § 1.55(o) .................................................................. 17

17 C.F.R. § 1.71(e) .................................................................. 17

17 C.F.R. § 17.00 .................................................................... 16

17 C.F.R. § 40.11 .............................................................. 12, 33

17 C.F.R. § 40.2(a) ................................................................. 19

17 C.F.R. § 40.3(a) ................................................................. 19

17 C.F.R. § 40.6(b)(1)............................................................. 57

17 C.F.R. § 155.3(a) ............................................................... 17

CFTC Letter No. 14-130 (Aug. 4, 2022),
    https://www.cftc.gov/csl/22-08/download ............................................. 37

CFTC Letter No. 25-36 (Sept. 30, 2025),
    https://www.cftc.gov/csl/25-36/download ............................................. 59

*Concept Release on the Appropriate Regulatory Treatment of
    Event Contracts*, 73 Fed. Reg. 25,669 (May 7, 2008) ................... 10, 44

*Event Contracts*, 89 Fed. Reg. 48,968 (June 10, 2024) ............... 15, 45, 55

Fed. R. App. P. 4(a)(1)(A) ......................................................... 1

*Further Definition of "Swap"*, 77 Fed. Reg. 48,208
    (Aug. 13, 2012) ...................................................... 46, 47

*Provisions Common to Registered Entities*, 76 Fed. Reg. 44,776
    (July 27, 2011)............................................................ 12

Statement, Federal Reserve Board (Dec. 10, 2025),
    https://www.federalreserve.gov/newsevents/pressreleases/
    monetary20251210a.htm................................................. 37

x

**Legislative Materials**

120 Cong. Rec. 30,464, 34,736 (1974) ..................................................... 32

156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) ......................... *passim*

Hearings Before the Committee on Agriculture and Forestry,
    United States Senate, on S. 2485, S. 2587, S. 2837 and H.R.
    13113, 93d Cong., 2d Sess. 685 (1974) ................................................ 7

H.R. Rep. No. 74-421 (1935) .................................................................. 30

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.), *reprinted in*
    1974 U.S.C.C.A.N. 5894 ................................................................... 31

Hearings Before the H. Comm. on Agric., 93d Cong. 121 (1973) ........... 30

S. Rep. No. 93-1131 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843 ........ 31

**Other Authorities**

Appellant's Br., *KalshiEx LLC v. CFTC*, 119 F.4th 58 (D.C. Cir.
    2004) (No. 24-5205), 2024 WL 4512583 (D.C. Cir. filed
    Oct. 16, 2024) ................................................................................... 54

*Associated*, Merriam-Webster (12th ed. 2025),
    https://www.merriam-webster.com/ dictionary/associated ............... 52

*Associated*, Oxford Dictionary of English (3d. ed 2011) ........................ 52

*Event*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ......... 36

*Event*, Random House Webster's Unabridged Dictionary
    (2d ed. 2001) ..................................................................................... 36

*Event*, Webster's II New College Dictionary (3d ed. 2005) ..................... 36

*Inherent*, Random House Webster's Unabridged Dictionary (2d ed.
    2001) .................................................................................................. 53

John V. Rainbolt II, *Regulating the Grain Gambler and His
    Successors*, 6 Hofstra L. Rev. 1 (1977) ............................................. 30

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi. Kent L. Rev. 657 (1982) ..................................................... 7

National Futures Association, Futures Commission Merchant (FCM) Members,
https://www.nfa.futures.org/members/fcm/index.html ...................... 16

Nevada Gaming Control Board, Monthly Revenue Report (Aug. 2025),
https://www.gaming.nv.gov/contentassets/a7958398526e4e309d 248ea35 a2a20dd/august-2025-monthly-revenue-report.pdf............. 67

Nevada Gaming Control Board, Monthly Revenue Report (Sept. 2025),
https://www.gaming.nv.gov/contentassets/a7958398526e4e309d 248ea35 a2a20dd/september-2025-monthly-revenue-report.pdf....... 67

Nevada Gaming Control Board, Monthly Revenue Report (Oct. 2025),
https://www.gaming.nv.gov/siteassets/content/about/gamingrev enue/2025oct-gri.pdf ........................................................................ 67

Nevada Gaming Control Board, Notice No. 2025-77, Sports Event Contracts are Wagers (Oct. 15, 2025),
https://www.gaming.nv.gov/contentassets/7568a04a6f774450a1 86ee4e28e1d614/notice-to-licensees-2025-77-10-15-25-.pdf ........ 10, 69

Notice to Licensees, KalshiEx and Robinhood Update (Nov. 25, 2025)
https://www.gaming.nv.gov/siteassets/content/about/industry notices/2025-100.pdf ........................................................................ 70

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 because this action presents a federal question under the Supremacy Clause of the United States Constitution. This Court has jurisdiction to review the district court's denial of Robinhood's motion for a preliminary injunction under 28 U.S.C. § 1292(a)(1). The district court denied the injunction on November 25, 2025, Excerpt of Record ("ER")-4, and Robinhood timely appealed pursuant to Fed. R. App. P. 4(a)(1)(A) on December 12, 2025, ER-249.

## STATEMENT OF THE ISSUES

1.     Whether Robinhood has demonstrated a likelihood of success—or at least serious questions on the merits—in establishing that federal law preempts the application of Nevada gaming laws to sports-related event contract trading on federally regulated designated contract markets.

2.     Whether Robinhood would suffer irreparable harm absent injunctive relief and whether that harm outweighs any harms Defendants would suffer if an injunction were granted such that the

1

balance of hardships and the equities weigh in favor of a preliminary injunction.

## STATUTORY PROVISIONS

The Addendum reproduces the pertinent statutory and regulatory provisions.

## INTRODUCTION

In 1974, Congress made a clear and express determination in the Commodity Exchange Act ("CEA") that the Commodity Futures Trading Commission ("CFTC") shall have "exclusive jurisdiction" over all derivatives trading on designated contract markets ("DCMs"). Congress has amended the CEA multiple times since then and has decided each time to retain for the CFTC this exclusive jurisdiction. This express delegation of authority to the CFTC thus preempts any attempts by states to regulate trading on DCMs. The relevant legislative history establishes that this was exactly Congress's intent: the grant of exclusive jurisdiction was designed to "preempt the field" and avoid the chaos that would arise from multiple states applying their own laws to federally regulated exchanges.

This litigation concerns sports-related event contracts, a specific type of derivative traded on DCMs and regulated by the CFTC. Millions of these contracts have traded after having been listed by exchanges with the CFTC through the procedures Congress set forth in the CEA, and therefore having become effective and legally deemed approved by the CFTC. In knowingly allowing these contracts to be traded on DCMs, the CFTC has concluded that these instruments are within the definition of "swaps" or transactions in commodities for future delivery over which it has exclusive jurisdiction. Unfortunately, in direct contravention of Congressional intent and the express statutory language of the CEA, various states have now created the very chaos Congress sought to avoid by seeking to apply state gaming laws to these federally regulated derivatives markets.

This appeal is one of three before this Court raising virtually identical issues arising from threats Nevada has made to criminally prosecute DCMs and other regulated entities such as Robinhood.[1]

---

[1] The other two appeals are *KalshiEx LLC v. Hendrick, et al.*, No. 25-7516 (9th Cir. filed Nov. 28, 2025) and *North American Derivatives Exchange, Inc. (d/b/a Crypto.com) v. State of Nevada, et al.*, No. 25-7187 (9th Cir. filed Nov. 14, 2025).

3

Similar appeals are now pending in the Third and Fourth Circuits arising from threatened enforcement of state law in New Jersey and Maryland. Other states have also threatened enforcement action against federally regulated entities for listing event contracts on DCMs. Absent appellate intervention, the system of consolidated, federal authority over DCMs that Congress constructed is at risk.

In denying Robinhood's request for a preliminary injunction, the district court made a series of legal errors. In particular, while the district court agreed that the CEA preempts state law with respect to "swaps or contracts of sale of a commodity for future delivery" traded on DCMs, it avoided preemption by finding that sports-related event contracts are neither "swaps" nor "contracts of sale of a commodity for future delivery." ER-5, ER-27–30, ER-44–57. This ruling was largely based on the district court's manufactured requirement that swaps and transactions in excluded commodities can concern only whether an event (such as football game) occurs, not the outcome of such an event. That decision is inconsistent with the plain text of the statute, the common meaning of the relevant words, Congressional intent, and CFTC regulatory action.

4

Indeed, the district court's decision reflects the very hostility towards futures that has motivated attempts by states to interfere with federal derivatives markets for more than a century. Relying on the proposition that "I know it when I see it," ER-102:21, the district court concluded that sports-related event contracts are gambling in another form and that the public interest requires state regulators—such as the Nevada Gaming Control Board—to decide whether to permit event contract trading on DCMs rather than leaving that to the CFTC. But this decision was not the district court's to make. Congress made a different decision in the CEA and specifically vested the CFTC—and *only* the CFTC—with the authority to decide whether sports-related event contracts should be prohibited from trading on DCMs as contrary to the public interest. While views may differ on that public interest evaluation, Congress has spoken, and it is the CFTC's view that controls—not the view of the district court below, and certainly not the view of state agencies.

Robinhood respectfully requests that the Court reverse the decision below and grant a preliminary injunction precluding the State of Nevada from interfering with the CFTC's exclusive jurisdiction.

## STATEMENT OF THE CASE

## I.     LEGAL BACKGROUND

### A.     Overview of Derivatives

Derivatives are financial instruments whose value is tied, as relevant here, to underlying commodities, which can either be actual physical commodities (such as grain or oil) or intangible commodities (such as interest rates or debt instruments).  One type of derivative—a futures contract—emerged in the nineteenth century as a means of managing exposure to volatile commodity prices.  A typical futures contract involves an agreement between two parties for the future purchase of a specified commodity at a set price.  *See Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 974 (D.C. Cir. 2023).  Futures contracts can also involve cash settlement (of both tangible and intangible commodities) at a future time at the then-market price, without physical delivery.  Futures contracts attracted criticism from their inception as facilitating speculative risk-taking, and were subject to numerous regulatory schemes in the early twentieth century, leading up to the passage of the CEA in 1936.  *See e.g., Cothran v. Ellis*, 16 N.E. 646, 647-48 (Ill. 1888); *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 190-200 (1933).

6

The CEA provided for federal regulation of all commodity futures trading and required that essentially all futures be traded on regulated exchanges. Congress significantly expanded the CEA in 1974 with the creation of the CFTC, in which Congress centralized regulatory authority. Congress gave this role to the CFTC to avoid the "total chaos" from having fifty states regulate futures markets. Hearings Before the Committee on Agriculture and Forestry, United States Senate, on S. 2485, S. 2587, S. 2837 and H.R. 13113, 93d Cong., 2d Sess. 685 (1974) ("Senate Hearings") (statement of Sen. Clark). To further that goal, Congress amended the CEA to expressly confer the CFTC with "exclusive jurisdiction" over trading on DCMs. Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, § 201(b), 88 Stat. 1389, 1395 (codified at 7 U.S.C. § 2(a)(1)(A)).[2]

## B.    Event Contracts

The derivatives at issue in this case are called "event contracts." Event contracts allow customers to trade on their predictions about the

---

[2] For a detailed history of the CEA and regulation of commodity futures trading, *see* Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657 (1982), and *FTC v. Ken Roberts Co.*, 276 F.3d 583, 587-88, 590-91 (D.C. Cir. 2001).

occurrence of future events and are typically structured as binary options posing a particular yes-or-no question. A buyer takes the "yes" side and a seller takes the "no" side. Upon expiration of the contract—typically, when the occurrence or outcome of the future event in question becomes known—the value of the contract goes to the party who was right. Until that time, buyers and sellers can trade the contract, and the price of the contract fluctuates based on the market's assessment of the probability that the event will occur. The price of an event contract can thus reveal valuable information about market sentiment concerning the underlying event and can be an important information-gathering tool. Traders may use event contracts to mitigate risk or simply to seek a financial return. Event contracts are traded on federally regulated DCMs, such as the exchanges operated by KalshiEx LLC ("Kalshi") and Crypto.com.

One type of event contract—the one at issue for Robinhood here—is a sports-related event contract. For these contracts, the underlying event is sports-related, such as who will win the Super Bowl or the Masters Golf Tournament, or which horse will win the Kentucky Derby.

While traditional sports bets at casinos (or through online sports-betting services) also involve sporting events, there are fundamental

8

differences between sports betting and sports-related event contracts. For example, contract markets leverage the power and rigor of financial markets to provide traders with liquidity and transparency, and prices are set by market participants. Customers can manage risk by adjusting or exiting their positions up until the contract expires, and prices respond accordingly. These markets may be at risk of market manipulation and other market distortions and inefficiencies.

Sportsbooks, by contrast, have a line set by the house, typically ahead of time and, once a bet is placed, does not change for the life of that bet. Gamblers bet directly against the house, and gamblers typically do not have the option to exit their position. Sportsbooks risk exploitation of gamblers due to the power imbalance between the house and the gambler.

### C. Congressional and CFTC Understanding of Event Contracts

The trading of event contracts on DCMs has been the subject of review, comment and litigation by the CFTC. It has also been addressed by Congress with the expansion of the CFTC's exclusive jurisdiction to regulate derivatives trading on DCMs. These actions and statements

9

confirm both Congressional and CFTC recognition that sports-related event contracts are within the CFTC's exclusive jurisdiction.

In 2008, the CFTC issued a concept release and solicited public comment regarding "the appropriate regulatory treatment of event contracts," explaining that such contracts may be based on "varied" eventualities such as "the results of political elections, or the outcome of particular entertainment events." *See* CFTC, *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25,669, 25,670 (May 7, 2008).[3] It noted that "the CEA supersedes and preempts other laws, including state and local gaming . . . laws, with respect to transactions executed on . . . a Commission-regulated market." *Id.* at 25,673.

---

[3] While Robinhood's litigation focuses on sports-related event contracts, Nevada has taken the position that election-related event contracts also fall within the scope of—and are prohibited by—its state gaming laws. *See* Nevada Gaming Control Board, Notice No. 2025-77, Sports Event Contracts Are Wagers (Oct. 15, 2025), https://www.gaming.nv.gov/contentassets/7568a04a6f774450a186ee4e2 8e1d614/notice-to-licensees-2025-77-10-15-25-.pdf ("Examples of event contracts that the Board specifically considers to be wagering subject to its jurisdiction include event contracts based on the outcome or partial outcome of . . . political elections.").

10

Before this rulemaking was finalized, Congress enacted the Dodd-Frank Act of 2010. One issue that Dodd-Frank addressed was to reverse changes that Congress had made to the CEA when, in 2000, it passed the Commodity Futures Modernization Act ("CFMA"). Through the CFMA, Congress had defined a category of commodity called "excluded commodities," and permitted trading of derivatives referencing excluded commodities over the counter (off of a DCM). *See United States v. Radley*, 632 F.3d 177, 181 (5th Cir. 2011). The definition of "excluded commodity" included, among other things, an "occurrence, extent of an occurrence, or contingency that is (1) beyond the control of the parties to the relevant contract, agreement, or transaction and (2) associated with a financial, commercial, or economic consequence." Pub. L. No. 106-554, Appx. E, § 101(4), 114 Stat. 2763A-365, 2763A-371 (codified originally at 7 U.S.C. § 1a(13), currently at § 1a(19)).

While Dodd-Frank preserved the definition of "excluded commodity" from the CFMA, Dodd-Frank added the term "swap" to the CEA and reinstated the requirement that many derivatives referencing "excluded commodities" be traded on DCMs. *See* Pub. L. No. 111-203, §§ 721(a)(21), 722(a)(1)(D), 124 Stat. 1376, 1666, 1672. Congress defined

11

"swap" to include contracts providing for payment based on "the occurrence . . . of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). This language is substantially similar—though not identical—to the definition of "excluded commodity."

The Dodd-Frank Act also added a special rule titled "Event contracts." Pub. L. No. 111-203, § 745(b), 124 Stat. 1376, 1735-36. Under this rule, the CFTC may prohibit "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency" in specific categories if it determines them to be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i).[4] The specific categories of event contracts covered by the special rule include: "(i) activity that is unlawful under any Federal or State law; (ii) terrorism; (iii) assassination; (iv) war; (v) gaming; or

---

[4] The CFTC has promulgated a regulation that sets out a two-step process for CFTC review "on a case-by-case basis" of whether an event contract listed by a DCM should be barred under the Special Rule. *See* CFTC, *Provisions Common to Registered Entities*, 76 Fed. Reg. 44,776, 44,785-86 (July 27, 2011) (adopting 17 C.F.R. § 40.11).

(vi) other similar activity determined by the [CFTC], by rule or regulation, to be contrary to the public interest." *Id.*

The legislative history of the Special Rule confirms Congress's specific intent that sports-related event contracts fall within the exclusive jurisdiction of the CFTC. It also refutes Nevada's core argument that Congress could not have meant to make the CFTC a regulator of conduct that resembles sports gambling in some ways. When discussing the Special Rule, the following exchange occurred between Senator Lincoln—who is identified as one of the authors of the Special Rule in the legislative history—and Senator Feinstein:

> Mrs. Feinstein: . . .
>
> I am glad the Senator is restoring this authority to the CFTC. I hope it was the Senator's intent, as the author of this provision, to define "public interest" broadly so that the CFTC may consider the extent to which a proposed derivative contract would be used predominantly by speculators or participants not having a commercial or hedging interest. Will CFTC have the power to determine that a contract is a gaming contract if the predominant use of the contract is speculative as opposed to a hedging or economic use?
>
> Mrs. Lincoln: That is our intent. The Commission needs the power to, and should, prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed "event contracts." It would be quite easy to construct an "event contract" around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf

13

Tournament. These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.

156 Cong. Rec. S5906-07 (daily ed. July 15, 2010).

This history confirms that the proponent of the Special Rule and other Senators clearly understood that event contracts could be based on sports events, that such event contracts could resemble gambling and that they fall within the relevant definitions of "swaps" or "transactions in commodities for future delivery." While both Senators expressed their own concerns about whether such contracts were in the public interest, critically, they recognized that Congress itself was not making any advanced determination on the public interest question and was instead vesting the CFTC, through the Special Rule, with the exclusive authority to make that determination. The intent was thus to allow the CFTC— not states, and not district courts—to decide whether event contracts traded on DCMs are in the public interest.

Citing the Special Rule, in 2023 the CFTC issued an order prohibiting Kalshi from offering certain contracts related to the outcome of elections. *KalshiEx LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *5 (D.D.C. Sept. 12, 2024), *stay denied*, 119 F.4th 58 (D.C. Cir. 2024).

14

A federal district court determined that this order exceeded the CFTC's statutory authority under the Special Rule because it prohibited contracts that the court determined did not involve any unlawful activity or gaming, and therefore did not fall within the Special Rule. *See id.* Notably, however, the district court agreed that contracts turning on the *outcome* of an election fit the CEA's definition of "excluded commodities" and thus, were within the CFTC's exclusive jurisdiction. *Id.* at *2 (explaining that the "CFTC is responsible for administering and enforcing the CEA," which "vests it with exclusive jurisdiction" to regulate derivatives involving "excluded commodities" such as election event contracts).

While the litigation over Kalshi's election contracts was proceeding, the CFTC published a (never adopted) notice of proposed rulemaking "to further specify the types of event contracts that involve 'gaming.'" CFTC, *Event Contracts*, 89 Fed. Reg. 48,968 (June 10, 2024). The CFTC stated that "event contracts are generally understood to be a type of derivative contract, typically with a binary payoff structure, based on the ***outcome*** of an underlying occurrence or event." *Id.* at 48,969 (emphasis added). This proposed rulemaking evinces the CFTC's understanding that it has

15

exclusive jurisdiction over the very types of sports-related event contracts (contracts with a binary payoff structure that turn on the outcome of an event) at issue in this case.

In sum, the actions of both Congress and the CFTC over the preceding decades confirm that Congress intended—and the CFTC understands—that event contracts traded on DCMs that turn on the outcome of events—including sports events—fall within the CFTC's exclusive regulatory authority.

## II. FACTUAL BACKGROUND

### A. Robinhood Makes Available Certain Kalshi Event Contracts

The companies within the Robinhood organization are democratizing finance by removing barriers to access to financial markets, including by offering zero-commission stock trading and easy-to-use mobile and web applications. ER-195 ¶ 2.

Robinhood is registered with the CFTC as a futures commission merchant ("FCM"), ER-195 ¶ 3, which is an entity that solicits or accepts orders to buy or sell futures and swaps and accepts payment from customers to support such orders. *See* National Futures Association, Futures Commission Merchant (FCM) Members,

16

https://www.nfa.futures.org/members/fcm/index.html. Registered FCMs such as Robinhood must comply with a host of federal requirements, including financial reporting requirements to the CFTC, 17 C.F.R. § 1.10(b), (d), 17.00 disclosure requirements to the public, *id.* § 1.55(k), (o), and minimum financial requirements, *id.* § 1.17(a); *see also id.* § 1.12(a). FCMs must "establish, maintain, and enforce a system of risk management policies and procedures designed to monitor and manage the risks associated with the activities of the" FCM, *id.* § 1.11(c)(1), and the CFTC's regulations set forth elements that such a risk management program must include, *see id.* § 1.11(e), as well as reporting requirements related to risk management, *see id.* § 1.15.

The CFTC also requires FCMs to "establish and enforce internal rules, procedures and controls to" ensure compliance with certain trading standards. *Id.* § 155.3(a). FCMs must also "adopt and implement written policies and procedures" to ensure that they and their employees comply with CFTC regulations concerning conflicts of interest. *Id.* § 1.71(e). Finally, the CFTC imposes recordkeeping requirements on FCMs. *See id.* §§ 1.14(a), 1.18. Failure to comply with these requirements could

require the FCM to "transfer all customer accounts and immediately cease doing business as a futures commission merchant." *Id*. § 1.17(a)(4).

On March 17, 2025, Robinhood launched its prediction markets hub, through which its customers can place event contract trade orders. ER-195 ¶ 4. Robinhood, as an FCM, intermediates certain of its customers' event contract trades, including sports-related event contract trades, on Kalshi's exchange. ER-195–96 ¶ 5; ER-67 ¶ 3. This means that while Robinhood customers place orders for event contract trades in their Robinhood accounts, the *trades* themselves take place on Kalshi's CFTC-designated exchange. ER-195–96 ¶ 5.

As a CFTC-designated contract market, ER-195 ¶ 5, Kalshi offers many types of event contracts relating to a variety of areas including, as relevant here, the outcome of sporting events. Status as a CFTC-designated contract market "imposes upon [an exchange] a duty of self-regulation, subject to the Commission's oversight," requiring the exchange to "enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances." *Am. Agric. Movement, Inc. v. Board of Trade of City of Chicago*, 977 F.2d 1147, 1150-51 (7th Cir. 1992). The CFTC is

18

authorized to suspend or revoke an exchange's designation if it fails to comply with any of the provisions of the CEA or the CFTC's regulations. 7 U.S.C. § 8(b). The CFTC's comprehensive regulatory framework for DCMs is designed to ensure and protect the integrity of the markets.

An exchange such as Kalshi may submit new contracts to the CFTC for approval prior to listing; alternatively, it may self-certify the contracts as complying with CFTC requirements. 7 U.S.C. § 7a-2(c)(1), (c)(4)(A); 17 C.F.R. §§ 40.2(a), 40.3(a). Generally, the CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA or CFTC regulations. 7 U.S.C. § 7a-2(c)(5)(B). If an exchange self-certifies a new contract, the CFTC may initiate a review of that contract within 10 business days of receiving notice of it. *See id.* § 7a-2(c)(2). If the CFTC does not act within that window, the new contract is deemed approved and becomes effective. *See id.*

Kalshi self-certified that its sports-related event contracts comply with the CEA's requirements and began listing them on January 24, 2025. *See* ER-207 ¶ 29. Because the CFTC declined to review or prohibit the contracts, they were deemed approved by the CFTC, became effective and are legal under federal law.

19

### B. The Letters from the Board

On March 4, 2025, the Nevada Gaming Control Board ("Board") sent Kalshi a cease-and-desist letter threatening to prohibit Kalshi from facilitating any trading of sports-related event contracts in Nevada. *KalshiEx, LLC v. Hendrick, et al.*, No. 2:25-cv-00575-APG-BNW (D. Nev. filed Mar. 28, 2025) (hereinafter "*KalshiEx*"), ECF No. 1-2, at 2. The Board asserted that Nevada gaming laws governed these transactions. In light of the cease-and-desist letter that Kalshi received—despite maintaining that offering Kalshi's sports-related event contracts to its customers in Nevada would not violate any state laws—Robinhood stopped allowing Nevada residents to enter positions for sports-related event contracts on March 14, 2025. ER-196–97 ¶ 8.

In response to the letter, Kalshi sought declaratory and injunctive relief from the district court, arguing that Nevada's gaming laws, as applied to trading on a DCM, are preempted by the CEA's comprehensive federal framework for regulating commodity futures and swaps trading. *KalshiEx*, ECF No. 1. The district court granted Kalshi's motion for a preliminary injunction, finding that Kalshi demonstrated a likelihood of success on the merits, that it would likely suffer irreparable harm

20

without relief, and that the balance of interests favored an injunction. ER-235–47.

On May 8, 2025, the Board sent Robinhood a letter stating that it would consider Robinhood's allowing Nevada customers to trade sports-related event contracts to be a violation of Nevada law. ER-230–31. On May 6 and 19, 2025, Robinhood met with the Board and sought an agreement permitting Robinhood at least temporarily to offer its customers the same sports-related event contracts that are traded on Kalshi's exchange. ER-192 ¶¶ 3-4. The Board declined Robinhood's proposal. ER-192 ¶ 4.

In light of the district court's grant of a preliminary injunction in *KalshiEx*, and the Board's refusal to reach an agreement with Robinhood to mitigate the substantial harms Robinhood continued to suffer in the marketplace while Kalshi was permitted to trade sports-related event contracts in Nevada, Robinhood activated its Nevada customers' access to opening new positions in sports-related event contracts on August 18, 2025. ER-197 ¶ 12, ER-198–99 ¶¶ 17-20.

## III. PROCEDURAL HISTORY AND RELATED ACTIONS

On August 19, 2025, Robinhood filed the action below, seeking to enjoin the State Defendants' enforcement of preempted state gaming law against Robinhood. *See generally* ER-200–25. Robinhood moved for a preliminary injunction that same day. ECF No. 7.

On October 14, 2025, in a related case brought by a DCM known as Crypto.com, the district court denied the plaintiff's motion for a preliminary injunction. ER-63 (hereinafter "*Crypto.com*"). Contrary to its own decision six months previously in *KalshiEx*, the district court found that Crypto.com had not demonstrated a likelihood of success on the merits because the court, without the argument even being raised by Nevada, concluded that sports-related event contracts are not "swaps" as defined by the CEA. ER-48–57. On October 20, 2025, in light of the *Crypto.com* decision, Nevada moved to dissolve Kalshi's preliminary injunction. *KalshiEx*, ECF No. 142.

On November 25, 2025, the court denied Robinhood's motion for a preliminary injunction, ER-4 (the "PI Order"),[5] and dissolved the

---

[5] While the PI Order is titled "Order Denying Motion for Temporary Restraining Order," ER-4, Robinhood had previously converted its

injunction it had granted in *KalshiEx*, ER-36 (the "*KalshiEx* Dissolution Order"). In the PI Order, the district court found that "Robinhood has not met its burden of showing it is likely to succeed on the merits of its claims," and "[a]lthough Robinhood has shown serious questions on the merits, it has not met its burden to show that the balance of hardships tips sharply in its favor or that the public interest favors a [preliminary injunction]." ER-5–6. The district court referred to its reasoning in the *KalshiEx* Dissolution Order, ER-8, and the *Crypto.com* order denying a preliminary injunction, ER-37. ER-5.

The following day, Robinhood moved for an injunction pending appeal. ECF No. 92. The district court denied that motion. ER-64.

On December 12, 2025, Robinhood timely appealed the PI Order. ER-249. On December 24, 2025, Robinhood filed with this Court a motion for an injunction pending appeal. (9th Cir. ECF No. 10.)

---

motion for a temporary restraining order and preliminary injunction into a motion only for a preliminary injunction given Nevada's agreement to forbear from enforcement until the motion was heard, ER-189.

## SUMMARY OF THE ARGUMENT

The district court correctly held that *if* Robinhood's sports-related event contracts fall within the statutory definition of swaps or transactions in commodities for future delivery, Section 2 of the CEA would preempt the application of Nevada gaming laws to those contracts traded on DCMs. The court nevertheless denied Robinhood an injunction because it concluded that sports-related event contracts do not fit the statutory definitions of swaps or transactions in commodities for future delivery. That ruling was fundamentally incorrect for multiple reasons. If not reversed, it would derail Congress's stated desire for uniform, federal regulation of derivatives traded on DCMs.

I.A. **Likelihood of Success/Serious Questions:** The district court correctly concluded that if sports-related event contracts are within the definitions of Section 2 of the CEA, state law is preempted. Robinhood has demonstrated that it is likely to succeed on the merits—or, at a minimum, has raised serious questions on the merits—with respect to whether sports-related event contracts meet the CEA's definitions of "swap" and transactions in commodities (specifically, "excluded commodities") for future delivery.

24

B.  The district court erroneously ruled that the term "event" in the definition of "swap" only covers a contract addressing whether a sporting contest will take place, not the outcome of a sporting contest.  That cannot be reconciled with the accepted definition of the relevant terms or common sense and leads to absurd outcomes.  Under the district court's approach, a contract on whether Game 7 of the NBA finals will occur fits the definition of a swap but a contract on who will win Game 6 falls outside of it.

C.  The district court erred in concluding that the CFTC does not have exclusive jurisdiction over event contracts as transactions in commodities for future delivery.  Excluded commodities are a subset of commodities, and sports-related event contracts fit the statutory definition of excluded commodities.  They also are contracts for future delivery, as the cash for the intangible excluded commodity is delivered at a future date.

D.  Sports-related event contracts are "associated with a potential financial, economic, or commercial consequence," and for that reason also fall within the definition of both swaps and excluded commodities.  The

25

district court's ruling to the contrary ignores the plain meaning of the terms "associated with" and "potential."

E. To the extent there is any question as to whether sports-related event contracts are properly traded on DCMs as swaps or transactions in commodities for future delivery, that is not an appropriate issue for resolution in this action. The CFTC has approved the listing of these contracts through the self-certification process, and that final agency determination can only be challenged in an action against the CFTC under the Administrative Procedure Act. By ruling that sports-related event contracts already trading on a DCM do not fall within Section 2 of the CEA, the district court improperly permitted (and decided) a collateral attack on the CFTC's exclusive authority.

II. **Irreparable Harm and Balance of the Equities:** The balance of hardships tips sharply in Robinhood's favor. An enforcement action would cause Robinhood severe harm, including irreparable financial loss and the loss of goodwill of its customers, each of which the district court erroneously discounted. On the other hand, there is no evidence in the record to support the district court's finding that Defendants would be harmed at all. The court's finding to the contrary

26

is belied by Defendants' failure to appeal the initial preliminary injunction in the *KalshiEx* action, which was in place for six months without challenge from Defendants.

## STANDARD OF REVIEW

A plaintiff seeking a preliminary injunction must establish (1) whether the movant is "likely to succeed on the merits," (2) whether it is "likely to suffer irreparable harm" absent an injunction; (3) whether the "balance of equities tips in [its] favor," and (4) whether "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Doe v. Horne*, 115 F.4th 1083, 1098 (9th Cir. 2024). This Court "weighs these factors on a sliding scale, such that where there are only 'serious questions going to the merits'—that is, less than a 'likelihood of success' on the merits—[an] injunction may still issue so long as 'the balance of hardships tips sharply in the plaintiff's favor' and the other two factors are satisfied." *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (citing *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)).

This Court "review[s] the denial of a preliminary injunction for abuse of discretion." *Lands Council v. McNair*, 537 F.3d 981, 986 (9th

27

Cir. 2008) (en banc). Legal conclusions are reviewed *de novo* and factual findings are reviewed for clear error. *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1123 (9th Cir. 2014).

## ARGUMENT

## I. ROBINHOOD DEMONSTRATED THAT IT IS LIKELY TO SUCCEED ON THE MERITS OR HAS AT LEAST RAISED SERIOUS QUESTIONS.

### A. Section 2 of the CEA Expressly Preempts State Law With Respect to Derivatives Traded on DCMs.

In its original decision granting Kalshi a preliminary injunction, the district court held that because sports-related event contracts constitute swaps, Section 2 of the CEA preempts Nevada state law as applied to those contracts traded on DCMs. ER-233–45. It recently reaffirmed that such preemption would arise if sports-related event contracts fall within the scope of Section 2 of the CEA in *Crypto.com*, ER-53–56, and did not disturb that conclusion in *KalshiEx, see generally* ER-8–36, or in the PI Order, *see generally* ER-4–7. While the district court ultimately changed its views on whether sports-related event contracts fall within Section 2 of the CEA, its original—undisturbed—conclusion about the preemptive effects of Section 2 was correct.

The Constitution and laws of the United States "shall be the supreme Law of the Land," U.S. Const. art. VI, cl. 2, and "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Federal law can preempt state law expressly, through a statement to that effect in the statute itself, or impliedly, through either field preemption or conflict preemption. Field preemption exists where Congress manifests an intent to occupy an entire field of regulation. *See Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982).

Here, the plain text of Section 2 provides that the CFTC "shall have exclusive jurisdiction" over "all transactions involving swaps or contracts of sale of a commodity for future delivery" that are traded on DCMs. 7 U.S.C. § 2(a)(1)(A). Express provisions of this type preempt state law. *See, e.g.*, *BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 765-66 (9th Cir. 2018) (describing statute's grant of "exclusive" jurisdiction as a "broad and general" preemption provision); *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 594-95 (7th Cir. 2001) (holding that statute's "exclusive jurisdiction" provision preempts state law claims). As a result, courts have routinely held that state law "is

29

preempted" when it "would directly affect trading on or the operation of a futures market." *Am. Agric. Movement*, 977 F.2d at 1156-57.

The legislative history of the CEA and its amendments confirms that Congress's grant of "exclusive jurisdiction" to the CFTC is an express preemption of state law as applied to the entire field of contracts traded on DCMs. When Congress first passed the CEA in 1936, the drafters' "intention" was not yet "to occupy the field." H.R. Rep. No. 74-421, at 5 (1935). As futures markets grew, however, a patchwork of regulations emerged, leading exchanges to recommend that "federal policy . . . be uniform throughout the United States" and not "subject to the vagaries" of different obligations in "different jurisdictions." Hearings Before the H. Comm. on Agric., 93d Cong. 121 (1973).[6]

Congress responded in 1974 by amending the CEA to include the relevant preemptive language in Section 2 and establish the CFTC as the

---

[6] Futures contracts were criticized from the beginning because they facilitated speculative risk-taking, leading many states to condemn such contracts as "gambling in grain." *Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888); *see also* John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1, 6 (1977) (documenting states' treatment of futures trading as unlawful gambling). They were thus subject to numerous regulatory schemes before the passage of the CEA.

exclusive regulator of futures trading. Senate Hearings at 847-48; H.R. Rep. No. 93-1383, at 35-36 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897; *see also Am. Agric. Movement*, 977 F.2d at 1155-56 (setting forth legislative history of the CFTC Act of 1974).

As the Conference Committee explained:

> Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned. Therefore, if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern. In view of the broad grant of authority to the Commission to regulate the futures trading industry, the Conferees do not contemplate that there will be a need for any supplementary regulation by the States.

H.R. Rep. No. 93-1383, at 35-36, *reprinted in* 1974 U.S.C.C.A.N. at 5897. Congress centralized regulatory authority with the CFTC to avoid the "total chaos" that could ensue if 50 states attempted to regulate futures markets. Senate Hearings at 685 (statement of Sen. Clark).

Thus, as the D.C. Circuit has recognized, "the statute's legislative history repeatedly emphasizes that the CFTC's jurisdiction was 'to be exclusive with regard to the trading of futures *on organized contract markets.*'" *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590-91 (D.C. Cir. 2001) (quoting S. Rep. No. 93-1131, at 23 (1974), *reprinted in*

31

1974 U.S.C.C.A.N. 5843, 5863) (emphasis in original). Establishing the CFTC and endowing it with exclusive jurisdiction was meant to "avoid unnecessary, overlapping and duplicative regulation." *Id.* at 588 (quoting 120 Cong. Rec. 34,736 (1974) (remarks of House Agriculture Committee Chairman Poage)). Other courts have similarly observed that the "passage of 7 U.S.C. § 2 is intended to clarify 'the preemption of all other would-be regulators at every level of government.'" *Witzel v. Chartered Sys. Corp. of N.Y. Ltd.*, 490 F. Supp. 343, 347 (D. Minn. 1980) (quoting *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 219 (D. Kan. 1979)).[7]

_____

[7] Congress's intent to vest jurisdiction *exclusively* in the CFTC is further confirmed by revisions during the drafting process. After House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC. S. Rep. No. 93-1131, at 31, *reprinted in* 1974 U.S.C.C.A.N. at 5870. The language ensured that "the Commission's jurisdiction, where applicable supersedes State as well as Federal agencies." *Id.* at 23, 1974 U.S.C.C.A.N. at 5848. Moreover, Congress considered adding but ultimately removed from the bill's final language a provision that would have preserved parallel state authority over futures trading. *See* 120 Cong. Rec. 30,464 (1974) (statements of Sens. Curtis and Talmadge). Congress therefore could not have intended states to regulate futures trading in parallel with the CFTC. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) ("Few principles of

In the alternative, conflict preemption exists. As noted above, the Special Rule for event contracts vests the CFTC with the power to approve or prohibit certain event contracts, including specifically sports-related event contracts as confirmed by Senators Lincoln and Feinstein. 7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a)(1)-(2); 156 Cong. Rec. S5906-07. If the Board were also permitted to determine whether event contracts on a CFTC-regulated exchange are in the public interest, there would be a direct conflict between federal and state regulation because the CFTC has already allowed these same contracts to trade on DCMs. *See Crosby*, 530 U.S. at 380 (conflict preemption exists where state law "undermines the congressional calibration of force" and is "at odds with achievement of the federal decision about the right degree of pressure to employ"); *De la Cuesta*, 458 U.S. at 153 (conflict preemption exists where "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" and where "compliance with both federal and state regulations is a physical

---

statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.").

impossibility" (internal quotation marks omitted)). Here, the CFTC has determined to allow Kalshi's sports-related event contracts by taking no action in response to Kalshi's self-certification of those contracts, making them legal under federal law, but the Board has threatened to preclude trading of those same event contracts by enforcing Nevada gaming laws. The conflict is clear.

### B. Sports-Related Event Contracts That Turn on the Outcome of a Game Are "Swaps."

The district court found that Robinhood was unlikely to succeed on the merits of its claims, even though the court rightly acknowledged that federal law preempts state regulation of swaps traded on a DCM. ER-5. The district court reached this erroneous result by creating a novel distinction between "events" and "outcomes" and holding that "event contracts that turn on the outcomes of sporting events are not swaps and thus do not fall within the CFTC's exclusive jurisdiction." ER-12. This is contrary to the plain text of both the CEA's definition of "swap" and the Special Rule, Congressional intent, and CFTC actions that confirm there is no distinction between an event and an outcome.

**Statutory Definition of "Swap."** Statutory interpretation must begin with the plain text of the CEA. *Pac. Coast Fed'n of Fishermen's*

34

*Ass'ns v. Glaser*, 945 F.3d 1076, 1083 (9th Cir. 2019). Under the CEA, a "swap" includes "any agreement, contract, or transaction" that "provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

The district court observed that the words "event" and "occurrence" are both used in the definition of "swap" and should not be ascribed the same meaning. ER-50. But the phrase "the occurrence of an event" already gives the words different meanings. In this phrase, "occurrence" means the happening or taking place, and "event" is the thing that happens or takes place. That distinction between "occurrence" and "event," however, does not tell us what may constitute the "event" (*i.e.*, thing) that "occurs" (*i.e.*, happens or takes place). For that answer, we must turn to the definition of "event."

While the word "event" is not defined in the CEA, its ordinary definition easily encompasses outcomes. *See Transwestern Pipeline Co. v. 17.19 Acres of Prop. Located in Maricopa Cnty.*, 627 F.3d 1268, 1270 (9th Cir. 2010) (consulting dictionary definitions). As the district court

35

recognized, many dictionaries support this reading. ER-49 n.5. Although one dictionary notes that "outcome" is an archaic definition of "event," ER-51 (citing *Event*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003)), other dictionaries include "outcome" as a contemporary meaning of "event." *See, e.g., Event,* Webster's II New College Dictionary (3d ed. 2005) ("[t]he actual outcome or final result"); *Event*, Random House Webster's Unabridged Dictionary (2d ed. 2001) (defining event to include "the *outcome*, issue or result of anything") (emphasis added). Various courts have thus recognized that "event" means "the outcome or consequence of anything." *See Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.*, 26 F.3d 1508, 1514-15 (10th Cir. 1994); *see also, e.g., Prysmian Cables & Sys. USA LLC v. ADT Com. LLC*, 665 F. Supp. 3d 236, 246 (D. Conn. 2023).

Embracing the common definition of the word "event" to include outcomes does not create a textual overlap, because the word "outcome" is not used elsewhere in the definition of a swap. Rather, by defining "event" *not* to include outcomes, the district court created thorny, perhaps unsolvable, semantic problems, which would force courts, DCMs and the CFTC itself to engage in esoteric philosophical and linguistic debates

36

about whether an event contract references a happening or an outcome of a happening.

Consider the Federal Reserve Board's recent decision to lower interest rates. *See* Federal Reserve Board, *Federal Reserve Issues FOMC Statement* (Dec. 10, 2025), https://www.federalreserve.gov/newsevents/pressreleases/monetary20251210a.htm. Is the Fed's decision to lower interest rates itself an "event" (a thing that happens) or is the lowered interest rate the "outcome" of the Fed's meeting (where the meeting is the event that happens)? Any distinction between these understandings is purely semantic—there is no principled way to distinguish them.

Or consider political elections. Event contracts referencing elections have long been understood to be covered by the CEA and subject to CFTC oversight, yet Nevada now takes the position they are covered by its state gaming laws. *See, e.g.*, Withdrawal of CFTC Letter No. 14-130, CFTC Letter No. 22-08, 2022 WL 3210641 (Aug. 4, 2022) (referencing CFTC no-action letter for offering "binary option contracts concerning political election *outcomes*" (emphasis added)). Who wins a political election is undoubtedly an event associated with great "financial, economic, or commercial consequences." 7 U.S.C.

§ 1a(47)(A)(ii); *see KalshiEx LLC v. CFTC*, 2024 WL 4164694, at \*2.  And

yet, if the district court's interpretation of the word "event" were correct,

whether contracts referencing election results are swaps properly traded

on DCMs would be uncertain.  If Candidate A wins an election, is that

the outcome of the "event" (the election), or is it in itself an "event" that

occurs?[8]

Nor are sports-related event contracts any easier to categorize

under the district court's interpretation.  Consider event contracts

related to a best-of-seven basketball playoff series where Team X trails

three games to one and faces elimination in Game 5.  If the court below

is correct, an event contract framed as "Will Team X beat Team Y in

Game 5?" would be subject to state gaming laws because it turns on the

outcome of the game.  By contrast, an event contract framed as "Will

---

[8] As another example, credit default swaps are listed in the definition of "swap" in 7 U.S.C. § 1a(47)(A)(iii).  *See* ER-52.  A credit default swap is like a sporting event in that there is a date on which something will happen (a game; a mortgage payment coming due).  In both instances, the possible outcomes of that event are binary and known in advance (win or loss; payment or nonpayment).  In both instances, the event may not happen at all (the game is rained out; the parties agree on a modification of the payment schedule).  Is a credit default swap a contract that references an event (a default) or an outcome (payment or non-payment)?

there be a Game 6?" would relate to the occurrence of an event and therefore be subject to the CFTC's exclusive jurisdiction, for which state law would be preempted. The contracts are substantively indistinguishable (each turns on whether Team X wins Game 5), highlighting how the district court's approach elevates semantics over substance.

Congress could not have intended to let financial regulation turn on such theoretical debates about what a swap is; indeed, the very breadth of the "swap" definition suggests that the opposite is the case. Congress intended the definition of "swap" to cover the waterfront of potential financial products, bringing them all under federal regulatory oversight. This is especially clear given the context of the Dodd-Frank Act of 2010. As the district court recognized, Dodd-Frank was a direct response to the 2008 financial crisis, and Congress intended to bring unregulated derivatives transactions that contributed to that crisis under federal regulation. ER-22. The definition of "swap" was thus designed to sweep broadly to bring derivatives transactions that may require federal oversight within the CFTC's exclusive jurisdiction. *Id*. Should that result in too broad a reach, there is an escape hatch: the CFTC may

39

exempt any agreement, contract, or transaction from the requirement that it be executed on a DCM. 7 U.S.C. § 6(c)(1).

The district court's concern that the proper reading of the CEA proposed by Robinhood would render superfluous the list of swaps specifically identified by Congress in Section 1a(47)(A)(iii) is misplaced. ER-52–53. To be sure, most—if not all—of the specific swaps listed in that subsection would satisfy the more general test set forth in the prior subsection, although that is equally true under the district court's reading. Nevertheless, Congress determined that a contract-by-contract review of the types of contracts enumerated in subsection (iii) to determine whether they met the criteria of subsection (ii) would be unnecessary. The mere fact that many of the enumerated swaps would satisfy multiple subsections in the definition does not itself render any of those subsections superfluous.[9] *See Loving v. IRS*, 742 F.3d 1013, 1019 (D.C. Cir. 2014) (Kavanaugh, J.). Again, Congress's concern in the Dodd-

---

[9] Even if the district court were right about how the subsections of the definition of "swap" work together—and it was not—this argument would have no bearing on whether sports-related event contracts are contracts in excluded commodities (*see infra* Argument Section I.C) because the definition of "excluded commodity" does not have the same subsections. 7 U.S.C. § 1a(19)(iv).

40

Frank Act was to ensure that federal regulation would encompass all of these financial products. *See* 156 Cong. Rec. S5906-07.

**The Statutory Special Rule.** The definition of "swap" should not be interpreted in isolation, but rather "must [be] construe[d] in light of the rest of the [CEA]." *Tulelake Irrigation Dist. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 930, 936 (9th Cir. 2022); *see also In re Davis*, 146 F.4th 710, 721 (9th Cir. 2025) (construing the statute "to fit, if possible, all parts into a harmonious whole" (internal quotation omitted)). Here, the Special Rule, 7 U.S.C. § 7a-2(c)(5)(C), is particularly instructive because it is the second step in a two-step analysis and therefore sheds light on how to construe the first step (the definition of "swap").

The structure of the Special Rule confirms that event contracts that relate to "outcomes," including sports-related outcomes, fall within the CFTC's jurisdiction. The Special Rule directly addresses event contracts and allows the CFTC to prohibit event contracts involving any of six enumerated categories if the CFTC finds that they are "contrary to the public interest." *Id.* But the CFTC can exercise that authority only as to listings by a DCM of "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an

41

occurrence or contingency." *Id.* In other words, a proposed DCM listing must be an event contract in the first step for the CFTC, at the second step, to have the authority to determine that the event contract would be contrary to the public interest. If the district court's ruling that outcomes of sporting events do not fall within the meaning of "event" were correct, the Special Rule would lack the obvious scope that Congress intended. *See* 156 Cong. Rec. S5906 (statement of Sen. Lincoln, in response to a question from Sen. Feinstein, of intent "to define 'public interest' broadly").

The legislative history of the Dodd-Frank Act underscores that Congress intended for both the Special Rule, and thus the CFTC's exclusive jurisdiction, to cover event contracts that turn on the outcome of sporting events. Senator Lincoln, an author of the relevant section who was speaking for herself and co-sponsor Senator Dodd, stated that the Special Rule "will strengthen the government's ability to protect the public interest from *gaming contracts and other events contracts.*" *Id.* at S5906 (emphasis added). Specifically, Senator Lincoln described the intent of the Special Rule as follows:

42

> The Commission needs the power to, and should, prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed 'event contracts." It would be quite easy to construct an "event contract" around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament. These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.

*Id.* at S5906-07. Congress was thus clearly focused on the possibility that the trading of event contracts based on the outcomes of sporting events could resemble gambling and raise public interest concerns and vested the CFTC with the authority to make that public interest determination through the Special Rule. However, for such contracts to fall within the Special Rule, they first must fall within the CFTC's jurisdiction as swaps or transactions in commodities for future delivery. Congress clearly contemplated that they did so.

Another enumerated category also highlights how the district court's interpretation would narrow what Congress intended to be broad: "war." 7 U.S.C. § 7a-2(c)(5)(C)(i)(IV). It is inconsistent with Congress's intent "to define 'public interest' broadly," *see* 156 Cong. Rec. S5906 (statement of Sen. Lincoln), if, under the Special Rule, the CFTC could only bar contracts on whether Russia would invade Ukraine, but not at

43

the same time bar contracts on which country will win the war. *See* 156 Cong. Rec. S5907 (statement of Sen. Lincoln that an event contract concerning "war" would be "contrary to the public interest"). Such a result would be contrary to the statutory structure as a whole. *See Tulelake*, 40 F.4th at 936; *Davis*, 146 F.4th at 721.

**CFTC Actions.** The CFTC's rulemaking history further confirms that the reading of the word "event" to include outcomes is the correct one. The CFTC has long recognized that event contracts are regulated derivatives and that "[a] significant number of event contracts" are structured to "pay out when an ***outcome*** either occurs or does not occur." CFTC, *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25,669, 25,670-71 (May 7, 2008) (emphasis added). In 2008, two years before Congress amended the CEA in the Dodd-Frank Act to include the term "swap," the CFTC noted that event contracts already came within its regulatory authority as options or futures in "excluded commodities." *Id.* at 25,670. In particular, the CFTC noted that event contracts "can be designed to exhibit the attributes of either options or futures contracts." *Id.* For example, in the case of options, the CFTC recognized that a "significant number of event

44

contracts are structured as all-or-nothing binary transactions commonly described as binary options." *Id.* Binary options (yes/no contracts) assign probabilities to discrete eventualities through market-derived prices and, as the CFTC stated, "typically pay out a fixed amount when an ***outcome*** either occurs or does not occur." *Id.* (emphasis added).

Similarly, in a proposed 2024 rulemaking, the CFTC stated that "event contracts are generally understood to be a type of derivative contract, typically with a binary payoff structure, based on the ***outcome*** of an underlying occurrence or event." CFTC, *Event Contracts*, 89 Fed. Reg. 48,968, 48,969 (June 10, 2024) (emphasis added). As part of that proposed rulemaking, the CFTC proposed to ban under the Special Rule all sports-related event contracts based on "*the outcome of . . . a sporting event.*" *Id.* at 48,975 (emphasis added). It is hard to envision a more direct confirmation of the CFTC's understanding—consistent with Congressional intent—that event contracts turning on the outcome of sporting events are "swaps" and "transactions in excluded commodities." Otherwise, they would not fall within the purview of the Special Rule at all.

Finally, it is not the case—as the district court posited (ER-53–54; ER-24–25)—that if sports-related event contracts on DCMs are swaps, a sports bet taken by a licensed Nevada sportsbook is likewise a swap, and any licensed sportsbook would therefore be in violation of the CEA for offering swaps off a CFTC-designated exchange. First, 7 U.S.C. § 16(e)(1)(B)(ii) confirms that the CEA does not displace states' regulatory authority with respect to transactions that are not conducted on DCMs, as bets at sportsbooks are not. The purpose of the CEA is to create "a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the [CFTC]." 7 U.S.C. § 5(b). The products the CEA covers are thus *tradeable* products. *See* CFTC, *Further Definition of "Swap,"* 77 Fed. Reg. 48,208, 48,217, 48,248 (Aug. 13, 2012) (describing swaps as instruments "*traded* on organized markets and over the counter" (emphasis added) and distinguishing swaps from insurance products and consumer/commercial arrangements on the basis that the latter are not traded). Sports bets are not tradeable at all and are not traded on DCMs.

Second, the CFTC has found that the definition of "swap" should not be construed to include arrangements that "historically have not been

46

considered swaps." 77 Fed. Reg. at 48,246. Robinhood is not arguing, and it is not plausible that anyone in the industry believes, that sports bets are swaps. Neither the district court nor Defendants identified any CFTC enforcement actions arising from bets taken at a sportsbook or any statement by the CFTC suggesting it would view bets taken at a sportsbook as within its regulatory authority.

## C. Sports-Related Event Contracts Are Also Transactions in "Excluded Commodities."

Sports-related event contracts traded on DCMs also fall within the CFTC's exclusive jurisdiction for a second reason (regardless of whether they are "swaps"); they are transactions in "excluded commodities." The district court erred in holding otherwise. ER-27–31.

The term "excluded commodity" is defined to include event contracts. *See* 7 U.S.C. § 1a(19)(iv) ("The term 'excluded commodity' means . . . an occurrence, extent of occurrence, or contingency . . . that is (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence."). "[E]xcluded commodities" are "'commodities' under the" CEA, *United States v. Wilkinson*, 986 F.3d 740, 745 (7th Cir. 2021); *see also* 7 U.S.C. § 1a(20) (defining "exempt commodity" as "a

47

commodity that is not an excluded commodity or an agricultural commodity"), and thus subject to the exclusive jurisdiction provision of Section 2(a)(1)(A).

The district court's purported distinction between events and outcomes, based on the phrase "occurrence of an event" in the CEA's definition of "swap," cannot apply to excluded commodities. Although "swaps" involve "the occurrence, nonoccurrence, or the extent of the occurrence of *an event* or *contingency*," *id.* § 1a(47)(A)(ii) (emphases added), transactions in an "excluded commodity" only involve "an *occurrence*, extent of an *occurrence*, or *contingency*," *id.* § 1a(19)(iv) (emphases added). The subjects of sports-related event contracts (such as whether the 49ers win the Super Bowl) easily qualify as "occurrences," *id.* § 1a(19)(iv), and for the reasons described below, the subjects of sports-related event contracts are also contingencies. Because the word "event" does not appear in the definition of "excluded commodity," any purported distinction between events and outcomes cannot limit its meaning. *See Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019).

Moreover, in the definition of "excluded commodity," the word "contingency" does not modify—and is not modified by—"occurrence,"

48

and because Congress used "or," a "contingency" can be an "excluded commodity" even if it is not an "occurrence." 7 U.S.C. § 1a(19)(iv); *see also* ER-51 n.9. Notably, in deciding that Kalshi's event contracts on election outcomes could not be prohibited under the Special Rule, the D.C. district court held that "[e]vent contracts are subject to regulation under the CEA as 'excluded commodities', and thus by the CFTC." *KalshiEx LLC v. CFTC*, 2024 WL 4164694, at *2.

The language of the Special Rule provides further confirmation that sports-related event contracts are contracts in excluded commodities. This provision, entitled a "[s]pecial rule for review and approval of event contracts," concerns "agreements, contracts, transactions, or swaps in excluded commodities," so an event contract must qualify as one of these. 7 U.S.C. § 7a-2(c)(5)(C)(i). If sports-related event contracts did not meet the definition of "excluded commodity," then they would not be covered by the Special Rule that allows the CFTC to review them with respect to the public interest, as Congress clearly intended. *Id*; *see also* 156 Cong. Rec. S5906 (statement of Sen. Lincoln, in response to a question from Sen. Feinstein, of intent "to define 'public interest' broadly").

49

The district court's conclusion that contracts involving excluded commodities are not subject to the CFTC's exclusive jurisdiction because they cannot be "delivered" is also wrong. ER-30–31. The CEA speaks of "future delivery," 7 U.S.C. § 2(a)(1)(A), but the concept of "future delivery" excludes only deferred commercial shipment, *id.* § 1a(27), and it has long been accepted that cash settlement qualifies as a form of future delivery. *CFTC v. Erskine*, 512 F.3d 309, 320 (6th Cir. 2008) (citing *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 542 (7th Cir. 1989)).

Indeed, many commodity futures subject to the CFTC's exclusive jurisdiction are based on an intangible commodity that cannot be physically delivered, or are based on physical commodities but nevertheless only cash settled. The district court's reasoning would mean that each state could regulate any futures contracts in excluded commodities or that are only cash settled.

### D. Sports-Related Event Contracts Are "Associated with a Potential Financial, Economic, or Commercial Consequence."

The district court erred in holding that the events that underlie Robinhood's sports-related event contracts are not "associated with a financial, economic, or commercial consequence," as required by the

statutory definitions of both swaps and excluded commodities. ER-18–23.[10]

As discussed above, Congress plainly understood sports-related event contracts to fall within the Special Rule, and by extension, recognized that they are "associated with financial, economic or commercial consequence[s]." (*See supra*, Statement of the Case Section I.C.) This makes obvious sense. Results of sporting events, such as the NBA Championship, unquestionably have potential (and actual) financial, economic and commercial consequences for the teams, the owners or the schools they represent, their communities, the television networks that cover the matches, and other stakeholders. For example, for a sports apparel company, merchandise demand will fluctuate based on playoff results and thus the occurrence or nonoccurrence of an event or contingency (whether a team makes the playoffs or wins the championship) will have tangible, direct financial consequences. The apparel company might then enter into an event contract tied to a particular team making the playoffs to hedge that exposure.

---

[10] 7 U.S.C. § 1a(47)(A)(ii); *see id.* § 1a(19)(iv).

The sports-related events that underlie sports-related event contracts are thus directly "associated with," that is, "related to," or "connect[ed]" to financial, economic, or commercial consequences. *Associated*, Merriam-Webster, https.//www.merriam-webster.com/ dictionary/associated (defining "associated" as "related, connected, or combined together"); *Associated*, Oxford Dictionary of English (3d ed. 2010) (defining "[a]ssociated" as "connected with something else"). The phrase "associated with" does not compel a more heightened degree of relation than what is embraced by its plain meaning. *See Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 556-57 (9th Cir. 2016).

The district court incorrectly held that the financial, economic or commercial consequence must be "*inherently* associated with" the underlying event, ER-25 (emphasis added), "without looking at externalities like potential downstream financial consequences." ER-19–20. This cannot be squared with the plain text of the statute. The word "inherent" appears nowhere in relevant provisions of the CEA, and certainly does not modify "associated with," which *does* appear in the statute. The plain and unambiguous definition of swap requires only that the underlying event be "associated with" a "potential financial,

52

economic, or commercial consequence," 7 U.S.C. § 1a(47)(A)(ii). The same is true for the definition of an "excluded commodity" (minus the word potential). *Id.* § 1a(19)(iv). Neither definition requires an *inherent* association or connection with financial, economic or commercial consequence. If a characteristic is "inherent," it is "permanent and inseparable" from that thing. *Inherent*, Random House Webster's Unabridged Dictionary (2d ed. 2001). By contrast, as noted above, the definition of the word "associated"—which Congress actually used—requires only a connection or relation.[11]

Further, the Special Rule explicitly contemplates that the events underlying event contracts can include "terrorism," "assassination" and "war," which also are not "inherently joined or connected" with financial, economic or commercial consequences. 7 U.S.C. § 7a-2(c)(5)(C)(i); ER-19. In short, the district court's approach improperly "rewrit[es] rules that Congress has affirmatively and specifically enacted." *Lamie v. U.S. Tr.*, 540 U.S. 526, 538 (2004) (quoting *Mobil Oil Corp. v. Higginbotham*,

---

[11] Requiring an "inherent" connection is also directly inconsistent with the fact that the definition of a swap requires only an association with a "potential" financial consequence.

436 U.S. 618, 625 (1978)); *see also id.* ("Our unwillingness to soften the import of Congress' chosen words even if we believe the words lead to a harsh outcome is longstanding."); *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020).

The district court also misapplied the CFTC's guidance on the definition of a swap in trying to draw support for its interpretation. ER-22–23. The district court began by analyzing *sports wagers* under the 2012 rulemaking, not event contracts. By assuming the conclusion, the district court naturally found that sports wagers are not swaps—a finding that belies the district court's concern elsewhere that sports wagers might be treated as swaps. *See* ER-53.

In fact, numerous other CFTC statements make it clear that event contracts based on the outcome of elections or sporting events necessarily meet the requirement of a "financial, economic, or commercial consequence." Under the district court's test, elections are not "inherently joined or connected" with a potential financial, economic or commercial consequence. Yet in the litigation over event contracts based on election outcomes, the CFTC told the D.C. Circuit that "Kalshi's event contacts" "fall within the definition of swap." Appellant's Br. at 12 &

n.11, *KalshiEx LLC v. CFTC*, 119 F.4th 58 (No. 24-5205), 2024 WL 4512583 (D.C. Cir. Filed Oct. 16, 2024), at *12 & n.11.

The same is true for the outcome of sporting events. As the CFTC has observed, "hotels and other businesses around the World Series could attest" to the economic consequences of sporting events. *Id.* at 48. Moreover, in its 2024 proposed rulemaking, the CFTC proposed to define "gaming" for purposes of the Special Rule to include "the outcome of a game in which one or more athletes compete." 89 Fed. Reg. at 48,975. Thus, contrary to the district court's reasoning, the CFTC has repeatedly staked out the position that sports-related event contracts have "financial, economic, or commercial consequence[s]."

For the reasons set forth above, Robinhood has demonstrated that sports-related event contracts fall within the definitions of "swaps" and transactions in excluded commodities. The district court's original decision granting a preliminary injunction to Kalshi in April 2025 must therefore stand, and Robinhood has a likelihood of success on the merits (or at least has raised serious questions).

**E. The District Court's Ruling Constituted an Impermissible Collateral Attack on the CFTC's Exclusive Jurisdiction.**

The district court's decision suffers from an additional flaw: by analyzing whether sports-related event contracts trading on a DCM are swaps or transactions in excluded commodities, the district court improperly permitted (and then decided) a collateral attack on the CFTC's decision to allow those contracts to trade on the regulated exchanges over which it has exclusive jurisdiction. While the district court relied on the adage that it is the province of the judiciary to "say what the law is," (ER-47 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)), the court ignored this Court's admonition that parties cannot "use a collateral proceeding to end-run the procedural requirements governing appeals of administrative decisions." *Big Lagoon Rancheria v. California*, 789 F.3d 947, 953 (9th Cir. 2015) (en banc) (internal quotation omitted).

In *Big Lagoon*, this Court denied California's attempt to collaterally attack a decision by the Bureau of Indian Affairs ("BIA"), where the State necessarily advanced an argument that "the BIA exceeded its authority when it took the eleven-acre parcel into trust." *Id*. Because the State's

56

argument amounted to an implicit challenge to the BIA's decision, the Court noted that "[t]he proper vehicle to make such a challenge is a petition for review pursuant to the APA." *Id.* (citing cases). However, the State had neither brought an APA claim nor joined the proper federal agencies or officials. *Id.* at 954 (citing 5 U.S.C. §§ 702, 703).

Here, the relevant agency decision is the CFTC's determination—under the self-certification rules—to allow the event contracts at issue to trade on Kalshi's DCM. Congress has directed that the CFTC "***shall*** approve a new contract . . . unless the [CFTC] finds that the new contract . . . would violate [the CEA or CFTC's regulations]." 7 U.S.C. § 7a-2(c)(5)(B) (emphasis added). As discussed above, *see supra* Statement of the Case Section II.A, a DCM may list for trading or accept for clearing new event contracts through the Congressionally designed self-certification process. The DCM can then list the new contract for trading 10 business days later, unless the CFTC notifies the DCM that it requires additional time to analyze the new contract. *Id.* § 7a-2(c)(2). Once the 10-day period expires, the contract and the associated rules are "deemed certified." 17 C.F.R. § 40.6(b)(1).

The district court incorrectly held that this process does not reflect final agency action. ER-14–16. This was incorrect. The APA explicitly defines agency action to include the "failure to act." 5 U.S.C. § 551(13); *see also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). The relevant standard in determining whether an agency action is final is whether: (1) "the action . . . mark[s] the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature"; and (2) "the action [is] one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). Here, millions of event contracts have been traded on DCMs specifically because the CFTC permitted their listing. Those contracts entailed legal consequences for each of the counterparties—as well as Robinhood as an FCM and Kalshi as a DCM. Many of these contracts (*e.g.*, for games that have been played) have closed and settled. There could be no more final an action than the CFTC's decision not to object to these contracts and thereby allow them to be traded and, in millions of instances, close.

The district court's citation to a recently issued CFTC Staff Advisory to bolster its decision that there has not been sufficient agency action to be deemed final was misplaced. ER-14. In fact, this CFTC letter undermines the court's finding. CFTC Letter No. 25-36, 2025 WL 2817302 (Sept. 30, 2025) (hereinafter, "CFTC Letter"). In that letter, the CFTC reminds its regulated entities that it has not made a public interest determination under the Special Rule with respect to sports-related event contracts (thus reaffirming it has exclusive jurisdiction to do so). CFTC Letter at 2 n.4. But whether these contracts should be— or will be—prohibited by the CFTC as contrary to the public interest has no bearing upon whether they are otherwise properly traded on a DCM as swaps or transactions in commodities for future delivery. Instead, the letter *confirms* that the CFTC is aware that it has deemed these contracts as certified for trading on the DCMs over which it has exclusive jurisdiction by not objecting to the self-certifications. Stated differently, the letter confirms that the CFTC has allowed millions of these contracts to trade as swaps or transactions in excluded commodities—a necessary precondition before the CFTC could ever make a decision as to whether

59

any of them should be prohibited under the Special Rule as against the public interest.

In sum, Congress has expressly delegated exclusive authority to the CFTC to regulate DCMs and the contracts that are listed for trading on them. The CFTC has exercised that authority, has chosen not to object to the contracts at issue here, and is actively engaged in oversight and regulation of the sports-related event contracts at issue in this case. If Nevada—or any other government or private actor—wants to challenge the CFTC's decision to permit these contracts to trade on its regulated exchanges, they can and must bring a direct challenge to that decision under the APA. They cannot collaterally attack the decision by threatening enforcement of state law against federally regulated entities. *Big Lagoon*, 789 F.3d at 953. The district court's role was thus limited to determining whether the CEA preempts state law, not second-guessing the CFTC's decision to permit event contracts to trade on DCMs.

## II.  ROBINHOOD DEMONSTRATED THAT IT WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION.

Robinhood is suffering—and will continue to suffer—irreparable harm absent an injunction.

"A credible threat of imminent prosecution for a state violation that conflicts with federal law can establish a likelihood of irreparable harm." ER-246; *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("When enforcement actions are imminent . . . there is no adequate remedy at law."). Indeed, because of the severe harm an enforcement action would cause, Robinhood reluctantly agreed (following the denial of its preliminary injunction motion) to suspend listing new sports-related event contracts in Nevada beginning on December 1, 2025. ER-69–71. Robinhood also agreed that if this Court denies Robinhood's motion for injunction pending appeal (9th Cir. ECF No. 10), Robinhood will unwind all open sports-related event contracts for Nevada residents. ER-69–71.

These actions, however, have now exposed Robinhood to new irreparable harms. For example, suspending the listing of new contracts is resulting in Robinhood losing out on trades on which it would make money. While the court below discounted this harm as "largely monetary," ER-6, the loss of business is irreparable where—as here— sovereign immunity bars a damages suit. *See, e.g.*, *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015); *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660 (2025) (per curiam) (although

61

"the loss of money is not typically considered irreparable harm, that changes if the funds cannot be recouped"). The district court's statement that Robinhood could avoid harm by using geofencing is also puzzling. ER-6. Geofencing would, at most, reduce Robinhood's financial harm by limiting the lost business to trading physically occurring in Nevada.

Preventing Nevada customers from opening sports-related event contract positions is also undermining customers' confidence in Robinhood, ER-197–98 ¶¶ 15-16, causing additional irreparable harm. *See Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*, 601 F. App'x 469, 474 (9th Cir. 2015). Robinhood stands to lose the goodwill of its customers, including over 16,000 customers in Nevada who have entered into millions of sports-related event contracts. ER-67 ¶¶ 4-5; ER-196 ¶ 18. Once lost, this goodwill cannot easily or quickly be regained. *See Life Alert*, 601 F. App'x at 474 (citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001)) (granting preliminary injunction due to "the threat to [business's] reputation and goodwill," which "is not readily compensable").

Although the court below did not dispute that these harms to Robinhood and its customers exist, it largely discounted their

significance based on its erroneous conclusion that such harms were purportedly self-inflicted because Robinhood had offered trading in sports-related event contracts with uncertain legal status. ER-6. This ignores, however, that Robinhood began offering sports-related event contracts to Nevada customers only *after* the district court preliminarily enjoined Nevada from enforcing gaming laws against Kalshi and *after* Nevada's decision *not to appeal* that ruling. ER-197 ¶¶ 11-12; ER-232–48. In other words, Robinhood offered sports-related event contracts in direct reliance on the district court's first ruling, and every Nevada customer with an open contract opened that contract after the court's prior decision. Courts "permit private parties to rely on judicial pronouncements of what the law is, without exposing themselves to potential liability for doing so." *Danielson v. Inslee*, 945 F.3d 1096, 1099 (9th Cir. 2019); *see also Bowles v. Russell*, 551 U.S. 205, 220 n.7 (2007) (Souter, J., dissenting) ("As a member of the Federal Judiciary, I cannot help but think that reliance on our orders is reasonable."). While Robinhood acknowledges that the original preliminary injunction decision was not a final decision on the merits, the existence of that ruling

63

directly undermines the reasonableness of the court's decision to discount Robinhood's harm as "self-inflicted."

## III. ROBINHOOD DEMONSTRATED THAT THE BALANCE OF HARDSHIPS TIPS SHARPLY IN ITS FAVOR AND THAT AN INJUNCTION IS IN THE PUBLIC INTEREST.

Whether the Court concludes that Robinhood is likely to succeed on the merits or that it has raised serious questions on the merits, the balance of hardships tips sharply in Robinhood's favor. The clear harm Robinhood will suffer (and is currently suffering) absent interim relief stands in stark contrast to the lack of any cognizable harm to Defendants.

*First*, any claim that Nevada will be harmed by maintaining the status quo that has existed since the district court granted Kalshi the now-dissolved injunction in April 2025 cannot be reconciled with Nevada's decision not to appeal that initial preliminary injunction. *Cf. Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (months-long delay to seek injunctive relief undercut claim of irreparable harm); *L ALD LLC v. Gray*, No. 24-CV-02195-GPC-MSB, 2025 WL 319247, at \*11 (S.D. Cal. Jan. 28, 2025) (finding delay in enforcing rights "demonstrates that there is a lack of irreparable harm") (citing *Miller v. California Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993)). The district court did not address

64

Defendants' clear strategic decision not to appeal its initial order notwithstanding their now-purported irreparable harm.

Defendants contend that "[a] delay in seeking judicial protection does not negate an irreparable injury," (9th Cir. ECF No. 13 at 21), but the only case they cite in support, *ARC of California v. Douglas*, 757 F.3d 975 (9th Cir. 2014), is inapposite. In that case, the alleged injuries resulted from "various cuts in compensation enacted over a period of time and having a cumulative impact" and therefore the "magnitude of the potential harm bec[ame] apparent gradually." *Id.* at 990-91. This Court therefore found that the plaintiff's decision to wait until three months after the most recent provision was passed to move for a preliminary injunction was not particularly probative. *Id.* at 990. Here, however, Defendants cannot credibly contend that the magnitude of their harm was not apparent until they filed their motion to dissolve the preliminary injunction—nor have they offered any evidence that that is the case. Defendants were happy to live with the status quo following the court's initial order in April, so any claim of irreparable harm should Nevada be enjoined from enforcing preempted state law rings hollow.

65

*Second*, Defendants contend that "[a] State suffers a form of irreparable injury any time it is enjoined by a court from effectuating statutes." (9th Cir. ECF No. 13 at 19 (internal quotations and alterations omitted).) But if this were enough to tip the scales in Defendants' favor, courts would never issue injunctions where, as here, a plaintiff brings a preemption challenge to state law. That obviously is not the law. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) ("[I]f an individual claims federal law immunizes him from state regulation the court may issue an injunction upon finding the state regulatory actions preempted."). Defendants rely on *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), but that case is inapposite. There, "[t]he question before [the Supreme Court] [was] whether the Government is likely to suffer irreparable harm from the District Courts' entry of injunctions that likely exceed the authority conferred by the Judiciary Act." *Id.* at 860. Here, an injunction prohibiting the application of preempted state law is plainly within this Court's (and the district court's) authority.

*Third*, the court cited "the interests of the gaming industry in this state," but assumed—without evidence—that those interests would be harmed by the trading of sports-related event contracts during this

appeal. ER-34–35. It was an assumption because neither Nevada nor amici offered any evidence below that any such harm has actually occurred. Perhaps that is because there is no such evidence; the only evidence in the record below was submitted by Robinhood and shows the absence of harm. Specifically, the Board's Gaming Revenue Reports demonstrate that the Nevada gaming industry is thriving. In August, the win revenue statewide of all reporting licensees for table, counter and card games; slot machines; race book parimutuel betting; and sports betting was $1.29 billion.[12] That same figure for September—after Robinhood launched sports-related event contract trading for its Nevada customers on August 19—increased to $1.36 billion.[13] In October, it rose again to $1.45 billion.[14] In any event, the Nevada legislature recently

---

[12] Nevada Gaming Control Board, Monthly Revenue Report (Aug. 2025),
https://www.gaming.nv.gov/contentassets/a7958398526e4e309d248ea35a2a20dd/august-2025-monthly-revenue-report.pdf.

[13] Nevada Gaming Control Board, Monthly Revenue Report (Sept. 2025),
https://www.gaming.nv.gov/contentassets/a7958398526e4e309d248ea35a2a20dd/september-2025-monthly-revenue-report.pdf.

[14] Nevada Gaming Control Board, Monthly Revenue Report (Oct. 2025),

enacted a statute that permits the State to seek disgorgement of profits from transactions in violation of Nevada gambling laws. *See* Nev. Rev. Stat. § 463.360(3), as amended by S.B. 256, 83rd Sess. (Nev. 2025). Thus, Defendants' purported monetary harm is *reparable* to the extent that statute is enforceable, and the district court's conclusion that this alleged harm outweighed Robinhood's *irreparable* monetary harm was in error.

*Fourth*, the district court reasoned that harm to the Nevada economy and lost tax revenue are hardships weighing in Defendants' favor. *See* ER-34–35. There is no evidence in the record that the availability of sports-related event contracts in Nevada has had any impact on sports wagering at Nevada casinos or resulted in lost tax revenue. Thus, this alleged harm is entitled to no weight. *See OG Int'l, Ltd. v. Ubisoft Ent.*, No. C 11-04980 CRB, 2011 WL 5079552, at *11 (N.D. Cal. Oct. 26, 2011) ("Given the speculative nature of [the defendant's] alleged harms, the Court finds that the balance does not [tip] sharply in [the defendant's] favor."). Nevada has also made clear that it is not

---

https://www.gaming.nv.gov/siteassets/content/about/gamingrevenue/2025oct-gri.pdf.

interested in allowing Robinhood to operate as a licensed entity in the state such that it could collect additional tax revenues.[15]

*Fifth*, the district court relied on DraftKings's and FanDuel's decisions no longer to seek licensure in Nevada and focus instead on launching prediction markets elsewhere. ER-35. As an initial matter, the facts surrounding DraftKings's and FanDuel's decisions were not briefed to the court and there was no evidence about these decisions in the record prior to the court's decision to deny the preliminary injunction. This issue was raised for the first time—by the court—at oral argument. ER-131:20–132:6. The true reason those entities abandoned Nevada licensure is regulatory overreach, not harm from sports-related events contract trading within Nevada. Specifically, the Board made clear to DraftKings and FanDuel that it would not grant them Nevada licenses

---

[15] *See* Nevada Gaming Control Board, Notice No. 2025-77, Sports Event Contracts Are Wagers (Oct. 15, 2025), https://www.gaming.nv.gov/contentassets/7568a04a6f774450a186ee4e2 8e1d614/notice-to-licensees-2025-77-10-15-25-.pdf (threatening licensees' licenses if they choose to offer sports-related event contract trading in Nevada or to partner with an entity offering such trading).

69

because of their sports-related event contract activities *elsewhere*.[16] It was only then that DraftKings and FanDuel decided not to seek licensure. In other words, Nevada began conditioning Nevada gaming licenses on whether companies offer federally regulated event contracts *anywhere*. This has nothing to do with Robinhood's offering of sports-related event contracts.

*Sixth*, the district court found that allowing Nevada to enforce its laws against FCMs and DCMs would further Nevada's interest in maintaining public trust in the gaming industry. ER-33. The court did not consider, however, that traditional derivatives contracts were at one time derided as nothing more than "gambling in grain" and were regulated by the states. *Cothran*, 16 N.E. at 647. Congress preempted such regulations more than 50 years ago with the CEA, and has allowed this "gambling" to occur on DCMs without regard to any state regulations ever since. The court thus erred by finding that Nevada's interest in

---

[16] *See* Nevada Gaming Control Board, Notice No. 2025-100, KalshiEx and Robinhood Update (Nov. 25, 2025), https://www.gaming.nv.gov/siteassets/content/about/industrynotices/2025-100.pdf (threatening discipline for entities engaging in or partnering with entities engaging in sports-related event contracts in other states).

regulation should be weighed heavily but the interest in maintaining Congress's chosen regulatory scheme should be discounted entirely.

*Seventh*, preventing violation of the Supremacy Clause is in the public interest. *See, e.g.*, *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059-60 (9th Cir. 2009); *United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019). Simply put, Nevada has no cognizable interest in enforcing preempted state law.

## CONCLUSION

The Court should reverse the denial of Robinhood's motion for preliminary injunction.

DATED: January 9, 2026

Respectfully submitted,

*/s/ Kevin J. Orsini*
Kevin J. Orsini

Antony L. Ryan
Brittany L. Sukiennik
CRAVATH, SWAINE & MOORE LLP
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

Todd L. Bice
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
(702) 214-2100

*Counsel for Appellant Robinhood
Derivatives, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 9, 2026. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Kevin J. Orsini*
Kevin J. Orsini

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-7831

I am the attorney or self-represented party.

**This brief contains** 13,810 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ⦿ complies with the word limit of Cir. R. 32-1.

- ◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

- ◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

- ◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

- ◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.

- ◯ complies with the length limit designated by court order dated _____.

- ◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** Kevin J. Orsini     **Date** January 9, 2026

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**     *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** | 25-7831

The undersigned attorney or self-represented party states the following:

○ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

● I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

> The following cases raise the same or closely related issues: 1) KalshiEx LLC v. Hendrick, et al., No. 25-7516, appealing order dissolving preliminary injunction enjoining Defendants from enforcing Nevada gaming laws against Plaintiff with respect to sports-related event contract transactions on its CFTC-designated contract market based on determination that Commodity Exchange Act does not preempt Nevada gaming laws; 2) North American Derivatives Exchange, Inc. v. Nevada, et al., No. 25-7187, appealing denial of same preliminary injunction on same grounds.

**Signature** | s/Kevin J. Orsini     **Date** | January 9, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**        *New 12/01/2018*

**ADDENDUM:**

**Pertinent Statutes and Regulations**

## TABLE OF CONTENTS

Provisions from the Administrative Procedure Act (as codified at 5 U.S.C.): .................................................................................... A.1

    5 U.S.C. § 551(13) ............................................................... A.1

    5 U.S.C. § 702 .................................................................... A.1

    5 U.S.C. § 703 .................................................................... A.1

Provisions from the Commodity Exchange Act (as codified at 7 U.S.C.): .................................................................................... A.2

    7 U.S.C. § 1a(13) ................................................................ A.2

    7 U.S.C. § 1a(19) ................................................................ A.2

    7 U.S.C. § 1a(20) ................................................................ A.3

    7 U.S.C. § 1a(27) ................................................................ A.3

    7 U.S.C. § 1a(47)(A) ........................................................... A.3

    7 U.S.C. § 2(a)(1)(A) ........................................................... A.5

    7 U.S.C. § 5(b) ................................................................... A.6

    7 U.S.C. § 6(c)(1) ................................................................ A.7

    7 U.S.C. § 7a-2(c)(1) ........................................................... A.8

    7 U.S.C. § 7a-2(c)(2) ........................................................... A.9

    7 U.S.C. § 7a-2(c)(4)(A) ....................................................... A.9

    7 U.S.C. § 7a-2(c)(5) ........................................................... A.9

    7 U.S.C. § 8(b) ................................................................. A.11

    7 U.S.C. § 16(e) ............................................................... A.12

Provisions from the Commodity Futures Trading Commission Act of 1974 (Pub. L. No. 93-463) (1974): ................................................ A.14

    Pub. L. No. 93-463, § 201(b), 88 Stat. 1389, 1395 ......................... A.14

Provisions from the Commodity Futures Modernization Act of 2000 (Pub. L. No. 106-554) (2000): ........................................................ A.15

    Pub. L. No. 106-554, Appx. E, § 101(4), 114 Stat. 2763A-365, 2763A-371 ....................................................................... A.15

Provisions from the Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub. L. No. 111-203) (2010): ..................................... A.16

    Pub. L. No. 111-203, § 721(a)(21), 124 Stat. 1376, 1666................ A.16

    Pub. L. No. 111-203, § 722(a)(1)(D), 124 Stat. 1376, 1672............. A.18

    Pub. L. No. 111-203, § 745(b), 124 Stat. 1376, 1735-37................ A.18

Provisions from Title 17 of the Code of Federal Regulations:............ A.20

    17 C.F.R. § 1.10(b)..................................................................... A.20

    17 C.F.R. § 1.10(d) ..................................................................... A.23

    17 C.F.R. § 1.11(c)(1).................................................................. A.27

    17 C.F.R. § 1.11(e)...................................................................... A.27

    17 C.F.R. § 1.12(a)...................................................................... A.33

    17 C.F.R. § 1.14(a)...................................................................... A.34

    17 C.F.R. § 1.15.......................................................................... A.37

    17 C.F.R. § 1.17(a)...................................................................... A.44

    17 C.F.R. § 1.18.......................................................................... A.48

    17 C.F.R. § 1.55(k) ..................................................................... A.49

    17 C.F.R. § 1.55(o)...................................................................... A.52

    17 C.F.R. § 1.71.......................................................................... A.54

    17 C.F.R. § 17.00........................................................................ A.54

    17 C.F.R. § 40.2(a)...................................................................... A.57

    17 C.F.R. § 40.3(a)...................................................................... A.58

    17 C.F.R. § 40.6(b)(1) ................................................................. A.60

    17 C.F.R. § 40.11........................................................................ A.60

    17 C.F.R. § 155.3........................................................................ A.61

Provisions from Chapter 463 of the Nevada Revised Statutes:......... A.63

    Section 360, as amended by S.B. 256, 83rd Sess. (Nev. 2025)....... A.63

**Provisions from the Administrative Procedure Act (as codified at 5 U.S.C.):**

**5 U.S.C. § 551(13)**

For the purpose of this subchapter—

(13) "agency action" includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]

**5 U.S.C. § 702 Right of review**

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

**5 U.S.C. § 703 Form and venue of proceeding**

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of

competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

**<u>Provisions from the Commodity Exchange Act (as codified at 7 U.S.C.):</u>**

**7 U.S.C. § 1a(13)**

(13) Contract of sale

The term "contract of sale" includes sales, agreements of sale, and agreements to sell.

**7 U.S.C. § 1a(19)**

(19) Excluded commodity

The term "excluded commodity" means—

(i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure;

(ii) any other rate, differential, index, or measure of economic or commercial risk, return, or value that is—

    (I) not based in substantial part on the value of a narrow group of commodities not described in clause (i); or

    (II) based solely on one or more commodities that have no cash market;

(iii) any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the relevant contract, agreement, or transaction; or

(iv) an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is—

> (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and

> (II) associated with a financial, commercial, or economic consequence.

## 7 U.S.C. § 1a(20)

(20) Exempt commodity

The term "exempt commodity" means a commodity that is not an excluded commodity or an agricultural commodity.

## 7 U.S.C. § 1a(27)

(27) Future delivery

The term "future delivery" does not include any sale of any cash commodity for deferred shipment or delivery.

## 7 U.S.C. § 1a(47)(A)

(47) Swap

> (A) In general

>> Except as provided in subparagraph (B), the term "swap" means any agreement, contract, or transaction—

>> (i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

A.3

(ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence;

(iii) that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including any agreement, contract, or transaction commonly known as—

(I) an interest rate swap;

(II) a rate floor;

(III) a rate cap;

(IV) a rate collar;

(V) a cross-currency rate swap;

(VI) a basis swap;

(VII) a currency swap;

(VIII) a foreign exchange swap;

(IX) a total return swap;

(X) an equity index swap;

A.4

(XI) an equity swap;

(XII) a debt index swap;

(XIII) a debt swap;

(XIV) a credit spread;

(XV) a credit default swap;

(XVI) a credit swap;

(XVII) a weather swap;

(XVIII) an energy swap;

(XIX) a metal swap;

(XX) an agricultural swap; an emissions swap; and

(XXI) a commodity swap;

(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;

(v) including any security-based swap agreement which meets the definition of "swap agreement" as defined in section 206A of the Gramm-Leach-Bliley Act (15 U.S.C. 78c note) of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein; or

(vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v).

## 7 U.S.C. § 2(a)(1)(A)

(a) Jurisdiction of Commission; Commodity Futures Trading Commission

(1) Jurisdiction of Commission

A.5

(A) In general

The Commission shall have exclusive jurisdiction, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of 2010 (including an amendment made by that Act) and subparagraphs (C), (D), and (I) of this paragraph and subsections (c) and (f), with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

## 7 U.S.C. § 5(b)

(b) Purpose

It is the purpose of this chapter to serve the public interests described in subsection (a) through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission. To foster these public interests, it is further the purpose of this chapter to deter and

A.6

prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to this chapter and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants.

**7 U.S.C. § 6(c)(1)**

(c) Public Interest Exemptions

(1) In order to promote responsible economic or financial innovation and fair competition, the Commission by rule, regulation, or order, after notice and opportunity for hearing, may (on its own initiative or on application of any person, including any board of trade designated or registered as a contract market or derivatives transaction execution facility for transactions for future delivery in any commodity under section 7 of this title) exempt any agreement, contract, or transaction (or class thereof) that is otherwise subject to subsection (a) (including any person or class of persons offering, entering into, rendering advice or rendering other services with respect to, the agreement, contract, or transaction), either unconditionally or on stated terms or conditions or for stated periods and either retroactively or prospectively, or both, from any of the requirements of subsection (a), or from any other provision of this chapter (except subparagraphs (C)(ii) and (D) of section 2(a)(1) of this title, except that—

(A) unless the Commission is expressly authorized by any provision described in this subparagraph to grant exemptions, with respect to amendments made by subtitle A of the Wall Street Transparency and Accountability Act of 2010—

(i) with respect to—

A.7

(I) paragraphs (2), (3), (4), (5), and (7), paragraph (18)(A)(vii)(III), paragraphs (23), (24), (31), (32), (38), (39), (41), (42), (46), (47), (48), and (49) of section 1a of this title, and sections 2(a)(13), 2(c)(1)(D), 6a(a), 6a(b), 6d(c), 6d(d), 6r, 6s, 7a–1(a), 7a–1(b), 7(d), 7(g), 7(h),[3] 7a–1(c), 7a–1(i), 12(e),[4] and 24a of this title; and

(II) section 206(e) [5] of the Gramm-Leach-Bliley Act (Public Law 106–102; 15 U.S.C. 78c note); and

(ii) in sections 721(c) and 742 of the Dodd-Frank Wall Street Reform and Consumer Protection Act; and

(B) the Commission and the Securities and Exchange Commission may by rule, regulation, or order jointly exclude any agreement, contract, or transaction from section 2(a)(1)(D) of this title) [6] if the Commissions determine that the exemption would be consistent with the public interest.

## 7 U.S.C. § 7a-2(c)(1)

(c) New contracts, new rules, and rule amendments

(1) In general

A registered entity may elect to list for trading or accept for clearing any new contract, or other instrument, or may elect to approve and implement any new rule or rule amendment, by providing to the Commission (and the Secretary of the Treasury, in the case of a contract of sale of a government security for future delivery (or option on such a contract) or a rule or rule amendment specifically related to such a contract) a written certification that the new contract or instrument or clearing of the new contract or instrument, new rule, or rule amendment complies with this chapter (including regulations under this chapter).

A.8

**7 U.S.C. § 7a-2(c)(2)**

(2) Rule review

The new rule or rule amendment described in paragraph (1) shall become effective, pursuant to the certification of the registered entity and notice of such certification to its members (in a manner to be determined by the Commission), on the date that is 10 business days after the date on which the Commission receives the certification (or such shorter period as determined by the Commission by rule or regulation) unless the Commission notifies the registered entity within such time that it is staying the certification because there exist novel or complex issues that require additional time to analyze, an inadequate explanation by the submitting registered entity, or a potential inconsistency with this chapter (including regulations under this chapter).

**7 U.S.C. § 7a-2(c)(4)(A)**

(4) Prior approval

(A) In general

A registered entity may request that the Commission grant prior approval to any new contract or other instrument, new rule, or rule amendment.

**7 U.S.C. § 7a-2(c)(5)**

(5) Approval

> (A) Rules
>
> The Commission shall approve a new rule, or rule amendment, of a registered entity unless the Commission finds that the new rule, or rule amendment, is inconsistent with this chapter (including regulations).
>
> (B) Contracts and instruments

A.9

The Commission shall approve a new contract or other instrument unless the Commission finds that the new contract or other instrument would violate this chapter (including regulations).

(C) Special rule for review and approval of event contracts and swaps contracts

(i) Event contracts

In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i) of this title), by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—

(I) activity that is unlawful under any Federal or State law;

(II) terrorism;

(III) assassination;

(IV) war;

(V) gaming; or

(VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

(ii) Prohibition

No agreement, contract, or transaction determined by the Commission to be contrary to the public interest under

A.10

clause (i) may be listed or made available for clearing or trading on or through a registered entity.

(iii) Swaps contracts

(I) In general

In connection with the listing of a swap for clearing by a derivatives clearing organization, the Commission shall determine, upon request or on its own motion, the initial eligibility, or the continuing qualification, of a derivatives clearing organization to clear such a swap under those criteria, conditions, or rules that the Commission, in its discretion, determines.

(II) Requirements

Any such criteria, conditions, or rules shall consider—

(aa) the financial integrity of the derivatives clearing organization; and

(bb) any other factors which the Commission determines may be appropriate.

(iv) Deadline

The Commission shall take final action under clauses (i) and (ii) in not later than 90 days from the commencement of its review unless the party seeking to offer the contract or swap agrees to an extension of this time limitation.

**7 U.S.C. § 8(b)**

(b) The Commission is authorized to suspend for a period not to exceed 6 months or to revoke the designation or registration of any contract market or derivatives transaction execution facility on a showing that the contract market or derivatives transaction execution facility is not enforcing or has not enforced its rules of government, made a condition of its designation or registration as set forth in sections 7 through 7a–1

A.11

of this title or section 7b–1 of this title, or that the contract market or derivatives transaction execution facility or electronic trading facility, or any director, officer, agent, or employee thereof, otherwise is violating or has violated any of the provisions of this chapter or any of the rules, regulations, or orders of the Commission thereunder. Such suspension or revocation shall only be made after a notice to the officers of the contract market or derivatives transaction execution facility or electronic trading facility affected and upon a hearing on the record: *Provided,* That such suspension or revocation shall be final and conclusive, unless within fifteen days after such suspension or revocation by the Commission such person appeals to the court of appeals for the circuit in which it has its principal place of business, by filing with the clerk of such court a written petition praying that the order of the Commission be set aside or modified in the manner stated in the petition, together with a bond in such sum as the court may determine, conditioned that such person will pay the costs of the proceedings if the court so directs. The clerk of the court in which such a petition is filed shall immediately cause a copy thereof to be delivered to the Commission and file in the court the record in such proceedings, as provided in section 2112 of title 28. The testimony and evidence taken or submitted before the Commission, duly filed as aforesaid as a part of the record, shall be considered by the court of appeals as the evidence in the case. Such a court may affirm or set aside the order of the Commission or may direct it to modify its order. No such order of the Commission shall be modified or set aside by the court of appeals unless it is shown by the person that the order is unsupported by the weight of the evidence or was issued without due notice and a reasonable opportunity having been afforded to such person for a hearing, or infringes the Constitution of the United States, or is beyond the jurisdiction of the Commission.

## 7 U.S.C. § 16(e)

(e) Relation to other law, departments, or agencies

> (1) Nothing in this chapter shall supersede or preempt—

>> (A) criminal prosecution under any Federal criminal statute;

(B) the application of any Federal or State statute (except as provided in paragraph (2)), including any rule or regulation thereunder, to any transaction in or involving any commodity, product, right, service, or interest—

(i) that is not conducted on or subject to the rules of a registered entity or exempt board of trade;

(ii) (except as otherwise specified by the Commission by rule or regulation) that is not conducted on or subject to the rules of any board of trade, exchange, or market located outside the United States, its territories or possessions; or

(iii) that is not subject to regulation by the Commission under section 6c or 23 of this title; or

(C) the application of any Federal or State statute, including any rule or regulation thereunder, to any person required to be registered or designated under this chapter who shall fail or refuse to obtain such registration or designation.

(2) This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability) in the case of—

(A) an electronic trading facility excluded under section 2(e) of this title; and

(B) an agreement, contract, or transaction that is excluded from this chapter under section 2(c) or 2(f) of this title or sections 27 to 27f of this title, or exempted under section 6(c) of this title (regardless of whether any such agreement, contract, or transaction is otherwise subject to this chapter).

A.13

**<u>Provisions from the Commodity Futures Trading Commission Act of 1974 (Pub. L. No. 93-463) (1974):</u>**

**Pub. L. No. 93-463, § 201(b), 88 Stat. 1389, 1395**

SEC. 201. Section 2(a) of the Commodity Exchange Act, as amended (7 U.S.C. 2,4), is amended—

\* \* \*

(b) By striking the period at the end of the third sentence of the section and substituting therefor the following: ", and all other goods and articles, except onions as provided in Public Law 85-839, and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in: *Provided,* That the Commission shall have exclusive jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 5 of this Act or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 217 of the Commodity Futures Trading Commission Act of 1974: *And provided further,* That, except as hereinabove provided, nothing contained in this section shall (i) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (ii) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State. Nothing in this Act shall be deemed to govern or in any way be applicable to transactions in foreign currency, security warrants, security rights, resales of installment loan contracts, repurchase options, government securities, or mortgages and mortgage purchase commitments, unless such transactions involve the sale thereof for future delivery conducted on a board of trade."

A.14

**Provisions from the Commodity Futures Modernization Act of 2000 (Pub. L. No. 106-554) (2000):**

**Pub. L. No. 106-554, Appx. E, § 101(4), 114 Stat. 2763A-365, 2763A-371**

SEC 101.  DEFINITIONS.

Section 1a of the Commodity Exchange Act (7 U.S.C. 1a) is amended—

* * *

(4) by inserting after paragraph (8) (as redesignated by paragraph (1)) the following:

* * *

"(13) EXCLUDED COMMODITY.—The term 'excluded commodity' means—

"(i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure;

"(ii) any other rate, differential, index, or measure of economic or commercial risk, return, or value that is—

"(I) not based in substantial part on the value of a narrow group of commodities not described in clause (i); or

"(II) based solely on one or more commodities that have no cash market;

"(iii) any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the relevant contract, agreement, or transaction; or

A.15

"(iv) an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is—

"(I) beyond the control of the parties to the relevant contract, agreement, or transaction; and

"(II) associated with a financial, commercial, or economic consequence."

**Provisions from the Dodd-Frank Act Wall Street Reform and Consumer Protection Act (Pub. L. No. 111-203) (2010):**

**Pub. L. No. 111-203, § 721(a)(21), 124 Stat. 1376, 1666**

(a) IN GENERAL.—Section 1a of the Commodity Exchange Act (7 U.S.C. 1a) is amended—

* * *

(21) by inserting after paragraph (46) (as redesignated by paragraph (1)) the following:

"(47) SWAP.—

"(A) IN GENERAL.—Except as provided in subparagraph (B), the term 'swap' means any agreement, contract, or transaction—

"(i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

"(ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an

A.16

event or contingency associated with a potential financial, economic, or commercial consequence;

"(iii) that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including any agreement, contract, or transaction commonly known as—

"(I) an interest rate swap;
"(II) a rate floor; "(III) a rate cap;
"(IV) a rate collar;
"(V) a cross-currency rate swap;
"(VI) a basis swap;
"(VII) a currency swap;
"(VIII) a foreign exchange swap;
"(IX) a total return swap;
"(X) an equity index swap;
"(XI) an equity swap;
"(XII) a debt index swap;
"(XIII) a debt swap;
"(XIV) a credit spread;
"(XV) a credit default swap;
"(XVI) a credit swap;
"(XVII) a weather swap;
"(XVIII) an energy swap;

A.17

"(XIX) a metal swap;
"(XX) an agricultural swap;
"(XXI) an emissions swap; and "(XXII) a commodity swap;

"(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;

"(v) including any security-based swap agreement which meets the definition of 'swap agreement' as defined in section 206A of the Gramm-Leach-Bliley Act (15 U.S.C. 78c note) of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein; or

"(vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v)."

**Pub. L. No. 111-203, § 722(a)(1)(D), 124 Stat. 1376, 1672**

(a) EXCLUSIVE JURISDICTION.—Section 2(a)(1) of the Commodity Exchange Act (7 U.S.C. 2(a)(1)) is amended—

(1) in subparagraph (A), in the first sentence—

(D) by striking "contracts of sale" and inserting "swaps or contracts of sale"[.]

**Pub. L. No. 111-203, § 745(b), 124 Stat. 1376, 1735-37**

(b) NEW CONTRACTS, NEW RULES, AND RULE AMENDMENTS.—Section 5c of the Commodity Exchange Act (7 U.S.C. 7a–2) is amended by striking subsection (c) and inserting the following:

(c) NEW CONTRACTS, NEW RULES, AND RULE AMENDMENTS.—

"(5) APPROVAL.—

A.18

"(C) SPECIAL RULE FOR REVIEW AND APPROVAL OF EVENT CONTRACTS AND SWAPS CONTRACTS.—

"(i) EVENT CONTRACTS.—In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i)), by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—

"(I) activity that is unlawful under any Federal or State law;

"(II) terrorism;

"(III) assassination;

"(IV) war;

"(V) gaming; or

"(VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

"(ii) PROHIBITION.—No agreement, contract, or transaction determined by the Commission to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity.

"(iii) SWAPS CONTRACTS.—

A.19

"(I) IN GENERAL.—In connection with the listing of a swap for clearing by a derivatives clearing organization, the Commission shall determine, upon request or on its own motion, the initial eligibility, or the continuing qualification, of a derivatives clearing organization to clear such a swap under those criteria, conditions, or rules thatthe Commission, in its discretion, determines.

"(II) REQUIREMENTS.—Any such criteria, conditions, or rules shall consider—

"(aa) the financial integrity of the derivatives clearing organization; and

"(bb) any other factors which the Commission determines may be appropriate.

"(iv) DEADLINE.—The Commission shall take final action under clauses (i) and (ii) in not later than 90 days from the commencement of its review unless the party seeking to offer the contract or swap agrees to an extension of this time limitation."

## Provisions from Title 17 of the Code of Federal Regulations:

**17 C.F.R. § 1.10(b)**

(b) Filing of financial reports.

(1)

(i) Except as provided in paragraphs (b)(3) and (h) of this section, each person registered as a futures commission merchant must file a Form 1-FR-FCM as of the close of

A.20

business each month. Each Form 1-FR-FCM must be filed no later than 17 business days after the date for which the report is made

(ii) In addition to the monthly financial reports required by paragraph (b)(1)(i) of this section, each person registered as a futures commission merchant must file a Form 1-FR-FCM as of the close of its fiscal year, which must be certified by an independent public accountant in accordance with § 1.16, and must be filed no later than 60 days after the close of the futures commission merchant's fiscal year: *Provided, however,* that a registrant which is registered with the Securities and Exchange Commission as a securities broker or dealer must file this report not later than the time permitted for filing an annual audit report under § 240.17a-5(d)(5) of this title.

(2)

(i) Except as provided in paragraphs (b)(3) and (h) of this section, and except for an introducing broker operating pursuant to a guarantee agreement which is not also a securities broker or dealer, each person registered as an introducing broker must file a Form 1-FR-IB semiannually as of the middle and the close of each fiscal year. Each Form 1-FR-IB must be filed no later than 17 business days after the date for which the report is made.

(ii)

(A) In addition to the financial reports required by paragraph (b)(2)(i) of this section, each person registered as an introducing broker must file a Form 1-FR-IB as of the close of its fiscal year which must be certified by an independent public accountant in accordance with § 1.16 no later than 90 days after the close of each introducing broker's fiscal year: *Provided, however,* that a registrant which is registered with the Securities and Exchange Commission as a securities

A.21

broker or dealer must file this report not later than the time permitted for filing an annual audit report under § 240.17a-5(d)(5) of this title.

(B) If an introducing broker has filed previously a Form 1-FR-IB, certified by an independent public accountant in accordance with the provisions of paragraphs (a)(2)(ii) or (j)(8) of this section and § 1.16 of this part, as of a date not more than one year prior to the close of such introducing broker's fiscal year, it need not have certified by an independent public accountant the Form 1-FR-IB filed as of the introducing broker's first fiscal year-end following the as of date of its initial certified Form 1-FR-IB. In such a case, the introducing broker's Form 1-FR-IB filed as of the close of the second fiscal year-end following the as of date of its initial certified Form 1-FR-IB must cover the period of time between those two dates and must be certified by an independent public accountant in accordance with § 1.16 of this part.

(3) The provisions of paragraphs (b)(1) and (b)(2) of this section may be met by any person registered as a futures commission merchant or as an introducing broker who is a member of a designated self-regulatory organization and conforms to minimum financial standards and related reporting requirements set by such designated self-regulatory organization in its bylaws, rules, regulations, or resolutions and approved by the Commission pursuant to Section 4f(b) of the Act and § 1.52: *Provided, however,* That each such registrant shall promptly file with the Commission a true and exact copy of each financial report which it files with such designated self-regulatory organization.

(4) Upon receiving written notice from any representative of the National Futures Association, the Commission or any self-regulatory organization of which it is a member, an applicant or registrant, except an applicant for registration as an introducing broker which has filed concurrently with its application for

A.22

registration a guarantee agreement and which is not also a securities broker or dealer, must, monthly or at such times as specified, furnish the National Futures Association, the Commission or the self-regulatory organization requesting such information a Form 1-FR or such other financial information as requested by the National Futures Association, the Commission or the self-regulatory organization. Each such Form 1-FR or such other information must be furnished within the time period specified in the written notice, and in accordance with the provisions of paragraph (c) of this section.

(5) Each futures commission merchant must file with the Commission the measure of the future commission merchant's leverage as of the close of the business each month. For purpose of this section, the term "leverage" shall be defined by a registered futures association of which the futures commission merchant is a member. The futures commission merchant is required to file the leverage information with the Commission within 17 business days of the close of the futures commission merchant's month end.

**17 C.F.R. § 1.10(d)**

(d) Contents of financial reports.

(1) Each Form 1-FR filed pursuant to this § 1.10 which is not required to be certified by an independent public accountant must be completed in accordance with the instructions to the form and contain:

(i) A statement of financial condition as of the date for which the report is made;

(ii) Statements of income (loss) and a statement of changes in ownership equity for the period between the date of the most recent statement of financial condition filed with the Commission and the date for which the report is made;

(iii) A statement of changes in liabilities subordinated to claims of general creditors for the period between the date of

A.23

the most recent statement of financial condition filed with the Commission and the date for which the report is made;

(iv) A statement of the computation of the minimum capital requirements pursuant to § 1.17 as of the date for which the report is made;

(v) For a futures commission merchant only, the statements of segregation requirements and funds in segregation for customers trading on U.S. commodity exchanges and for customers' dealer options accounts, the statement of secured amounts and funds held in separate accounts for 30.7 customers (as defined in § 30.1 of this chapter) in accordance with § 30.7 of this chapter, and the statement of cleared swaps customer segregation requirements and funds in cleared swaps customer accounts under section 4d(f) of the Act as of the date for which the report is made; and

(vi) In addition to the information expressly required, such futher material information as may be necessary to make the required statements and schedules not misleading.

(2) Each Form 1-FR filed pursuant to this § 1.10 which is required to be certified by an independent public accountant must be completed in accordance with the instructions to the form and contain:

(i) A statement of financial condition as of the date for which the report is made;

(ii) Statements of income (loss), cash flows, changes in ownership equity, and changes in liabilities subordinated to claims of general creditors, for the period between the date of the most recent certified statement of financial condition filed with the Commission and the date for which the report is made: *Provided,* That for an applicant filing pursuant to paragraph (a)(2) of this section the period must be the year ending as of the date of the statement of financial condition;

A.24

(iii) A statement of the computation of the minimum capital requirements pursuant to § 1.17 as of the date for which the report is made;

(iv) For a futures commission merchant only, the statements of segregation requirements and funds in segregation for customers trading on U.S. commodity exchanges and for customers' dealer options accounts, the statement of secured amounts and funds held in separate accounts for 30.7 customers (as defined in § 30.1 of this chapter) in accordance with § 30.7 of the chapter, and the statement of cleared swaps customers segregation requirements and funds in cleared swaps customer accounts under section 4d(f) of the Act as of the date for which the report is made;

(v) Appropriate footnote disclosures;

(vi) A reconciliation, including appropriate explanations, of the statement of the computation of the minimum capital requirements pursuant to § 1.17 and, for a futures commission merchant only, the statements of segregation requirements and funds in segregation for customers trading on U.S. commodity exchanges and for customers' dealer option accounts, the statement of secured amounts and funds held in separate accounts for 30.7 customers (as defined in § 30.1 of this chapter) in accordance with § 30.7 of this chapter, and the statement of cleared swaps customer segregation requirements and funds in cleared swaps customer accounts under section 4d(f) of the Act, in the certified Form 1-FR with the applicant's or registrant's corresponding uncertified most recent Form 1-FR filing when material differences exist or, if no material differences exist, a statement so indicating; and

(vii) In addition to the information expressly required, such further material information as may be necessary to make the required statements not misleading.

(3) The statements required by paragraphs (d)(2)(i) and (d)(2)(ii) of this section may be presented in accordance with generally accepted accounting principles in the certified reports filed as of the close of the registrant's fiscal year pursuant to paragraphs (b)(1)(ii) or (b)(2)(ii) of this section or accompanying the application for registration pursuant to paragraph (a)(2) of this section, rather than in the format specifically prescribed by these regulations: *Provided,* the statement of financial condition is presented in a format as consistent as possible with the Form 1-FR and a reconciliation is provided reconciling such statement of financial condition to the statement of the computation of the minimum capital requirements pursuant to § 1.17. Such reconciliation must be certified by an independent public accountant in accordance with § 1.16.

(4) Attached to each Form 1-FR filed pursuant to this section must be an oath or affirmation that to the best knowledge and belief of the individual making such oath or affirmation the information contained in the Form 1-FR is true and correct. The individual making such oath or affirmation must be:

> (i) If the registrant or applicant is a sole proprietorship, the proprietor; if a partnership, any general partner; if a corporation, the chief executive officer or chief financial officer; and, if a limited liability company or limited liability partnership, the chief executive officer, the chief financial officer, the manager, the managing member, or those members vested with the management authority for the limited liability company or limited liability partnership; o

> (ii) If the registrant or applicant is registered with the Securities and Exchange Commission as a securities broker or dealer, the representative authorized under § 240.17a-5 of this title to file for the securities broker or dealer its Financial and Operational Combined Uniform Single Report under the Securities Exchange Act of 1934, part II, part IIA, or part II CSE.

A.26

(iii) In the case of a Form 1-FR filed via electronic transmission in accordance with procedures established by or approved by the Commission, such transmission must be accompanied by the user authentication assigned to the authorized signer under such procedures, and the use of such user authentication will constitute and become a substitute for the manual signature of the authorized signer for the purpose of making the oath or affirmation referred to in this paragraph.

## 17 C.F.R. § 1.11(c)(1)

(c) Risk Management Program.

(1) Each futures commission merchant shall establish, maintain, and enforce a system of risk management policies and procedures designed to monitor and manage the risks associated with the activities of the futures commission merchant as such. For purposes of this section, such policies and procedures shall be referred to collectively as a "Risk Management Program."

## 17 C.F.R. § 1.11(e)

(e) Elements of the Risk Management Program. The Risk Management Program of each futures commission merchant shall include, at a minimum, the following elements:

(1) Identification of risks and risk tolerance limits.

(i) The Risk Management Program shall take into account market, credit, liquidity, foreign currency, legal, operational, settlement, segregation, technological, capital, and any other applicable risks together with a description of the risk tolerance limits set by the futures commission merchant and the underlying methodology in the written policies and procedures. The risk tolerance limits shall be reviewed and approved quarterly by senior management and annually by the governing body. Exceptions to risk tolerance limits shall be subject to written policies and procedures.

(ii) The Risk Management Program shall take into account risks posed by affiliates, all lines of business of the futures commission merchant, and all other trading activity engaged in by the futures commission merchant. The Risk Management Program shall be integrated into risk management at the consolidated entity level.

(iii) The Risk Management Program shall include policies and procedures for detecting breaches of risk tolerance limits set by the futures commission merchant, and alerting supervisors within the risk management unit and senior management, as appropriate.

(2) Periodic Risk Exposure Reports.

(i) The risk management unit of each futures commission merchant shall provide to senior management and to its governing body quarterly written reports setting forth all applicable risk exposures of the futures commission merchant; any recommended or completed changes to the Risk Management Program; the recommended time frame for implementing recommended changes; and the status of any incomplete implementation of previously recommended changes to the Risk Management Program. For purposes of this section, such reports shall be referred to as "Risk Exposure Reports." The Risk Exposure Reports also shall be provided to the senior management and the governing body immediately upon detection of any material change in the risk exposure of the futures commission merchant.

(ii) Furnishing to the Commission. Each futures commission merchant shall furnish copies of its Risk Exposure Reports to the Commission within five (5) business days of providing such reports to its senior management.

(3) Specific risk management considerations. The Risk Management Program of each futures commission merchant shall include, but not be limited to, policies and procedures necessary to monitor and manage the following risks:

A.28

(i) Segregation risk. The written policies and procedures shall be reasonably designed to ensure that segregated funds are separately accounted for and segregated or secured as belonging to customers as required by the Act and Commission regulations and must, at a minimum, include or address the following:

(A) A process for the evaluation of depositories of segregated funds, including, at a minimum, documented criteria that any depository that will hold segregated funds, including an entity affiliated with the futures commission merchant, must meet, including criteria addressing the depository's capitalization, creditworthiness, operational reliability, and access to liquidity. The criteria should further consider the extent to which segregated funds are concentrated with any depository or group of depositories. The criteria also should include the availability of deposit insurance and the extent of the regulation and supervision of the depository;

(B) A program to monitor an approved depository on an ongoing basis to assess its continued satisfaction of the futures commission merchant's established criteria, including a thorough due diligence review of each depository at least annually;

(C) An account opening process for depositories, including documented authorization requirements, procedures that ensure that segregated funds are not deposited with a depository prior to the futures commission merchant receiving the acknowledgment letter required from such depository pursuant to §§ 1.20, and 22.2 and 30.7 of this chapter, and procedures that ensure that such account is properly titled to reflect that it is holding segregated funds pursuant to the Act and Commission regulations;

A.29

(D) A process for establishing a targeted amount of residual interest that the futures commission merchant seeks to maintain as its residual interest in the segregated funds accounts and such process must be designed to reasonably ensure that the futures commission merchant maintains the targeted residual amounts and remains in compliance with the segregated funds requirements at all times. The policies and procedures must require that senior management, in establishing the total amount of the targeted residual interest in the segregated funds accounts, perform appropriate due diligence and consider various factors, as applicable, relating to the nature of the futures commission merchant's business including, but not limited to, the composition of the futures commission merchant's customer base, the general creditworthiness of the customer base, the general trading activity of the customers, the types of markets and products traded by the customers, the proprietary trading of the futures commission merchant, the general volatility and liquidity of the markets and products traded by customers, the futures commission merchant's own liquidity and capital needs, and the historical trends in customer segregated fund balances, including undermargined amounts and net deficit balances in customers' accounts. The analysis and calculation of the targeted amount of the future commission merchant's residual interest must be described in writing with the specificity necessary to allow the Commission and the futures commission merchant's designated self-regulatory organization to duplicate the analysis and calculation and test the assumptions made by the futures commission merchant. The adequacy of the targeted residual interest and the process for establishing the targeted residual interest must be reassessed periodically by Senior Management and revised as necessary;

A.30

(E) A process for the withdrawal of cash, securities, or other property from accounts holding segregated funds, where the withdrawal is not for the purpose of payments to or on behalf of the futures commission merchant's customers. Such policies and procedures must satisfy the requirements of § 1.23, § 22.17 of this chapter, or § 30.7 of this chapter, as applicable;

(F) A process for assessing the appropriateness of specific investments of segregated funds in permitted investments in accordance with § 1.25. Such policies and procedures must take into consideration the market, credit, counterparty, operational, and liquidity risks associated with such investments, and assess whether such investments comply with the requirements in § 1.25 including that the futures commission merchant manage the permitted investments consistent with the objectives of preserving principal and maintaining liquidity;

(G) Procedures requiring the appropriate separation of duties among individuals responsible for compliance with the Act and Commission regulations relating to the protection and financial reporting of segregated funds, including the separation of duties among personnel that are responsible for advising customers on trading activities, approving or overseeing cash receipts and disbursements (including investment operations), and recording and reporting financial transactions. The policies and procedures must require that any movement of funds to affiliated companies and parties are properly approved and documented

(H) A process for the timely recording of all transactions, including transactions impacting customers' accounts, in the firm's books of record;

A.31

(I) A program for conducting annual training of all finance, treasury, operations, regulatory, compliance, settlement, and other relevant officers and employees regarding the segregation requirements for segregated funds required by the Act and regulations, the requirements for notices under § 1.12, procedures for reporting suspected breaches of the policies and procedures required by this section to the chief compliance officer, without fear of retaliation, and the consequences of failing to comply with the segregation requirements of the Act and regulations; and

(J) Policies and procedures for assessing the liquidity, marketability and mark-to-market valuation of all securities or other non-cash assets held as segregated funds, including permitted investments under § 1.25, to ensure that all non-cash assets held in the customer segregated accounts, both customer-owned securities and investments in accordance with § 1.25, are readily marketable and highly liquid. Such policies and procedures must require daily measurement of liquidity needs with respect to customers; assessment of procedures to liquidate all non-cash collateral in a timely manner and without significant effect on price; and application of appropriate collateral haircuts that accurately reflect market and credit risk.

(ii) Operational risk.  The Risk Management Program shall include automated financial risk management controls reasonably designed to prevent the placing of erroneous orders, including those that exceed pre-set capital, credit, or volume thresholds. The Risk Management Program shall ensure that the use of automated trading programs is subject to policies and procedures governing the use, supervision, maintenance, testing, and inspection of such programs.

A.32

(iii) Capital risk. The written policies and procedures shall be reasonably designed to ensure that the futures commission merchant has sufficient capital to be in compliance with the Act and the regulations, and sufficient capital and liquidity to meet the reasonably foreseeable needs of the futures commission merchant.

(4) Supervision of the Risk Management Program. The Risk Management Program shall include a supervisory system that is reasonably designed to ensure that the policies and procedures required by this section are diligently followed.

## 17 C.F.R. § 1.12(a)

(a) Each person registered as a futures commission merchant or who files an application for registration as a futures commission merchant, and each person registered as an introducing broker or who files an application for registration as an introducing broker (except for an introducing broker or applicant for registration as an introducing broker operating pursuant to, or who has filed concurrently with its application for registration, a guarantee agreement and who is not also a securities broker or dealer), who knows or should have known that its adjusted net capital at any time is less than the minimum required by § 1.17 or by the capital rule of any self-regulatory organization to which such person is subject, or the minimum net capital requirements of the Securities and Exchange Commission if the applicant or registrant is registered with the Securities and Exchange Commission, must:

(1) Give notice, as set forth in paragraph (n) of this section that the applicant's or registrant's capital is below the applicable minimum requirement. Such notice must be given immediately after the applicant or registrant knows or should have known that its adjusted net capital or net capital, as applicable, is less than minimum required amount; and

(2) Provide together with such notice documentation, in such form as necessary, to adequately reflect the applicant's or registrant's capital condition as of any date on which such person's adjusted net capital is less than the minimum required; *Provided, however,*

A.33

that if the applicant or registrant cannot calculate or otherwise immediately determine its financial condition, it must provide the notice required by paragraph (a)(1) of this section and include in such notice a statement that the entity cannot presently calculate its financial condition. The applicant or registrant must provide similar documentation of its financial condition for other days as the Commission may request.

**17 C.F.R. § 1.14(a)**

(a) Requirement to maintain and preserve information.

(1) Each futures commission merchant registered with the Commission pursuant to Section 4d of the Act, unless exempt pursuant to paragraph (d) of this section, shall prepare, maintain and preserve the following information:

(i) An organizational chart which includes the futures commission merchant and each of its affiliated persons. Included in the organizational chart shall be a designation of which affiliated persons are "Material Affiliated Persons" as that term is used in paragraph (a)(2) of this section, which Material Affiliated Persons file routine financial or risk exposure reports with the Securities and Exchange Commission, a federal banking agency, an insurance commissioner or other similar official or agency of a state, or a foreign regulatory authority, and which Material Affiliated Persons are dealers in financial instruments with off-balance sheet risk and, if a Material Affiliated Person is such a dealer, whether it is also an end-user of such instruments;

(ii) Written policies, procedures, or systems concerning the futures commission merchant's:

(A) Method(s) for monitoring and controlling financial and operational risks to it resulting from the activities of any of its affiliated persons;

A.34

(B) Financing and capital adequacy, including information regarding sources of funding, together with a narrative discussion by management of the liquidity of the material assets of the futures commission merchant, the structure of debt capital, and sources of alternative funding;

(C) Establishing and maintaining internal controls with respect to market risk, credit risk, and other risks created by the futures commission merchant's proprietary and noncustomer clearing activities, including systems and policies for supervising, monitoring, reporting and reviewing trading activities in securities, futures contracts, commodity options, forward contracts and financial instruments; policies for hedging or managing risks created by trading activities or supervising accounts carried for noncustomer affiliates, including a description of the types of reviews conducted to monitor positions; and policies relating to restrictions or limitations on trading activities: *Provided, however,* that if the futures commission merchant has no such written policies, procedures or systems, it must so state in writing;

(iii) Fiscal year-end consolidated and consolidating balance sheets for the highest level Material Affiliated Person within the futures commission merchant's organizational structure, which shall include the futures commission merchant and its other Material Affiliated Persons, prepared in accordance with generally accepted accounting principles, which consolidated balance sheets shall be audited by an independent certified public accountant if an annual audit is performed in the ordinary course of business, but which otherwise may be unaudited, and which shall include appropriate explanatory notes. The consolidating balance sheets may be those prepared by the futures commission merchant's highest level Material Affiliated Person as part

A.35

of its internal financial reporting process. Any additional information required to be filed under § 1.15(a)(2)(iii) shall also be maintained and preserved; and

(iv) Fiscal year-end consolidated and consolidating income statements and consolidated cash flow statements for the highest level Material Affiliated Person within the futures commission merchant's organizational structure, which shall include the futures commission merchant and its other Material Affiliated Persons, prepared in accordance with generally accepted accounting principles, which consolidated statements shall be audited by an independent certified public accountant if an annual audit is performed in the ordinary course of business, but which otherwise may be unaudited, and which shall include appropriate explanatory notes. The consolidating statements may be those prepared by the futures commission merchant's highest level Material Affiliated Person as part of its internal financial reporting process. Any additional information required to be filed under § 1.15(a)(2)(iii) shall also be maintained and preserved.

(2) The determination of whether an affiliated person of a futures commission merchant is a Material Affiliated Person shall involve consideration of all aspects of the activities of, and the relationship between, both entities, including without limitation, the following factors:

(i) The legal relationship between the futures commission merchant and the affiliated person;

(ii) The overall financing requirements of the futures commission merchant and the affiliated person, and the degree, if any, to which the futures commission merchant and the affiliated person are financially dependent on each other;

(iii) The degree, if any, to which the futures commission merchant or its customers rely on the affiliated person for

operational support or services in connection with the futures commission merchant's business;

(iv) The level of market, credit or other risk present in the activities of the affiliated person; and

(v) The extent to which the affiliated person has the authority or the ability to cause a withdrawal of capital from the futures commission merchant.

(3) For purposes of this section and § 1.15, the term Material Affiliated Person does not include a natural person.

(4) The information, reports and records required by this section shall be maintained and preserved, and made readily available for inspection, in accordance with the provisions of § 1.31.

## 17 C.F.R. § 1.15 Risk assessment reporting requirements for futures commission merchants.

(a) Reporting requirements with respect to information required to be maintained by § 1.14.

(1) Each futures commission merchant registered with the Commission pursuant to Section 4d of the Act, unless exempt pursuant to paragraph (c) of this section, shall file the following with the regional office with which it files periodic financial reports by no later than April 30, 1995, provided that in the case of a futures commission merchant whose registration becomes effective after December 31, 1994, such futures commission merchant shall file the following within 60 calendar days after the effective date of such registration, or by April 30, 1995, whichever comes later:

(i) A copy of the organizational chart maintained by the futures commission merchant pursuant to paragraph (a)(l)(i) of § 1.14. Where there is a material change in information provided, an updated organizational chart shall be filed within sixty calendar days after the end of the fiscal quarter in which the change has occurred; and

A.37

(ii) Copies of the financial, operational, and risk management policies, procedures and systems maintained by the futures commission merchant pursuant to paragraph (a)(l)(ii) of § 1.14. If the futures commission merchant has no such written policies, procedures or systems, it must file a statement so indicating. Where there is a material change in information provided, such change shall be reported within sixty calendar days after the end of the fiscal quarter in which the change has occurred.

(2) Each futures commission merchant registered with the Commission pursuant to Section 4d of the Act, unless exempt pursuant to paragraph (c) of this section, shall file the following with the regional office with which it files periodic financial reports within 105 calendar days after the end of each fiscal year or, if a filing is made pursuant to a written notice issued under paragraph (a)(2)(iii) of this section, within the time period specified in the written notice:

(i) Fiscal year-end consolidated and consolidating balance sheets for the highest level Material Affiliated Person within the futures commission merchant's organizational structure, which shall include the futures commission merchant and its other Material Affiliated Persons, prepared in accordance with generally accepted accounting principles, which consolidated balance sheets shall be audited by an independent certified public accountant if an annual audit is performed in the ordinary course of business, but which otherwise may be unaudited, and which consolidated balance sheets shall include appropriate explanatory notes. The consolidating balance sheets may be those prepared by the futures commission merchant's highest level Material Affiliated Person as part of its internal financial reporting process;

(ii) Fiscal year-end annual consolidated and consolidating income statements and consolidated cash flow statements for the highest level Material Affiliated Person within the futures commission merchant's organizational structure, which shall include the futures commission merchant and its other Material Affiliated Persons, prepared in accordance with generally accepted accounting principles, which consolidated statements shall be

A.38

audited by an independent certified public accountant if an annual audit is performed in the ordinary course of business, but which otherwise may be unaudited, and which consolidated statements shall include appropriate explanatory notes. The consolidating statements may be those prepared by the futures commission merchant's highest level Material Affiliated Person as part of its internal financial reporting process; and

(iii) Upon receiving written notice from any representative of the Commission and within the time period specified in the written notice, such additional information which the Commission determines is necessary for a complete understanding of a particular affiliate's financial impact on the futures commission merchant's organizational structure.

(3) For the purposes of this section, the term Material Affiliated Person shall have the meaning used in § 1.14.

(4) The reports required to be filed pursuant to paragraphs (a)(1) and (2) of this section must be filed via electronic transmission using a form of user authentication assigned in accordance with procedures established by or approved by the Commission, and otherwise in accordance with instructions issued by or approved by the Commission. Any such electronic submission must clearly indicate the registrant on whose behalf such filing is made and the use of such user authentication in submitting such filing will constitute and become a substitute for the manual signature of the authorized signer.

(b) [Reserved]

(c) Exemptions.

(1) The provisions of this section shall not apply to any futures commission merchant which holds funds or property of or for futures customers of less than $6,250,000 and has less than $5,000,000 in adjusted net capital as of the futures commission

merchant's fiscal year-end; *provided, however,* that such futures commission merchant is not a clearing member of an exchange.

(2) The Commission may, upon written application by a Reporting Futures Commission Merchant, exempt from the provisions of this section, other than paragraph (a)(1)(ii) of this section, either unconditionally or on specified terms and conditions, any futures commission merchant affiliated with such Reporting Futures Commission Merchant. The term "Reporting Futures Commission Merchant" shall mean, in the case of a futures commission merchant that is affiliated with another registered futures commission merchant, the futures commission merchant which maintains the greater amount of net capital as last reported on its financial reports filed with the Commission pursuant to § 1.10 unless another futures commission merchant is acting as the Reporting Broker or Dealer under § 240.17h-2T of this title or the Commission permits another futures commission merchant to act as the Reporting Futures Commission Merchant. In granting exemptions under this section, the Commission shall consider, among other factors, whether the records and other information required to be maintained pursuant to § 1.14 concerning the Material Affiliated Persons of the futures commission merchant affiliated with the Reporting Futures Commission Merchant will be available to the Commission pursuant to the provisions of this section. A request for exemption filed under this paragraph (c)(2) shall explain the basis for the designation of a particular futures commission merchant as the Reporting Futures Commission Merchant and will become effective on the thirtieth day after receipt of such request by the Commission unless the Commission objects to the request by that date. The Reporting Futures Commission Merchant must submit the information required by paragraph (a)(1)(ii) of this section on behalf of its affiliated futures commission merchants.

(3) The Commission may exempt any futures commission merchant from any provision of this section if it finds that the exemption is not contrary to the public interest and the purposes

A.40

of the provisions from which the exemption is sought. The Commission may grant the exemption subject to such terms and conditions as it may find appropriate.

(d) Special provisions with respect to Material Affiliated Persons subject to the supervision of certain domestic regulators.

(1) In the case of a futures commission merchant which is required to file, or has a Material Affiliated Person which is required to file, Form 17-H (or such other forms or reports as may be required) with the Securities and Exchange Commission pursuant to § 240.17h-2T of this title, or such other risk assessment regulations as the Securities and Exchange Commission may adopt, such futures commission merchant shall be deemed to be in compliance with the reporting requirements of paragraphs (a)(1)(i) and (a)(2) of this section if the futures commission merchant furnishes, in accordance with paragraph (a)(2) of this section, a copy of the most recent Form 17-H filed by the futures commission merchant or its Material Affiliated Person with the Securities and Exchange Commission, *provided however,* that if the futures commission merchant has designated any of its affiliated persons as Material Affiliated Persons for purposes of this section and § 1.14 which are not designated as Material Associated Persons for purposes of the Form 17-H filed pursuant to §§ 240.17h-1T and 240.17h-2T of this title, the futures commission must also designate any such affiliated person as a Material Affiliated Person on the organizational chart required as Item 1 of part I of Form 17-H. To comply with paragraphs (a)(1)(i) and (a)(2) of this section, such futures commission merchant may, at its option, file Form 17-H in its entirety or file such form without the information required under part II of Form 17-H.

(2) In the case of a Material Affiliated Person (including a foreign banking organization) that is subject to examination by, or the reporting requirements of, a Federal banking agency, the futures commission merchant shall be deemed to be in compliance with the reporting requirements of paragraph (a)(2) of this section with respect to such Material Affiliated Person if the futures

A.41

commission merchant or such Material Affiliated Person maintains in accordance with § 1.14 copies of all reports filed by the Material Affiliated Person with the Federal banking agency pursuant to section 5211 of the Revised Statutes, section 9 of the Federal Reserve Act, section 7(a) of the Federal Deposit Insurance Act, section 10(b) of the Home Owners' Loan Act, or section 5 of the Bank Holding Company Act of 1956.

(3) In the case of a futures commission merchant that has a Material Affiliated Person that is subject to the supervision of an insurance commissioner or other similar official or agency of a state, such futures commission merchant shall be deemed to be in compliance with the reporting requirements of paragraph (a)(2) of this section with respect to the Material Affiliated Person if:

> (i) With respect to a Material Affiliated Person organized as a mutual insurance company or a non-public stock company, the futures commission merchant or such Material Affiliated Person maintains in accordance with § 1.14 copies of the annual statements with schedules and exhibits prepared by the Material Affiliated Person on forms prescribed by the National Association of Insurance Commissioners or by a state insurance commissioner; and

> (ii) With respect to a Material Affiliated Person organized as a public stock company, the futures commission merchant or such Material Affiliated Person maintains, in addition to the annual statements with schedules and exhibits required to be maintained pursuant to § 1.14, copies of the filings made by the Material Affiliated Person pursuant to sections 13 or 15 of the Securities Exchange Act of 1934 and the Investment Company Act of 1940.

(4) No futures commission merchant shall be required to furnish to the Commission any examination report of any Federal banking agency or any supervisory recommendations or analyses contained therein with respect to a Material Affiliated Person that is subject to the regulation of a Federal banking agency. All information

A.42

received by the Commission pursuant to this section concerning a Material Affiliated Person that is subject to examination by or the reporting requirements of a Federal banking agency shall be deemed confidential for the purposes of section 8 of the Act.

(5) The furnishing of any information or documents by a futures commission merchant pursuant to this section shall not constitute an admission for any purpose that a Material Affiliated Person is otherwise subject to the Act.

(e) Special provisions with respect to Material Affiliated Persons subject to the supervision of a Foreign Regulatory Authority. A futures commission merchant shall be deemed to be in compliance with the reporting requirements of paragraph (a)(2) of this section with respect to a Material Affiliated Person if such futures commission merchant furnishes, or causes such Material Affiliated Person to make available, in accordance with the provisions of this section, copies of any financial or risk exposure reports filed by such Material Affiliated Person with a foreign futures authority or other foreign regulatory authority, provided that:

(1) The futures commission merchant agrees to use its best efforts to obtain from the Material Affiliated Person and to cause the Material Affiliated Person to provide, directly or through its foreign futures authority or other foreign regulatory authority, any supplemental information the Commission may request and there is no statute or other bar in the foreign jurisdiction that would preclude the futures commission merchant, the Material Affiliated Person, the foreign futures authority or other foreign regulatory authority from providing such information to the Commission; or

(2) The foreign futures authority or other foreign regulatory authority with whom the Material Affiliated Person files such reports has entered into an information sharing agreement with the Commission which is in effect as of the futures commission merchant's fiscal year-end and which will allow the Commission to obtain the type of information required herein. The futures

A.43

commission merchant shall file a copy of the original report and a copy translated into the English language. For the purposes of this section, the term "Foreign Futures Authority" shall have the meaning set forth in section 1a(10) of the Act.

(f) Confidentiality. All information obtained by the Commission pursuant to the provisions of this section from a futures commission merchant concerning a Material Associated Person shall be deemed confidential information for the purposes of section 8 of the Act.

(g) Implementation schedule. Each futures commission merchant registered as of December 31, 1994 and subject to the requirements of this section shall file the information required by paragraph (a)(1) of this section no later than April 30, 1995 and the information required by paragraph (a)(2) of this section no later than May 15, 1995. Each futures commission merchant whose registration becomes effective after December 31, 1994 and is subject to the requirements of this section shall file the information required by paragraph (a)(1) of this section within 60 calendar days after registration is granted, or by April 30, 1995, whichever comes later and the information required by paragraph (a)(2) of this section within 105 calendar days after registration is granted or by May 15, 1995, whichever comes later.

**17 C.F.R. § 1.17(a)**

(a)

    (1)

        (i) Except as provided in paragraph (a)(2)(i) of this section, each person registered as a futures commission merchant must maintain adjusted net capital equal to or in excess of the greatest of:

            (A) $1,000,000, *Provided, however,* that if the futures commission merchant also is a swap dealer, the minimum amount shall be $20,000,000;

A.44

(B) The futures commission merchant's risk-based capital requirement, computed as the sum of:

(1) Eight percent of the total risk margin requirement (as defined in § 1.17(b)(8) of this section) for positions carried by the futures commission merchant in customer accounts and noncustomer accounts; and

(2) For a futures commission merchant that is also a registered swap dealer, two percent of the total uncleared swap margin, as that term is defined in paragraph (b)(11) of this section.

(C) The amount of adjusted net capital required by a registered futures association of which it is a member; or

(D) For securities brokers and dealers, the amount of net capital required by Rule 15c3-1(a) of the Securities and Exchange Commission (17 CFR 240.15c3-1(a)).

(ii) A futures commission merchant that is registered as a swap dealer and has received approval to use internal models to compute market risk and credit risk charges for uncleared swaps must maintain net capital equal to or in excess of $100 million and adjusted net capital equal to or in excess of $20 million.

(iii) Except as provided in paragraph (a)(2) of this section, each person registered as an introducing broker must maintain adjusted net capital equal to or in excess of the greatest of:

(A) $45,000;

(B) The amount of adjusted net capital required by a registered futures association of which it is a member; or

A.45

(C) For securities brokers and dealers, the amount of net capital required by Rule 15c3-1(a) of the Securities and Exchange Commission (17 CFR 240.15c3-1(a)).

(2)

(i) The requirements of paragraph (a)(1) of this section shall not be applicable if the registrant is a member of a designated self-regulatory organization and conforms to minimum financial standards and related reporting requirements set by such designated self-regulatory organization in its bylaws, rules, regulations or resolutions approved by the Commission pursuant to section 4f(b) of the Act and § 1.52.

(ii) The minimum requirements of paragraph (a)(1)(iii) of this section shall not be applicable to an introducing broker which elects to meet the alternative adjusted net capital requirement for introducing brokers by operation pursuant to a guarantee agreement which meets the requirements set forth in § 1.10(j). Such an introducing broker shall be deemed to meet the adjusted net capital requirement under this section so long as such agreement is binding and in full force and effect, and, if the introducing broker is also a securities broker or dealer, it maintains the amount of net capital required by Rule 15c3-1(a) of the Securities and Exchange Commission (17 CFR 240.15c3-1(a)).

(3) No person applying for registration as a futures commission merchant or as an introducing broker shall be so registered unless such person affirmatively demonstrates to the satisfaction of the National Futures Association that it complies with the financial requirements of this section. Each registrant must be in compliance with this section at all times and must be able to demonstrate such compliance to the satisfaction of the Commission or the designated self-regulatory organization.

(4) A futures commission merchant who is not in compliance with this section, or is unable to demonstrate such compliance as

A.46

required by paragraph (a)(3) of this section, or who cannot certify to the Commission immediately upon request and demonstrate with verifiable evidence that it has sufficient access to liquidity to continue operating as a going concern, must transfer all customer accounts and immediately cease doing business as a futures commission merchant until such time as the firm is able to demonstrate such compliance; *Provided, however,* The registrant may trade for liquidation purposes only unless otherwise directed by the Commission and/or the designated self-regulatory organization; And, *Provided further,* That if such registrant immediately demonstrates to the satisfaction of the Commission or the designated self-regulatory organization the ability to achieve compliance, the Commission or the designated self-regulatory organization may in its discretion allow such registrant up to a maximum of 10 business days in which to achieve compliance without having to transfer accounts and cease doing business as required above. Nothing in this paragraph shall be construed as preventing the Commission or the designated self-regulatory organization from taking action against a registrant for non-compliance with any of the provisions of this section.

(5) An introducing broker who is not in compliance with this section, or is unable to demonstrate such compliance as required by paragraph (a)(3) of this section, must immediately cease doing business as an introducing broker until such time as the registrant is able to demonstrate such compliance: *Provided, however,* That if such registrant immediately demonstrates to the satisfaction of the Commission or the designated self-regulatory organization the ability to achieve compliance, the Commission or the designated self-regulatory organization may in its discretion allow such registrant up to a maximum of 10 business days in which to achieve compliance without having to cease doing business as required above. If the introducing broker is required to cease doing business in accordance with this paragraph (a)(5), the introducing broker must immediately notify each of its customers and the futures commission merchants carrying the account of each customer that it has ceased doing business.

A.47

Nothing in this paragraph (a)(5) shall be construed as preventing the Commission or the designated self-regulatory organization from taking action against a registrant for non-compliance with any of the provisions of this section.

## 17 C.F.R. § 1.18 Records for and relating to financial reporting and monthly computation by futures commission merchants and introducing brokers.

(a) No person shall be registered as a futures commission merchant or as an introducing broker under the Act unless, commencing on the date his application for such registration is filed, he prepares and keeps current ledgers or other similar records which show or summarize, with appropriate references to supporting documents, each transaction affecting his asset, liability, income, expense and capital accounts, and in which (except as otherwise permitted in writing by the Commission) all his asset, liability and capital accounts are classified into either the account classification subdivisions specified on Form 1-FR-FCM or Form 1-FR-IB, respectively, or, if such person is registered with the Securities and Exchange Commission as a securities broker or dealer and he files (in accordance with § 1.10(h)) a copy of his Financial and Operational Combined Uniform Single Report under the Securities Exchange Act of 1934, Part II, Part IIA, or Part II CSE (FOCUS report) in lieu of Form 1-FR-FCM or Form 1-FR-IB, the account classification subdivisions specified on such FOCUS report, or categories that are in accord with generally accepted accounting principles. Each person so registered shall prepare and keep current such records.

(b)

(1) Each applicant or registrant must make and keep as a record in accordance with § 1.31 formal computations of its adjusted net capital and of its minimum financial requirements pursuant to § 1.17 or the requirements of the designated self-regulatory organization to which it is subject as of the close of business each month. Such computations must be completed and made available for inspection by any representative of the National Futures Association, in the case of an applicant, or of the Commission or

A.48

designated self-regulatory organization, if any, in the case of a registrant, within 17 business days after the date for which the computations are made, commencing the first month end after the date the application for registration is filed.

(2) An applicant or registrant that has filed a monthly Form 1-FR or Statement of Financial and Operational Combined Uniform Single Report under the Securities Exchange Act of 1934, Part II, Part IIA, or Part II CSE (FOCUS report) in accordance with the requirements of § 1.10(b) will be deemed to have satisfied the requirements of paragraph (b)(1) of this section for such month.

(c) The provisions of this section do not apply to an introducing broker which is operating pursuant to a guarantee agreement, nor do such provisions apply to an applicant for registration as an introducing broker who files concurrently with such application a guarantee agreement, provided such introducing broker or applicant therefor is not also a securities broker or dealer.

## 17 C.F.R. § 1.55(k)

(k) The futures commission merchant shall provide material information about the following specific topics:

(1) The futures commission merchant's name, address of its principal place of business, phone number, fax number, and email address;

(2) The name, title, business address, business background, areas of responsibility, and the nature of the duties of each person that is defined as a principal of the futures commission merchant pursuant to § 3.1 of this chapter;

(3) The significant types of business activities and product lines engaged in by the futures commission merchant, and the approximate percentage of the futures commission merchant's assets and capital that are used in each type of activity;

A.49

(4) The futures commission merchant's business on behalf of its customers, including types of customers, markets traded, international businesses, and clearinghouses and carrying brokers used, and the futures commission merchant's policies and procedures concerning the choice of bank depositories, custodians, and counterparties to permitted transactions under § 1.25;

(5) The material risks, accompanied by an explanation of how such risks may be material to its customers, of entrusting funds to the futures commission merchant, including, without limitation, the nature of investments made by the futures commission merchant (including credit quality, weighted average maturity, and weighted average coupon); the futures commission merchant's creditworthiness, leverage, capital, liquidity, principal liabilities, balance sheet leverage and other lines of business; risks to the futures commission merchant created by its affiliates and their activities, including investment of customer funds in an affiliated entity; and any significant liabilities, contingent or otherwise, and material commitments;

(6) The name of the futures commission merchant's designated self-regulatory organization and its Web site address and the location where the annual audited financial statements of the futures commission merchant is made available;

(7) Any material administrative, civil, enforcement, or criminal complaints or actions filed against the FCM where such complaints or actions have not concluded, and any enforcement complaints or actions filed against the FCM during the last three years;

(8) A basic overview of customer fund segregation, futures commission merchant collateral management and investments, futures commission merchants, and joint futures commission merchant/broker dealers;

(9) Information on how a customer may obtain information regarding filing a complaint about the futures commission

A.50

merchant with the Commission or with the firm's designated self-regulatory organization; and

(10) The following financial data as of the most recent month-end when the Disclosure Document is prepared:

(i) The futures commission merchant's total equity, regulatory capital, and net worth, all computed in accordance with U.S. Generally Accepted Accounting Principles and § 1.17, as applicable;

(ii) The dollar value of the futures commission merchant's proprietary margin requirements as a percentage of the aggregate margin requirement for futures customers, Cleared Swaps Customers, and 30.7 customers;

(iii) The smallest number of futures customers, Cleared Swaps Customers, and 30.7 customers that comprise 50 percent of the futures commission merchant's total funds held for futures customers, Cleared Swaps Customers, and 30.7 customers, respectively;

(iv) The aggregate notional value, by asset class, of all non-hedged, principal over-the-counter transactions into which the futures commission merchant has entered;

(v) The amount, generic source and purpose of any committed unsecured lines of credit (or similar short-term funding) the futures commission merchant has obtained but not yet drawn upon;

(vi) The aggregated amount of financing the futures commission merchant provides for customer transactions involving illiquid financial products for which it is difficult to obtain timely and accurate prices; and

(vii) The percentage of futures customer, Cleared Swaps Customer, and 30.7 customer receivable balances that the

futures commission merchant had to write-off as uncollectable during the past 12-month period, as compared to the current balance of funds held for futures customers, Cleared Swaps Customers, and 30.7 customers; and

(11) A summary of the futures commission merchant's current risk practices, controls and procedures.

## 17 C.F.R. § 1.55(o)

(o)

(1) Each futures commission merchant shall make the following financial information publicly available on its Web site:

(i) The daily Statement of Segregation Requirements and Funds in Segregation for Customers Trading on U.S. Exchanges for the most current 12-month period;

(ii) The daily Statement of Secured Amounts and Funds Held in Separate Accounts for 30.7 Customers Pursuant to Commission Regulation 30.7 for the most current 12-month period;

(iii) The daily Statement of Cleared Swaps Customer Segregation Requirements and Funds in Cleared Swaps Customer Accounts Under Section 4d(f) of the Act for the most current 12-month period;

(iv) A summary schedule of the futures commission merchant's adjusted net capital, net capital, and excess net capital, all computed in accordance with § 1.17 and reflecting balances as of the month-end for the 12 most recent months;

(v) The Statement of Financial Condition, the Statement of Segregation Requirements and Funds in Segregation for Customers Trading on U.S. Exchanges, the Statement of Secured Amounts and Funds Held in Separate Accounts for 30.7 Customers Pursuant to Commission Regulation 30.7,

A.52

the Statement of Cleared Swaps Customer Segregation Requirements and Funds in Cleared Swaps Customer Accounts Under Section 4d(f) of the Act, an all related footnotes to the above schedules that are part of the futures commission merchant's most current certified annual report pursuant to § 1.16; and

(vi) The Statement of Segregation Requirements and Funds in Segregation for Customers Trading on U.S. Exchanges, the Statement of Secured Amounts and Funds Held in Separate Accounts for 30.7 Customers Pursuant to Commission Regulation 30.7, and the Statement of Cleared Swaps Customer Accounts Under Section 4d(f) of the Act that are part of the futures commission merchant's unaudited Form 1-FR-FCM or Financial and Operational Combined Uniform Single Report under the Securities Exchange Act of 1934 ("FOCUS Report") for the most current 12-month period.

(2) To the extent any of the financial data identified in paragraph (1) of this section is amended, the FCM must clearly notate that the data has been amended.

(3) Each futures commission merchant must include a statement on its Web site that is available to the public that financial information regarding the futures commission merchant, including how the futures commission merchant invests and holds customer funds, may be obtained from the National Futures Association and include a link to the Web site of the National Futures Association's Basic System where information regarding the futures commission merchant's investment of customer funds is maintained.

(4) Each futures commission merchant must include a statement on its Web site that is available to the public that additional financial information on all futures commission merchants is available from the Commodity Futures Trading Commission, and

A.53

include a link to the Commodity Futures Trading Commission's Web page for financial data for futures commission merchants.

## 17 C.F.R. § 1.71(e)

(e) Undue influence on customers. Each futures commission merchant and introducing broker must adopt and implement written policies and procedures that mandate the disclosure to its customers of any material incentives and any material conflicts of interest regarding the decision of a customer as to the trade execution and/or clearing of the derivatives transaction.

## 17 C.F.R. § 17.00 Information to be furnished by futures commission merchants, clearing members and foreign brokers.

(a) Special accounts—reportable futures and options positions, delivery notices, and exchanges of futures.

(1) Each futures commission merchant, clearing member and foreign broker shall submit a report to the Commission for each business day with respect to all special accounts carried by the futures commission merchant, clearing member or foreign broker, except for accounts carried on the books of another futures commission merchant or clearing member on a fully-disclosed basis. Except as otherwise authorized by the Commission or its designee, such report shall be made pursuant to paragraph (g) of this section. The report shall show each futures position, separately for each reporting market and for each future, and each put and call options position separately for each reporting market, expiration and strike price in each special account as of the close of market on the day covered by the report and, in addition, the number of futures and options contracts bought and sold, the quantity of exchanges of futures or options for commodities or for derivatives positions, the number of delivery notices issued for each such account by the clearing organization of a reporting market and the number stopped by the account, the number of long and short options expired and exercised, the number of long and short futures assigned, and the number of long and short

A.54

transfers sent and received. The report shall also show all positions in all contract months and option expirations of that same commodity on the same reporting market for which the special account is reportable.

(2) A report covering the first day upon which a special account is no longer reportable shall also be filed showing the information specified in paragraph (a)(1) of this section.

(b) Interest in or control of several accounts. Except as otherwise instructed by the Commission or its designee and as specifically provided in § 150.4 of this chapter, if any person holds or has a financial interest in or controls more than one account, all such accounts shall be considered by the futures commission merchant, clearing member, or foreign broker as a single account for the purpose of determining special account status and for reporting purposes.

(1) Accounts of eligible entities —Accounts of eligible entities as defined in § 150.1 of this chapter that are traded by an independent account controller shall, together with other accounts traded by the independent account controller or in which the independent controller has a financial interest, be considered a single account.

(2) Accounts controlled by two or more persons —Accounts that are subject to day-to-day trading control by two or more persons shall, together with other accounts subject to control by exactly the same persons, be considered a single account.

(3) Account ownership. Multiple accounts owned by a trader shall be considered a single account as provided under §§ 150.4(b), (c) and (d) of this chapter.

(c) [Reserved]

(d) Net positions. Futures commission merchants, clearing members and foreign brokers shall report positions net long or short in each future of a commodity and each strike price of a put or call option for

each expiration month in all special accounts, except as specified in paragraph (e) of this section.

(e) Gross positions. In the following cases, the futures commission merchant, clearing member or foreign broker shall report gross long and short positions in each future of a commodity and each strike price of a put or call option for each expiration month in all special accounts:

(1) Positions which are reported to an exchange or the clearinghouse of an exchange on a gross basis, which the exchange uses for calculating total open interest in a commodity;

(2) Positions in accounts owned or held jointly with another person or persons;

(3) Positions in multiple accounts subject to trading control by the same trader; and

(4) Positions in omnibus accounts.

(f) Omnibus accounts. If the total open long positions or the total open short positions for any future of a commodity carried in an omnibus account is a reportable position, the omnibus account is in Special Account status and shall be reported by the futures commission merchant or foreign broker carrying the account in accordance with paragraph (a) of this section.

(g) Media and file characteristics. Except as otherwise approved by the Commission or its designee, all of the applicable data elements set forth in appendix C to this part shall be included in a report required by paragraph (a) of this section and shall be submitted together in a single file. The report shall be submitted in the form and manner published by the Commission or its designee pursuant to § 17.03.

(h) Correction of errors and omissions. Except as otherwise approved by the Commission or its designee, corrections to errors and omissions in data provided pursuant to paragraph (a) of this section shall be submitted in the form and manner published by the Commission or its designee pursuant to § 17.03.

A.56

(i) Exclusively self-cleared contracts. Unless determined otherwise by the Commission, reporting markets that list exclusively self-cleared contracts shall meet the requirements of paragraphs (a) through (h) of this section, as they apply to trading in such contracts by all clearing members, on behalf of all clearing members.

**17 C.F.R. § 40.2(a)**

(a) Submission requirements. A designated contract market or a swap execution facility must comply with the submission requirements of this section prior to listing a product for trading that has not been approved under § 40.3. A submission shall comply with the following conditions:

> (1) The designated contract market or the swap execution facility has filed its submission electronically in a format and manner specified by the Commission;
>
> (2) The Commission has received the submission by the open of business on the business day preceding the product's listing; and
>
> (3) The submission includes:
>
> > (i) The information required by appendix D to this part;
> >
> > (ii) A copy of the rules that set forth the contract's terms and conditions;
> >
> > (iii) The intended listing date;
> >
> > (iv) A certification by the designated contract market or the swap execution facility that the product to be listed complies with the Act and Commission regulations thereunder;
> >
> > (v) A concise explanation and analysis that is complete with respect to the product's terms and conditions, the underlying commodity, and the product's compliance with applicable provisions of the Act, including core principles, and the Commission's regulations thereunder. This explanation and analysis shall either be accompanied by the documentation relied upon to establish the basis for compliance with

applicable law, or incorporate information contained in such documentation, with appropriate citations to data sources;

(vi) A certification that the registered entity posted a notice of a pending product certification with the Commission and a copy of the submission, concurrent with the filing of a submission with the Commission, on the registered entity's website. Information that the registered entity seeks to keep confidential may be redacted from the documents published on the registered entity's website but must be republished consistent with any determination made pursuant to § 40.8(0(4); and

(vii) A request for confidential treatment, if appropriate, as permitted under § 40.8.

## 17 C.F.R. § 40.3(a)

(a) Request for approval. Pursuant to section 5c(c) of the Act, a designated contract market, a swap execution facility, or a derivatives clearing organization may request that the Commission approve a new product prior to listing the product for trading or accepting the product for clearing, or if a product was initially submitted under § 40.2 or § 39.5 of this chapter, subsequent to listing the product for trading or accepting the product for clearing. A submission requesting approval shall:

(1) Be filed electronically in a format and manner specified by the Commission;

(2) Include the information required by appendix D to this part;

(3) Include a copy of the rules that set forth the contract's terms and conditions;

(4) Include an explanation and analysis that is complete with respect to the product's terms and conditions, the underlying commodity, and the product's compliance with applicable provisions of the Act, including core principles, and the Commission's

regulations thereunder. This explanation and analysis shall either be accompanied by the documentation relied upon to establish the basis for compliance with the applicable law, or incorporate information contained in such documentation, with appropriate citations to data sources;

(5) Describe any agreements or contracts entered into with other parties that enable the registered entity to carry out its responsibilities;

(6) Include the certifications required in § 41.22 for product approval of a commodity that is a security future or a security futures product as defined in Sections 1a(44) or 1a(45) of the Act, respectively;

(7) Include, if appropriate, a request for confidential treatment as permitted under § 40.8;

(8) Include the filing fee required under appendix A to this part;

(9) Certify that the registered entity posted a notice of its request for Commission approval of the new product and a copy of the submission, concurrent with the filing of a submission with the Commission, on the registered entity's website. Information the registered entity seeks to keep confidential may be redacted from the documents published on the registered entity's website but must be republished consistent with any determination made pursuant to § 40.8(0(4); and

(10) Include, if requested by Commission staff, additional evidence, information or data demonstrating that the contract meets, initially or on a continuing basis, the requirements of the Act, or other requirement for designation or registration under the Act, or the Commission's regulations or policies thereunder. The registered entity shall submit the requested information by the time specified by Commission staff, or at the conclusion of any extended period agreed to by Commission staff after timely receipt of a written request from the registered entity.

**17 C.F.R. § 40.6(b)(1)**

(b) Review by the Commission.

> (1) The Commission shall have 10 business days to review the new rule or rule amendment before the new rule or rule amendment is deemed certified and can be made effective, unless the Commission notifies the registered entity during the 10-business day review period that it intends to issue a stay of the certification under paragraph (c) of this section.

**17 C.F.R. § 40.11 Review of event contracts based upon certain excluded commodities.**

(a) Prohibition. A registered entity shall not list for trading or accept for clearing on or through the registered entity any of the following:

> (1) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law; or

> (2) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which involves, relates to, or references an activity that is similar to an activity enumerated in § 40.11(a)(1) of this part, and that the Commission determines, by rule or regulation, to be contrary to the public interest.

(b) [Reserved]

(c) 90-day review and approval of certain event contracts. The Commission may determine, based upon a review of the terms or conditions of a submission under § 40.2 or § 40.3, that an agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), be subject to a 90-day review. The 90-day review shall commence from the

A.60

date the Commission notifies the registered entity of a potential violation of § 40.11(a).

(1) The Commission shall request that a registered entity suspend the listing or trading of any agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), during the Commission's 90-day review period. The Commission shall post on the Web site a notification of the intent to carry out a 90-day review.

(2) Final determination. The Commission shall issue an order approving or disapproving an agreement, contract, transaction, or swap that is subject to a 90-day review under § 40.11(c) not later than 90 days subsequent to the date that the Commission commences review, or if applicable, at the conclusion of such extended period agreed to or requested by the registered entity.

**17 C.F.R. § 155.3 Trading standards for futures commission merchants.**

(a) Each futures commission merchant shall, at a minimum, establish and enforce internal rules, procedures and controls to:

(1) Ensure, to the extent possible, that each order received from a customer which is executable at or near the market price is transmitted to the floor of the appropriate contract market before any order in any future or in any commodity option in the same commodity for any proprietary account, any other account in which an affiliated person has an interest, or any account for which an affiliated person may originate orders without the prior specific consent of the account owner, if the affiliated person has gained knowledge of the customer's order prior to the transmission to the floor of the appropriate contract market of the order for a proprietary account, an account in which the affiliated person has an interest, or an account in which the affiliated person may originate orders without the prior specific consent of the account owner; and

A.61

(2) Prevent affiliated persons from placing orders, directly or indirectly, with another futures commission merchant in a manner designed to circumvent the provisions of paragraph (a)(1) of this section.

(b) No futures commission merchant or any of its affiliated persons shall:

(1) Disclose that an order of another person is being held by the futures commission merchant or any of its affiliated persons, unless such disclosure is necessary to the effective execution of such order or is made at the request of an authorized representative of the Commission, the contract market on which such order is to be executed, or a futures association registered with the Commission pursuant to section 17 of the Act; or

(2)

(i) Knowingly take, directly or indirectly, the other side of any order of another person revealed to the futures commission merchant or any of its affiliated persons by reason of their relationship to such other person, except with such other person's prior consent and in conformity with contract market rules approved by or certified to the Commission.

(ii) In the case of a customer who does not qualify as an "institutional customer" as defined in § 1.3 of this chapter, a futures commission merchant must obtain the customer's prior consent through a signed acknowledgment, which may be accomplished in accordance with § 1.55(d) of this chapter.

(c) No futures commission merchant shall knowingly handle the account of any affiliated person of another futures commission merchant or of an introducing broker unless the futures commission merchant:

(1) Receives written authorization from a person designated by such other futures commission merchant or introducing broker with responsibility for the surveillance over such account

A.62

pursuant to paragraph (a)(2) of this section or § 155.4(a)(2), respectively;

(2) Prepares immediately upon receipt of an order for such account a written record of such order, including the account identification and order number, and records thereon, by time-stamp or other timing device, the date and time, to the nearest minute, the order is received; and

(3) Transmits on a regular basis to such other futures commission merchant or introducing broker copies of all statements for such account and of all written records prepared upon the receipt of orders for such account pursuant to paragraph (c)(2) of this section.

(d) No affiliated person of a futures commission merchant shall have an account, directly or indirectly, with another futures commission merchant unless:

(1) Such affiliated person receives written authorization to maintain such an account from a person designated by the futures commission merchant with which such person is affiliated with responsibility for the surveillance over such account pursuant to paragraph (a)(2) of this section; and

(2) Copies of all statements for such account and of all written records prepared by such other futures commission merchant upon receipt of
orders for such account pursuant to paragraph (c)(2) of this section are transmitted on a regular basis to the future commission merchant with which such person is affiliated.

**Provisions from Chapter 463 of the Nevada Revised Statutes:**

**Section 360, as amended by S.B. 256, 83rd Sess. (Nev. 2025)**

AN ACT relating to gaming; requiring the disgorgement of any profit, gain, gross receipt or other benefit related to certain illegal gaming

activities; increasing a penalty; and providing other matters properly relating thereto.

Section 1.  NRS 463.360 is hereby amended to read as follows:

463.360  1.  Conviction by a court of competent jurisdiction of a person for a violation of, an attempt to violate, or a conspiracy to violate any of the provisions of this chapter or of chapter 463B, 464 or 465 of NRS may act as an immediate revocation of all licenses which have been issued to the violator, and, in addition, the court may, upon application of the district attorney of the county or of the Commission, order that no new or additional license under this chapter be issued to the violator, or be issued to any person for the room or premises in which the violation occurred, for 1 year after the date of the revocation.

2.  A person who willfully fails to report, pay or truthfully account for and pay over any license fee or tax imposed by the provisions of this chapter, or willfully attempts in any manner to evade or defeat any such license fee, tax or payment thereof is guilty of a category C felony and shall be punished as provided in NRS 193.130. In addition to any other penalty, the court shall order the person to pay restitution.

3.  Except as otherwise provided in subsection 4, a person who willfully violates, attempts to violate, or conspires to violate any of the provisions of subsection 1 of NRS 463.160 is guilty of a category B felony and shall be punished by imprisonment in the state prison for a minimum term of not less than 1 year and a maximum term of not more than 10 years, by a fine of not more than $50,000, or by both fine and imprisonment. *The court shall also order any profits, gain, gross receipts or other benefit from the violation to be disgorged and paid to the State Treasurer for deposit in the State General Fund.*

4.  A licensee who puts additional games or slot machines into play or displays additional games or slot machines in a public area without first obtaining all required licenses and approval is subject only to the penalties provided in NRS 463.270 and 463.310 and in any applicable ordinance of the county, city or town.

A.64

5. A person who willfully violates any provision of a regulation adopted pursuant to NRS 463.125 is guilty of a category C felony and shall be punished as provided in NRS 193.130.

6. The violation of any of the provisions of this chapter, the penalty for which is not specifically fixed in this chapter, is a gross misdemeanor.

A.65