No. 25-7831

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ROBINHOOD DERIVATIVES LLC,
*Plaintiff-Appellant,*

v.

MIKE DREITZER, GEORGE ASSAD, CHANDENI K. SENDALL, NEVADA
GAMING CONTROL BOARD, JENNIFER TOGLIATTI, ROSA SOLIS-RAINEY,
BRIAN KROLICKI, GEORGE MARKANTONIS, NEVADA GAMING
COMMISSION, AND AARON D. FORD,
*Defendants-Appellees,*

NEVADA RESORT ASSOCIATION,
*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court for Nevada,
No. 25-cv-01541 (Hon. Andrew P. Gordon)

**STATE DEFENDANTS' ANSWERING BRIEF**

| | |
|---|---|
| **ANDERSEN BEEDE WEISENMILLER** | AARON D. FORD |
| Ryan A. Andersen, Esq. | Attorney General |
| Nevada Bar No. 12321 | Jessica E. Whelan (Bar No. 14781) |
| Mark M. Weisenmiller, Esq. | Sabrena K. Clinton (Bar No. 6499) |
| Nevada Bar No. 12128 | Office of the Attorney General |
| Michael N. Beede, Esq. | 1 State of Nevada Way, Suite 100 |
| Nevada Bar No. 13068 | Las Vegas, NV 89119 |
| 3199 E Warm Springs Rd., Ste 400 | |
| Las Vegas, Nevada 89120 | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION...................................................................1

JURISDICTIONAL STATEMENT.......................................3

**STATEMENT OF THE ISSUE**.........................................3

STATEMENT OF THE CASE ...........................................3

    A.    Legal Background.....................................3

        1.    Nevada Comprehensively Regulates Gaming 3

        2.    The CFTC Regulates Commodity Futures.....4

    B.    Factual Background ...............................6

SUMMARY OF THE ARGUMENT.................................12

ARGUMENT .....................................................................17

    A.    The District Court Did Not Abuse Its Discretion..17

    B.    Robinhood Is Not Likely to Succeed on the Merits ..19

    C.    The Balance of Hardships Weighs Against Robinhood ..............................................55

CONCLUSION ..................................................................61

# TABLE OF AUTHORITIES

**Cases**                                                                       **Page(s)**

*Adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 764 (9th Cir. 2018) ............................................................................ 17

*Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020) ................................................................ 56

*Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) ...................................................................... 20, 46

*Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992) ........................................................ 49

*Am. Apparel & Footwear Ass'n v. Baden*, 107 F.4th 934, 943 (9th Cir. 2024) ............................................................................ 54

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648 (9th Cir. 2025) .............................................................. 58

*Arc of Cal. v. Douglas*, 757 F.3d 975 (9th Cir. 2014) .............................................................. 60

*Artichoke Joe's California Grand Casino v. Norton*, *353 F.3d 712, 737 (9th Cir. 2003)* ........................................................ 36

*Beecham v. United States*, 511 U.S. 368, 371 (1994) ...................................................................... 29

*Big Lagoon Rancheria v. California*, 789 F.3d 947 (9th Cir. 2015) .............................................................. 40

*Bond v. United States*, 572 U.S. 844 (2014) ...................................................................... 19, 20

*CFTC v. Frankwell Bullion Ltd.*, 99 F.3d 299, 301 (9th Cir. 1996) ........................................................ 37

*CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766 (9th Cir. 1995) .................................................................. 5

## TABLE OF AUTHORITIES
### (continued)

**Cases (continued)**                                    **Page(s)**

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics,*
　29 F.4th 468, 475 (9th Cir. 2022) ................................................ 17, 18

*Carter v. Carter Coal Co.,*
　298 U.S. 238, 311 (1936) ................................................................ 42

*Cipollone v. Liggett Grp., Inc.,*
　505 U.S. 504, 517, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) ................ 45

*Commodity Futures Trading Comm'n v. White Pine Tr. Corp.,*
　574 F.3d 1219 (9th Cir. 2009) ........................................................ 35

*Drakes Bay Oyster Co. v. Jewell,*
　747 F.3d 1073, 1092 (9th Cir. 2014) ............................................... 17

*Drapich v. Donovan,*
　693 F.2d 1296, 1298 (9th Cir. 1982) ............................................... 25

*Dubin v. United States,*
　599 U.S. 110 ................................................................................ 25

*FCC v. Consumers' Rsch.,*
　606 U.S. 656, 695 (2025) ............................................................... 42

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana,*
　98 F.4th 1180 (9th Cir. 2024) ........................................................ 17

*Flynt v. Bonta,*
　131 F.4th 918 (9th Cir. 2025) .................................................... 19, 50

*Freightliner Corp. v. Myrick,*
　514 U.S. 280 ........................................................................... 45, 46

*Effex Cap., LLC v. Nat'l Futures Ass'n,*
　933 F.3d 882, 894 (7th Cir. 2019) .................................................. 43

*Epic Sys. Corp. v. Lewis,*
　584 U.S. 497, 510 (2018) ............................................................... 52

4

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**          **Page(s)**

*Fisher v. Dean Witter Reynolds, Inc.,*
526 F. Supp. 558, 559-60 (E.D. Pa. 1981) ............................................. 35

*GCIU-Emp. Ret. Fund v. MNG Enters., Inc.,*
51 F.4th 1092, 1097 (9th Cir. 2022) ...................................................... 30

*Greater New Orleans Broad. Ass'n,*
527 U.S. at 185 ....................................................................................... 51

*Gregory v. Ashcroft,*
501 U.S. 452, 460 (1991) ....................................................................... 51

*Griffin v. Oceanic Contractors, Inc.,*
458 U.S. 564, 575 (1982) ....................................................................... 37

*Haaland v. Brackeen,*
599 U.S. 255, 273 (2023) ....................................................................... 41

*Hubbard v. City of San Diego,*
139 F.4th 843, 849 (9th Cir. 2025) ....................................................... 16

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods.*
*Liab. Litig.,*
959 F.3d 1201, 1215 (9th Cir. 2020 ....................................................... 43

*Inv. Co. Inst. v. CFTC,*
891 F. Supp. 2d 162, 172-73 (D.D.C. 2012) ......................................... 32

*John Doe Co. v. CFPB,*
235 F. Supp. 3d 194 (D.D.C. 2017) ....................................................... 57

*KalshiEX LLC v. Martin,*
793 F. Supp. 3d 667 (D. Md. 2025) ................................................ *Passim*

*KalshiEX LLC v. CFTC,*
2024 WL 4164694 (D.D.C. Sept. 12, 2024) ......................................... 26

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                                       **Page(s)**

*Kansas v. Garcia,*
589 U.S. 191, 203 (2020) ................................................................ 43

*Karnoski v. Trump,* 926
F.3d 1180, 1198 & n.14 (9th Cir. 2019) ............................................ 17

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369, 402 (2024) ................................................................ 39

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996) .......................................................... 19, 45, 46

*Marbury v. Madison,*
5 U.S. (1 Cranch) 137, 177 (1803) ................................................... 39

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
456 U.S. 353 (1982) ......................................................................... 5

*Montalvo v. Spirit Airlines,*
508 F.3d 464, 471 (9th Cir. 2007) .................................................... 55

*Murphy v. NCAA,*
584 U.S. 453 (2018) ................................................................. *Passim*

*Negrete v. Allianz Life Ins. Co. of N. Am.,*
523 F.3d 1091, 1096 (9th Cir. 2008) ................................................ 18

*N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.,*
*No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151, at \*1 (D.*
*Nev. Oct. 14, 2025)* ........................................................... 24, 25, 37

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev.*
*Comm'n,* 461 U.S. 190, 203 (1983) ............................................. 42, 43

*Plaskett v. Wormuth,*
18 F.4th 1072 (9th Cir. 2021) .......................................................... 40

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                                      **Page(s)**

*Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.*,
26 F.3d 1508 (10th Cir. 1994) ........................................ 26

*Rissetto v. Plumbers & Steamfitters Loc.
343*, 94 F.3d 597, 604 (9th Cir. 1996) .................................. 34

*Sacco v. State*,
105 Nev. 844 (1989) .................................................... 58

*Sackett v. EPA*,
598 U.S. 651, 674 (2023) ............................................... 46

*Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*,
322 F.3d 1039 (9th Cir. 2003) ..................................... 5, 22

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .................................................... 58

*Nat'l Fed'n of the Blind v. United Airlines Inc.*,
813 F.3d 718, 733 (9th Cir. 2016) ...................................... 45

*United States v. Lucero*,
989 F.3d 1088, 1094 (9th Cir. 2021) .................................... 21

*Util. Air Regul. Grp. v. E.P.A.,*
573 U.S. 302, 134 S. Ct. 2427, 189 L. Ed. 2d 372 (2014) ...................... 26

*Vietnam Veterans of Am. v. CIA*,
811 F.3d 1068, 1075 (9th Cir. 2016) .................................... 40

*Yates v. United States*,
574 U.S. 528, 543-44 (2015) ............................................ 29

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ................................................. 2, 51

*Winter v. NRDC*,
555 U.S. 7 (2008) ...................................................... 17

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                                **Page(s)**

*Wyeth v. Levine,*
   555 U.S. 555, 573 (2009) ................................................................ 54, 55

**Statutes and Regulations**

5 U.S.C. § 551 .................................................................................... 39

7 U.S.C. § 1a(19)(iii) ......................................................................... 35

7 U.S.C. § 1a(18) ........................................................................... 5, 37

7 U.S.C. § 2(e) ...........................................................................5, 35, 36, 37

7 U.S.C. § 1a(47)(A) ................................................................. *Passim*

7 U.S.C. § 1a(47)(B)(i) ...................................................................... 34

7 U.S.C. § 2(a)(1)(A) .................................................................. *Passim*

7 U.S.C. § 6(a) ....................................................................... 36, 37, 50

7 U.S.C. § 7a-2(c)(1) ............................................................................ 6

7 U.S.C. § 7a-2(c)(5) ....................................................6, 26, 31, 40, 49

7 U.S.C. § 16(e)(2) .............................................................................. 44

17 C.F.R. § 38.4(b) .............................................................................. 34

Pub. L. No. 74-675, § 3, 40 Stat. 1491 (1936) ................................... 5

Pub. L. No. 93-463, § 201(b), 88 Stat. 1389 (1974) .......................... 5

17 C.F.R. § 40.11 ......................................................................... *Passim*

17 C.F.R. § 33.3(a) ....................................................................... 36, 37

18 U.S.C. § 1084 ........................................................................... 52, 53

## TABLE OF AUTHORITIES

**(continued)**

**Statutes and Regulations (continued)**          **Page(s)**

25 U.S.C. §§ 5108 ............................................................................ 41

25 U.S.C. §§ 5131 ............................................................................ 41

30 U.S.C. § 1254(a)(3) ...................................................................... 47

NRS §§ 172.015 ............................................................................... 57

NRS § 463.0129(1)(d) ........................................................................ 4

NRS § 463.160(1) .............................................................................. 4

NRS § 463.170 .................................................................................. 4

NRS §§ 463.0193 ............................................................................... 4

NRS §§ 463.01962 ............................................................................. 4

NRS § 463.343 ................................................................................. 57

NRS § 463.350(1)(a) ..................................................................... 4, 60

NRS § 463.370 .................................................................................. 4

NRS § 463.3072(2)(a) .................................................................... 3, 4

Nev. Gaming Reg. 5.225(18)(a) ..................................................... 4, 60

Nev. Gaming Reg. 22.1205 ............................................................ 4, 59

## Other Authorities

77 Fed. Reg. 48208-01 (Aug. 13, 2012) ........................................... 33

89 Fed. Reg. 48968 (June 10, 2024) ............................................. 8, 20

Kendall Baker, *NCAA President Charlie Baker on Sports
    Betting*, Yahoo! Sports (Dec. 11, 2025) ...................................... 59

## TABLE OF AUTHORITIES
## (continued)

**Other Authorities (continued)** **Page(s)**

Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street
Reform and Consumer Protection Act* (2017) ........................................... 5

Becky Harris & Husna Alikhan, *Nevada, Over 60 Years
Regulating Gambling*, 23 Gaming L. Rev. 645 (2019) ........................... 4

Testimony of Jeff Miller (NFL), H. Comm. on Agric., 119th
Cong. (Dec. 11, 2025) ................................................................................. 60

Marc Novicoff, *The Company Making a Mockery of State
Gambling Bans*, The Atlantic (Oct. 26, 2025) ........................................ 9

*Robinhood Extends its Prediction Markets Offering through
New Joint Venture and Partnership with Susquehanna to
Operate CFTC-Licensed Exchange and Clearinghouse*,
Robinhood, (Nov. 25, 2025),
https://robinhood.com/us/en/newsroom/robinhood-prediction-
markets-joint-venture/ [https://perma.cc/9SJJ-4ZUM] ........................... 9

Sean Conlon, *Robinhood is rolling out NFL parlay and prop
bets on prediction markets platform*, CNBC (Dec. 17, 2025),
https://www.cnbc.com/2025/12/16/robinhood-is-rolling-out-
nfl-parlay-and-prop-bets-on-prediction-markets-
platform.html [https://perma.cc/9R5N-ZU68] ........................................ 9

*The Next Phase of Project Crypto: Unleashing Innovation for
the New Frontier of Finance, Remarks of Chairman Michael
S. Selig at CFTC-SEC Event on Harmonization, Commodity
Futures Trading Commission* (Jan. 29, 2026),
https://www.cftc.gov/PressRoom/SpeechesTestimony/opaseli
g1 [https://perma.cc/9EQC-CDWX] ........................................................ 7

## INTRODUCTION

Robinhood brought the underlying action, seeking to enjoin the State Defendants from enforcing Nevada's gaming laws. Robinhood sought to continue expanding its illegal gambling business while undermining Nevada's gaming industry, threatening the State's economy, and endangering public safety. The District Court denied Robinhood's motion for a preliminary injunction, and Robinhood now appeals.

Robinhood offers its customers the sports-event contracts of its partner, KalshiEX LLC ("**Kalshi**"). Kalshi advertises its sports-event contracts as "legal sports betting in all 50 states." StateSER-9. But Robinhood, by offering the Kalshi contracts, does not comply with sports-betting laws in Nevada or any other State. Instead, Robinhood claims that it (and the contracts it offers) can be regulated only by the Commodity Futures Trading Commission ("**CFTC**"). As the District Court explained, Robinhood is simply wrong. The CFTC is responsible for regulating trading in commodity futures, not sports betting. Despite Robinhood's arguments, the sports-event contracts at issue in the instant case are wagers on sporting events. Nothing in the Commodity Exchange Act ("**CEA**") shows that Congress intended to take away the States' and Tribes' historic powers to regulate gambling and give them wholesale to the CFTC.

The implications of Robinhood's merits position are truly staggering— as the District Court recognized. Under Robinhood's view, *all* sports wagers

1

are "swaps" that can be regulated *only* by the CFTC. According to Robinhood, when Congress amended the CEA in 2010 in response to the financial crisis, it intended not only to legalize sports betting nationwide, but also to make the CFTC the Nation's sole gaming regulator. Then nobody noticed for over a decade—not even the Supreme Court, which reaffirmed the States' power to regulate sports betting in *Murphy v. NCAA*, 584 U.S. 453 (2018). Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). It did not secretly or inadvertently preempt all state gaming regulation in a law about commodity-futures trading.

Apart from the merits, the Court should deny relief because the District Court clearly did not abuse its discretion in denying the preliminary injunction. Preliminary injunctions are not granted as a right but are an extraordinary remedy. It is undisputed that the District Court applied the appropriate standard in denying Robinhood the relief it sought.

Moreover, the balance of equities tips strongly against Robinhood. Robinhood wants to keep profiting from unlicensed sports betting. However, its harms are self-inflicted; the District Court and the CFTC warned Robinhood of the risks of expanding its business, and Robinhood did it anyway. Robinhood's claimed harms are also unsubstantiated, as the District Court thoroughly explained.

On the other hand, Robinhood's continued operation poses an

2

existential threat to Nevada's gaming industry, which is at the core of its economy. Robinhood's refusal to follow the same rules as its state-licensed competitors threatens the integrity of that industry and deprives the State of critical revenue used to pay for schools, roads, and social services. Robinhood also harms the public by offering gambling without any of Nevada's restrictions on gambling by minors, problem gambling, insider betting, and criminal conduct. Every day Robinhood operates causes irreparable harm to Nevada, its gaming industry, and the public. The Court should affirm the District Court.

## JURISDICTIONAL STATEMENT

The jurisdictional statement in Robinhood's brief is correct.

## STATEMENT OF THE ISSUE

Whether the District Court abused its discretion in denying the preliminary injunction, when (1) Robinhood is unlikely to succeed in showing that the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, preempts Nevada gaming law with respect to Kalshi's election and sports-event contracts, and (2) the balance of equities tips heavily against Robinhood.

## STATEMENT OF THE CASE

### A. Legal Background

#### 1. Nevada Comprehensively Regulates Gaming

Nevada's gaming industry is "vital to the economy of [the] State" and is "critical[ly] importan[t] to the general welfare" of Nevadans. NRS

3

§ 463.3072(2)(a).

Nevada has the "gold standard in gaming regulation." Becky Harris & Husna Alikhan, *Nevada, Over 60 Years Regulating Gambling*, 23 Gaming L. Rev. 645, 645-49 (2019). Its comprehensive regulatory scheme ensures that gaming is "conducted honestly [and] competitively," free from "criminal" elements, while "protect[ing] the public health." NRS § 463.0129(1)(d)-(e). Nevada requires all gaming operators to obtain licenses and pay fees and taxes, *id.* §§ 463.160(1), 463.370; thoroughly investigates potential licensees to ensure suitability, *id.* § 463.170; and imposes many requirements to protect the public, including age restrictions, *id.* § 463.350(1)(a), and measures to address problem gambling, *e.g.*, Nev. Gaming Reg. 5.225(18)(a)-(b).

Nevada specifically regulates sports and event betting. Nevada permits wagering on organized sports events, NRS §§ 463.0193, 463.01962, but not on elections or events that lack effective supervision, Nev. Gaming Reg. 22.1205. Among other things, Nevada requires licensees to verify that insiders (*e.g.*, players or coaches) do not wager on their own events. *Id.*

### 2. The CFTC Regulates Commodity Futures

The CFTC regulates trading in financial instruments that businesses and other market participants use to hedge risk in commodity markets. It is not a gaming regulator.

As enacted in 1936, the CEA gave various federal agencies authority

4

to regulate "futures" contracts in wheat, corn, and other agricultural commodities, Pub. L. No. 74-675, § 3, 40 Stat. 1491 (1936)—meaning contracts to buy or sell fixed quantities of commodities at specified prices on set future dates, *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772 (9th Cir. 1995). In 1974, Congress expanded the CEA to cover nearly all commodity futures. Pub. L. No. 93-463, § 201(b), 88 Stat. 1389 (1974). It also created the CFTC and gave it "exclusive jurisdiction" over futures markets "to consolidate federal regulation of commodity futures trading." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386-87 (1982).

In 2010, Congress enacted the Dodd-Frank Act in response to the 2008-2009 financial crisis. That Act amended the CEA to cover "swaps," 7 U.S.C. § 2(a)(1)(A), which are agreements between two parties to exchange financial obligations, *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1042 (9th Cir. 2003). Congress did that because certain swaps (credit default swaps) exacerbated the financial crisis. Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street Reform and Consumer Protection Act* 3 (2017).

Congress defined "swap" to capture financial instruments traditionally understood as swaps. 7 U.S.C. § 1a(47)(A). Congress also specified that it shall be unlawful for any person to enter into a swap unless the swap is entered into on a CFTC-registered designated contract markets (DCMs). *Id.* §§ 1a(18), 2(e).

5

To offer a contract for trading, a DCM can self-certify that the contract complies with the CEA and start trading right away, without any action by the CFTC. 7 U.S.C. § 7a-2(c)(1)-(2). The CFTC can review a self-certification and can disallow a contract that involves "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," or "gaming." *Id.* § 7a-2(c)(5). The CFTC has categorically prohibited contracts involving "gaming." 17 C.F.R. § 40.11(a).

## B. Factual Background

Robinhood alleges that it is a financial services company that offers its approved customers the opportunity to trade, among other things, "sports-related event contracts" through the Robinhood platform. The contracts themselves trade on Kalshi's designated contract markets ("**DCMs**"). Thus, Robinhood's customers can access "sports-related event contracts" trading through Robinhood's platform, but all the trading occurs on Kalshi's DCM. ER-201 ("**Complaint**"), ¶ 1. On March 4, 2025, the Nevada Gaming Control Board ("**Board**") sent Kalshi a cease-and-desist letter threatening to prohibit Kalshi from facilitating any trading of "sports-related event contracts" in Nevada. *Id.*, ¶ 2.

In light of the cease-and-desist letter to Kalshi, Robinhood claims that it did not allow Nevada residents to enter positions for "sports-related event contracts" as of March 14, 2025. *Id.*, ¶ 3. On March 17, 2025, when Robinhood launched its prediction markets hub, through which its

customers could place event contract trade orders, Robinhood did not allow Nevada residents to enter positions for "sports-related event contracts." Complaint, ¶¶ 3 & 30. In fact, from March 14 until August 17, 2025, Robinhood prohibited Nevada residents from entering positions for "sports-related event contracts." ER-197. Kalshi, on the other hand, filed a lawsuit seeking declaratory and injunctive relief from the District Court. *KalshiEx LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW (D. Nev. filed Mar. 28, 2025) ("**Kalshi Case**"). ER-201, ¶ 3.

In an expedited proceeding, the District Court granted Kalshi a preliminary injunction ER-232 ("**Kalshi Injunction**"). Br. 20. The District Court did not address the threshold question whether Kalshi's event contracts are "swaps" or other derivatives subject to the CEA. The District Court cautioned Kalshi that it was "proceeding at its own risk and creating its own harms." ER-247. The CFTC similarly issued guidance "caution[ing]" DCMs to "account for" "State regulatory actions and pending and potential litigation." StateSER-21 ("**CFTC Guidance**")[1], StateSER-21-

---

[1] On January 29, 2026, the CFTC's new Chair, Michael S. Selig, made personal remarks, setting out his own views about a variety of issues facing the CFTC that do not have the force of law and do not bear on the issues presented in the appeal. Prediction markets were just one of the topics he addressed, and he did not state that the CFTC had taken any action with respect to prediction markets—instead, he indicated that he would like the CFTC to take certain actions going forward. *See The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance, Remarks of Chairman Michael S. Selig at CFTC-SEC Event on Harmonization,*

22. Despite those warnings, Kalshi (and thus Robinhood) "greatly expanded its offerings." ER-8 ("**Kalshi Order**") ER-10-11, ER-33.

Following entry of the Kalshi Injunction, Robinhood granted access to "sports-related event contract" trading for Nevada residents on its platform on August 18, 2025 (and filed its Complaint the next day). ER-67; ER-197; ER-200. Robinhood's business has grown exponentially during the lawsuit. Robinhood now offers sports-event contracts to its customers trading on Kalshi and ForecastEx, and purchased MIAXdx, a CFTC-licensed DCM,

---

Commodity Futures Trading Commission (Jan. 29, 2026), https://www.cftc.gov/PressRoom/SpeechesTestimony/opaselig1 [https://perma.cc/9EQC-CDWX](visited February 6, 2026)

Specifically, Chair Selig stated an intention to abandon a 2024 rulemaking (which never resulted in any new rules), to withdraw the CFTC Guidance that discussed ongoing litigation, to begin a new rulemaking about event contracts, and to reassess whether the CFTC should participate in any of the pending litigations. Chair Selig did not directly address any of the issues in the case—he did not address, for example, whether sports-related contracts are "swaps" within the CFTC's jurisdiction or whether the CEA would preempt all state gaming regulation if they were. Chair Selig also did not state any intention to withdraw 17 C.F.R. § 40.11(a), which categorically bans all event contracts related to gaming.

By withdrawing the 2024 proposed rulemaking, the CFTC has not allowed DCMs to offer sports-related contracts. Section 40.11 already prohibits DCMs from offering contracts involving "gaming." 17 C.F.R. § 40.11(a). The proposed rulemaking would only have "further specif[ied] the types of event contracts that involve 'gaming'" and are therefore prohibited under 17 C.F.R. § 40.11(a). See 89 Fed. Reg. 48968 (June 10, 2024). Withdrawing the proposed rulemaking would not change Section 40.11(a). Nor would it shed any additional light on whether Robinhood's contracts are swaps, which is the threshold issue in this case.

8

though a joint-venture, and brought on market maker, Susquehanna International Group. *See* Sean Conlon*, Robinhood is rolling out NFL parlay and prop bets on prediction markets platform,* CNBC (Dec. 17, 2025), https://www.cnbc.com/2025/12/16/robinhood-is-rolling-out-nfl-parlay-and-prop-bets-on-prediction-markets-platform.html [https://perma.cc/9R5N-ZU68](visited February 6, 2026) [hereinafter Conlon]; *Robinhood Extends its Prediction Markets Offering through New Joint Venture and Partnership with Susquehanna to Operate CFTC-Licensed Exchange and Clearinghouse, Robinhood,* (Nov. 25, 2025), https://robinhood.com/us/en/newsroom/robinhood-prediction-markets-joint-venture/ [https://perma.cc/9SJJ-4ZUM](visited February 6, 2026).

Kalshi (and thus, Robinhood) initially offered sports-event contracts only on the winners or losers of games, but since have expanded to prop bets (bets on outcomes within a game, such as the winning margin or total number of points scored) and parlays (chained bets on two or more outcomes). *See* Marc Novicoff, *The Company Making a Mockery of State Gambling Bans*, The Atlantic (Oct. 26, 2025), perma.cc/8TAG-NJSJ. With its addition of parlays and prop bets, Robinhood's offerings are indistinguishable from those of traditional sports books. *See* Conlon.

## C.    Procedural History

On August 19, 2025, Robinhood filed its Complaint, seeking a preliminary injunction and declaratory relief to enjoin state enforcement,

9

on the basis that the CEA preempts Nevada gaming laws with respect to "swaps" and "excluded commodities" traded on DCMs. ER-200 at Section D. Following the filing of the Complaint, the District Court denied a preliminary injunction to Robinhood's competitor, Crypto.com, holding that sports-event contracts are *not* swaps under the CEA. ER-37 ("**Crypto Order**"), ER-44-57, ER-63. A district court in Maryland also rejected Kalshi's preemption arguments. *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025), *appeal docketed*, No. 25-1892 (4th Cir. Aug. 6, 2025). State Defendants then moved to dissolve the Kalshi Injunction. StateSER-26.

The District Court dissolved the Kalshi Injunction on November 24, 2025, holding that Kalshi's event contracts are not "swaps," "options," or "futures" under the CEA. Kalshi Order, ER-18-31.[2] It explained that Kalshi's position would "require all sports betting across the country to come within the jurisdiction of the CFTC," "upset[ting] decades of federalism regarding gaming regulation." ER-8. The District Court then concluded that "the balance of hardships tips in favor of [State Defendants], and the public interest favors dissolving the injunction." ER-12.

On November 25, 2025, the District Court entered its order ("**Order**"),

---

[2] The Kalshi Order is discussed at length in this Answering Brief because the District Court incorporated into the Order its reasoning in the Robinhood and Crypto Orders.

10

denying Robinhood's injunction. ER-4. Robinhood argues that the sole basis of the Order was that the sports-event contracts are not "swaps" or "excluded commodities" under the CEA. Br. 17. However, the District Court also ruled that: (i) the sports-event contracts are not "swaps" or "excluded commodities;" (ii) the CEA's exclusive jurisdiction provision applies to "commodities" not "excluded commodities;" and (iii) even if the sport event contracts were "swaps" or "excluded commodities," federal preemption does not apply to state gaming law. Order, ER-6 (incorporating the reasoning in the Crypto Order and Kalshi Order).[3]

On November 26, 2025, the Nevada Defendants and Robinhood filed their enforcement agreement ER-69 ("**Enforcement Agreement**"), which provided: (i) Robinhood will stop offering new sports-related event contracts in Nevada until final resolution of Robinhood's appeal of the Order, so long as no injunction pending appeal is granted; (ii) during that time, Robinhood will take reasonable action to explore unwinding longer-duration open sports-event contracts in Nevada; and (iii) State Defendants will forbear from bringing any enforcement actions for sports-event contracts offered before December 1, 2025. ER-70-71. On November 28, 2025, Robinhood

---

[3] In the Crypto and Kalshi Orders, the District Court explained why the CEA does not preempt state gaming law. ER-53-56; ER-23-24. In the Kalshi Order, the District Court explained why excluded commodities did not fall under the CEA's exclusive jurisdiction provision. ER-28-31.

notified its customers via email that "Nevada customers will no longer be able to trade sports event contracts on Robinhood listed on or after December 1, 2025. If you have an open position, you can hold it through resolution or close it at any time. You'll still be able to open and close positions in any event contracts that were listed before December 1." StateSER-19. The District Court denied Robinhood's motion for an injunction pending appeal. ER-64.

## SUMMARY OF THE ARGUMENT

The District Court did not abuse its discretion in denying Robinhood's motion for a preliminary injunction.

I. As a threshold matter, Robinhood failed to demonstrate that the District Court abused its discretion in denying Robinhood's motion for a preliminary injunction. To do so, Robinhood was required to demonstrate that the District Court's ruling was based on an erroneous legal standard or clearly erroneous factual findings, neither of which is applicable here. Robinhood does not expressly argue that the District Court either applied an errant legal standard or that its factual findings were erroneous.

II. To prevail on the merits, Robinhood must show both that the contracts it offers are swaps (or other commodity derivatives) under the CEA, and that the CEA preempts all state gaming law as to those contracts. It cannot show a likelihood of success on either.

A. The Kalshi contracts offered by Robinhood are not "swaps" or other

12

commodity derivatives, so its claim of preemption fails at the outset.

Robinhood attempts to avoid this question altogether by arguing that the CFTC has "exclusive jurisdiction" over *any* contract traded on a DCM. But that is not what the CEA says: It gives the CFTC jurisdiction over swaps, futures, options, and other listed derivatives that are traded on DCMs or on other markets. 7 U.S.C. § 2(a)(1)(A). Simply trading on a DCM is not enough.

Kalshi's contracts are not "swaps." Swaps are financial instruments used to hedge risk. The statutory definition reflects that understanding; it requires payment to be based on the "occurrence" of an "event" that is "associated with" potential economic consequences, meaning events that create risk against which a business could want to hedge. 7 U.S.C. § 1a(47)(A)(ii). Kalshi's contracts, offered by Robinhood, are based on the *outcomes* of sports events, not on whether the events occur. Sports bets are not used to hedge existing economic risk; the bets *create* the risk. Robinhood's expansive definition of "swaps" is limitless; it would encompass a "contract on anything that happens or could happen." ER-19-20.

Kalshi's contracts, offered by Robinhood, are not "option[s]" or "contracts of sale of a commodity for future delivery." Notably, Kalshi *told* the CFTC that its contracts are "swaps," and the definition of swaps expressly excludes options and futures. In any event, its contracts do not qualify as options or futures under the settled meanings of those terms.

13

The implications of Robinhood's position are extreme. Under Robinhood's view, all sports bets would qualify as swaps, futures, or options. The CEA expressly requires that all consumer swaps, futures, and options be traded *only* on CFTC-registered DCMs. So, all sports betting would have to be done on CFTC-registered DCMs, and nowhere else. The CFTC would be the Nation's sole sports-betting regulator, to the complete exclusion of States and Tribes. Robinhood attempts to avoid that absurd result but ultimately has no way around it.

As a fallback, Robinhood argues that this Court cannot even decide the threshold question of whether its contracts are commodity derivatives. But Robinhood brought this lawsuit and invoked the CEA to enjoin State Defendants. Of course, this Court can decide whether the CEA applies. State Defendants are not required to sue the CFTC, because they are not seeking to enforce the CEA; they want to enforce Nevada law. Besides, the CFTC has not taken any action to approve Kalshi's contracts offered by Robinhood, so there would be no basis for such a lawsuit.

B. Even if Kalshi's products were within the CFTC's jurisdiction, the CEA would not preempt all state gaming law. The regulation of gaming is at the heart of the States' police power, and taking away that power would have vast economic and political consequences. Congress would need to speak exceptionally clearly if it intended that result. Nothing in the CEA shows that clear intent.

14

Robinhood argues that express, field, and conflict preemption all prevent the application of Nevada gaming law to prevent Robinhood's unlawful conduct. It relies on the CEA's "exclusive jurisdiction" provision, but that provision says nothing about preempting all state gaming law, as would be required for express or field preemption to apply. To the contrary, the CEA's narrow express-preemption provisions confirm that "exclusive jurisdiction" does not preempt state gaming law generally. The CEA lacks a comprehensive regulatory scheme for gaming. It is implausible to think that Congress made the CFTC the Nation's sports-betting regulator, without giving it any tools to regulate gaming or guidance on how to do so.

With respect to conflict preemption, Robinhood could comply with both Nevada law and the CEA—it just chooses not to. Robinhood identifies no Nevada regulation that supposedly conflicts with federal law, and there is no conflict. Nevada gaming law also does not pose an obstacle to fulfilling the purposes of the CEA. Congress enacted the CEA to "bring[] risky financial products out of the shadows," not to "enabl[e] nationwide gambling on CFTC-designated exchanges." ER-22.

II. As the District Court found, the balance of equities weighs against Robinhood. Robinhood identifies no clear error in that finding.

A. Robinhood's claimed harms are speculative and self-inflicted. It aggressively expanded its business in the face of legal uncertainty and express warnings by the District Court and the CFTC. Robinhood wishes

15

to avoid the costs of geofencing, but its competitors pay those costs, and the costs are minuscule in comparison to Robinhood's revenues. Robinhood cites possible criminal enforcement, but State Defendants simply seek to bring a state civil suit to stop Robinhood's unlawful activities.

B. In contrast, State Defendants' harms are severe and irreparable. Nevada has a sovereign interest in enforcing its gaming laws. Robinhood's continued operation severely disrupts Nevada's regulated gaming industry by giving it an unfair advantage over licensed competitors. It harms Nevada's economy and public finances by depriving the State of critical tax revenues. It also harms the public, including its own customers, because Robinhood does not comply with Nevada's consumer-protection requirements, and its platform is open to manipulation and abuse. Allowing Robinhood to resume offering unlawful wagers in violation of Nevada law imposes "substantial irreparable harms to the Board, the State of Nevada, the gaming industry in this state, and the public interest." ER-33.

This Court should affirm.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy that is never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). This Court reviews "the denial of a preliminary injunction for abuse of discretion, but [it] review[s] de novo the underlying issues of law." *Hubbard v. City of San Diego*, 139 F.4th 843, 849

(9th Cir. 2025) (quotation marks omitted). A district court abuses its discretion if it bases its decision "on an erroneous legal standard or on clearly erroneous factual findings." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 475 (9th Cir. 2022) (quotation marks omitted). The Court reviews the District Court's legal determinations *de novo* and its factual findings for clear error. *Adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 764 (9th Cir. 2018).

To obtain the extraordinary remedy Robinhood sought below, it must satisfy the four factors in *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008): (1) it is likely to succeed on the merits; (2) it likely will suffer irreparable harm without a preliminary injunction; (3) the balance of equities favors it; and (4) an injunction is in the public interest. *Karnoski v. Trump*, 926 F.3d 1180, 1198 & n.14 (9th Cir. 2019). Where the defendant is a government entity, the last two factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). The Court also has permitted injunctive relief using a sliding-scale approach, when the movant raises "serious questions" on the merits and the balance of hardships "tips sharply" in its favor. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (internal quotation marks omitted).

## ARGUMENT

### A. The District Court Did Not Abuse Its Discretion.

The District Court did not abuse its discretion in denying Robinhood's

motion for preliminary injunction. "A preliminary injunction is an extraordinary remedy that is never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). A district court abuses its discretion if it bases its decision "on an erroneous legal standard or on clearly erroneous factual findings." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 475 (9th Cir. 2022) (quotation marks omitted). "A district court's decision is based on an erroneous legal standard if: '(1) the court did not employ the appropriate legal standards that govern the issuance of a preliminary injunction; or (2) in applying the appropriate standards, the court misapprehended the law with respect to the underlying issues in the litigation." *Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1096 (9th Cir. 2008)

Robinhood fails to offer any substantive argument on appeal as to how the District Court purportedly abused its discretion. Instead, Robinhood appears to ask this Court to disregard the District Court's decision entirely without anything more than a passing reference to the abuse of discretion standard. It is undisputed that the District Court applied the correct legal standard concerning the preliminary injunction. As more thoroughly described below, the District Court did not misapprehend the law. The District Court applied a careful analysis of the law and rightfully found that the sports-event contracts at issue in this matter are not properly classified as a swap or listed derivative subject to the jurisdiction of the CFTC. ER-

18

18-31.

The District Court also correctly concluded that Nevada's relevant gaming law is not preempted by the CEA. While Robinhood clearly disagrees with the District Court's application of the law to the relevant facts, no factual findings made by the District Court are clearly erroneous. Robinhood's failure to expressly argue how the District Court abused its discretion is an independently sufficient basis to affirm.

## B. Robinhood Is Not Likely to Succeed on the Merits

To succeed on the merits, Robinhood must show that (1) its sports-event contracts are "swaps" or other derivatives within the CFTC's jurisdiction, and (2) the CEA preempts all state regulation of them. Robinhood cannot show either.

Robinhood's position has a fundamental problem: Its definition of "swaps" is so sweeping that it would necessarily give the CFTC all authority over sports betting, to the complete exclusion of States and Tribes. Courts presume that Congress did not preempt state law, "particularly" in cases involving "a field which the States have traditionally occupied." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks omitted). Gaming is such a field. *Flynt v. Bonta*, 131 F.4th 918, 927 (9th Cir. 2025); *see Murphy*, 584 U.S. at 458-61. Thus, Robinhood needs to show exceptionally clear congressional intent to preempt state gaming law. *Bond v. United States*, 572 U.S. 844, 858-59 (2014). Nothing in the CEA shows

19

that intent. ER-23-24.

Robinhood thus would need to show exceptionally clear congressional intent to preempt state gaming law. *Bond v. United States*, 572 U.S. 844, 858-59 (2014). If the CEA "is susceptible of more than one plausible reading," this Court should "accept the reading that disfavors pre-emption." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (internal quotation marks omitted). Nothing in the CEA shows the necessary intent.

The CFTC itself has recognized that it has neither "the statutory mandate nor specialized experience appropriate to oversee" gaming. 89 Fed. Reg. 48968, 48982-83 (June 10, 2024). It has categorically prohibited DCMs from "list[ing] for trading" any contract that involves "gaming." 17 C.F.R. 40.11(a). Robinhood cannot claim the protection of the CFTC when the CFTC has said it is *not* a gambling regulator and does *not* want sports wagers on its markets.

### 1. The CFTC Does Not Have "Exclusive Jurisdiction" Over Any Contract Traded on a DCM

Robinhood's threshold argument—that any contract traded on a DCM is subject to the CFTC's exclusive jurisdiction—is wrong. Robinhood repeatedly asserts that the CEA "grants the CFTC 'exclusive jurisdiction' over trading on DCMs"—meaning that if a contract is traded on a DCM, *only* the CFTC may regulate it. *See* Br. 2-5, 7, 9-10, 12-16, 24-26, 28-34, 39, 41-43, 46-51, 56-60. According to Robinhood, "Congress's grant of "exclusive

jurisdiction" to the CFTC is an express preemption of state law as applied to the entire field of contracts traded on DCMs." Br. 30.

But that is not what the statute says. Section 2(a)(1)(A) gives the CEA "exclusive jurisdiction" over "swap[s]," "option[s]," "contracts of sale of a commodity for future delivery," and other listed derivatives that are "traded or executed on [a DCM]," or "any other" market. 7 U.S.C. § 2(a)(1)(A). To apply, a contract must both qualify as one of the listed derivatives and be traded on a DCM or other market. If a contract is not one of those derivatives, Section 2(a)(1)(A) does not apply, and the claim of preemption fails at the outset.

Thus, the mere fact that a contract is traded on a DCM does not mean that the CFTC has "exclusive jurisdiction" over it. And the fact that a contract is traded on a DCM does not mean it is a "swap" or other derivative, because nothing in the CEA restricts DCMs to those financial instruments. Products are traded on DCMs that are not listed in Section 2(a)(1)(A), such as "spots" (contracts to directly buy the underlying commodity). *E.g.*, Chi. Mercantile Exch., *Rulebook* ch. 13, at 2, perma.cc/YW8G-D66W (spot contracts on foreign currencies); CFTC, *Acting Chairman Pham Announces First-Ever Listed Spot Crypto Trading on U.S. Regulated Exchanges* (Dec. 4, 2025), perma.cc/6XC8-EXY8 (spot contracts on cryptocurrencies).

In interpreting a statute, this Court cannot "ignore [its] plain text"; instead, the Court "appl[ies] the text" as written. *United States v. Lucero*,

21

989 F.3d 1088, 1094 (9th Cir. 2021). Thus, in order to invoke the CEA as a basis for preemption, Robinhood must show that all of its offered event contracts fit the textual definition of "swaps" or other listed derivatives.

### 2. The Contracts Robinhood Offers Are Not "Swaps"

A swap is a financial instrument by which two parties agree to exchange cash flows on financial obligations, as a means of hedging volatility and managing risk. *Thrifty Oil*, 322 F.3d at 1042. Because there are many different types of swaps in the market, the CEA sets out a detailed, six-part definition of "swap." 7 U.S.C. § 1a(47)(A). Robinhood relies on the second part, which covers a contract where "payment" is "dependent on" the "occurrence, nonoccurrence, or the extent of the occurrence" of "an event or contingency" that is "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

As the District Court explained, Robinhood's interpretation of "swap" is contrary to the statutory text, makes no sense in context, "goes against congressional intent" and the CFTC Guidance, and ignores longstanding federalism principles. ER-18-27.

### a. Robinhood's interpretation is contrary to the statutory text

Robinhood's contracts do not come within the plain text of the "swaps" definition for two reasons: they depend on the *outcomes* of events, not the "event[s]" themselves, and the outcomes of sports events are not "associated

with" potential economic consequences, meaning consequences businesses and other market participants would want to hedge against. These textual limitations ensure that "swaps" include only financial instruments that businesses and other market participants use to hedge risk, and not "contract[s] on anything that happens or could happen." ER-19-20.

### i. Events vs. outcomes.

The "swap" definition requires that payment "depend[] on" whether "an event or contingency" occurs. 7 U.S.C. § 1a(47)(A)(ii).

The definition requires an "event or contingency" in order to capture "significan[t]" occurrences that create risk businesses and other market participants could want to hedge. ER-18 (internal quotation marks omitted). An "event" is different from an "outcome." An "event" is "a happening of some significance that took place or will take place, in a certain location, during a particular interval of time." ER-18 (citation omitted); *see, e.g.*, *Webster's New World College Dictionary* 492 (4th ed. 2004) (a "happening or occurrence, esp. when important"); *Oxford English Dictionary* (2025), perma.cc/XER3-NGE7 (OED, *Event*) ("[s]omething that happens or takes place, esp. something significant or noteworthy"). An "outcome" is a "result" of the event. *Webster's New World College Dictionary* 1023.

Robinhood's sports and election contracts depend on the *outcomes* of events, not the "events" themselves. ER-18. Indeed, in its self-

certifications, Kalshi calls the sports and election contracts offered by Robinhood, "outcome" contracts. StateSER-51, 62. For example, a contract on the winner of an NFL game is not based on whether the game occurs, but which team wins. *N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.,* No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151, at *1 (D. Nev. Oct. 14, 2025), at *9. Props and parlays are not even based on the primary result of a sporting event (who wins), but instead on secondary results (such as the number of points scored), which Kalshi again labels "outcomes" in its self-certifications. StateSER-51, 62. Ordinary English speakers do not call the number of points scored in a football game an "event." *See N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.,* No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151, at *1 (D. Nev. Oct. 14, 2025), at *8.

The contracts offered by Robinhood likewise are not based on "contingenc[ies]." ER-18. "Contingency" means "contingent event"—a happening that may or may not occur—not the result of an event already scheduled to occur. *Id*, at *8 n.9; *see, e.g.*, *Webster's New World College Dictionary* 314 (an "event" that "depends on" "another"). For example, a "deal-contingent swap" is based on a contingency, because it depends on whether the proposed deal is "consummated by a specified date." Deloitte, *Hedge Accounting* § 4.1.1.1.1 (2025), perma.cc/FX2W-LLPA. The contracts offered by Robinhood are based on the outcomes of events, not on whether the events occur.

24

Robinhood has essentially two responses. First, it argues that an "event" (or "contingency") includes an "outcome." Br. 35. They are different: The event (or contingent event) is the thing that happens, and the outcome is the result. *N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.,* No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151, at *1 (D. Nev. Oct. 14, 2025), at *7. Robinhood notes that some dictionaries define "event" to include "outcome," but more comprehensive dictionaries confirm that this usage is "archaic." Br. 35-36; *N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.,* No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151, at *1 (D. Nev. Oct. 14, 2025),at *7 & n.6; *see, e.g.*, OED, *Event* (labeling this usage "rare"). It would not make sense to adopt that archaic usage here, because then the definition of "swap" would be so broad as to be limitless; "everything a person can conceive of happening [would be] an event or contingency." ER-26; *see Drapich v. Donovan*, 693 F.2d 1296, 1298 (9th Cir. 1982) (rejecting an "archaic" definition that is "more expansive than the ordinary understanding" of the term). As the Supreme Court has often found, "a statute's meaning does not always turn solely on the broadest imaginable definitions of its component words. Instead, linguistic and statutory context also matter. Even in cases where the literal language of the statute is neutral in isolation, reading the whole phrase can point to a more targeted reading." *Dubin v. United States*, 599 U.S. 110, 120, 143 S.

Ct. 1557, 1566, 216 L. Ed. 2d 136 (2023)(internal citations and quotations omitted)

Robinhood cites (Br. 48-49) court decisions that use "event" and "outcome" interchangeably, but those decisions did not address the definition of "swap" under Section 1a(47)(A)(ii).[4]  Robinhood also relies (Br. 28) on a proposed rulemaking that would have strengthened the prohibition on gaming on DCMs —but that also did not interpret Section 1a(47)(A)(ii)'s definition of swap; instead, it involved the Special Rule, which applies to "agreements, contracts, transactions, or swaps," not just "swaps."  7 U.S.C. § 7a-2(c)(5)(C)(i); *see* 89 Fed. Reg. at 48969.  The "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Util. Air Regul. Grp. v. E.P.A.,* 573 U.S. 302, 320, 134 S. Ct. 2427, 2441, 189 L. Ed. 2d 372 (2014)(citing *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 134, 120 S. Ct. 1291, 1301, 146 L. Ed. 2d 121 (2000))

Second, Robinhood argues that distinguishing "outcomes" from "events" creates "unsolvable, semantic problems," because any "event" could be recharacterized as the "outcome" of a prior "event."  (Br. 36-39). But the

---

[4]     *See Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.,* 26 F.3d 1508 (10th Cir. 1994); *KalshiEX LLC v. CFTC*, 2024 WL 4164694 (D.D.C. Sept. 12, 2024).

fact that an event (*e.g.*, a mortgage default) could be the outcome of an underlying event (*e.g.*, a recession) does not negate the fact that the first event is a significant independent event. This argument, like Robinhood's other textual arguments, would make the definition of "swap" limitless. *See* ER-18.

### ii. *Associated with potential economic consequences*.

The swaps definition also requires that the event be "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

This requirement limits qualifying events to those where there is an existing economic risk that companies and other market participants seek to hedge. "Associate" means to "connect" or "join together" or to "connect in the mind." *Webster's New World Collegiate Dictionary* 86; *see Oxford English Dictionary* (2025), perma.cc/EW6F-NPP2 ("[t]o connect in idea"); ER-19 n.1. Events that are "associated with" potential financial, economic, or commercial consequences are those that are "inherently joined or connected with a potential financial, economic, or commercial consequence." ER-19 (footnote omitted). They have potential economic consequences "without looking at externalities like potential downstream financial consequences." ER-20.

A sports bet does not hedge against existing risk; it creates the risk. The point spread or a parlay bet generally does not have any direct economic

27

consequence that someone would wish to hedge against. A sports bet concerning the number of points a specific player may score or the number of points by which a team may win has no conceivable economic consequence to anyone. Kalshi has admitted that sports are "staged purely for entertainment" and "their outcome[s] carry no economic risks," and that "a game doesn't have economic consequences outside of the game itself," ER-21 (internal quotation marks omitted). Sports contracts thus are unlikely to serve any commercial or hedging interest.

Robinhood argues that its sports contracts *do* have economic consequences. Br. 50-55. But each of the economic consequences that it alludes to concerns only the occurrence of a sporting event, not the result. While the occurrence of a championship game in a specific market may have economic consequences, whether a specific player scores a minimum number of points in that game cannot.

Robinhood's bottom line is that because every event has some possible downstream economic consequence, every event contract qualifies as a "swap." Br. 9-16, 50-54. Its view "knows no limiting principle." ER-19.

As the District Court explained, every event "might have some conceivable financial consequence if one is creative enough." ER-19. For example, a bet on which team wins a youth kickball game could qualify as a "swap" under Robinhood's view because the winning team might eat a celebratory dinner at its favorite restaurant. If those attenuated

consequences were sufficient, then every event would be "associated with" potential economic consequences, and the potential-consequence requirement would "lose all meaning." ER-25-26. After all, if a person eats a ham sandwich for lunch, perhaps the price of pork will increase, and, through Robinhood's argument, this individual culinary decision is the type of "swap" Congress intended to regulate through the Dodd-Frank Act.

### b. Robinhood's interpretation of "swaps" makes no sense in context

The surrounding statutory text confirms that Robinhood-offered contracts are not "swaps." ER-20-21.

Section 1a(47)(A)(ii) is part of a six-part definition of "swap." 7 U.S.C. § 1a(47)(A). When a definition contains multiple parts, a court should look to the other parts to inform the meaning of the part at issue. *Yates v. United States*, 574 U.S. 528, 543-44 (2015) (*noscitur a sociis* canon). If the other parts all share a common thread, the court should interpret the part at issue also to contain that thread. *E.g.*, *Beecham v. United States*, 511 U.S. 368, 371 (1994).

Here, all other parts of the definition refer to specific "financial measures, indices, or instruments" used to hedge risk. ER-20. Parts (i) and (iii) cover specific financial instruments that involve "financial or economic interests" such as "interest or other rates, currencies, commodities, [or] securities or property of any kind." 7 U.S.C. § 1a(47)(A)(i), (iii). Part (iii)

29

further lists 22 "commonly known" swaps. *Id.* § 1a(47)(A)(iii). Part (iv) covers any contract "that is or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv). Part (v) covers certain "security-based swap agreement[s]" in which "a material term is based on the price, yield, value, or volatility of any security." *Id.* § 1a(47)(A)(v). And part (vi) covers any contract "that is any combination or permutation" of contracts in the five previous parts. *Id.* § 1a(47)(A)(vi). Part (ii) should be read in context to also cover financial instruments based on inherently economic events, not sports bets. ER-21.

Under Robinhood's interpretation, part (ii) would lose the common thread and swallow the rest of the definition. If part (ii) reaches contracts "on anything that happens or could happen," ER-19, then the remaining parts are left with nothing to do, ER-26. This Court should not adopt a reading that makes most of the "swaps" definition "superfluous, void, or insignificant." *GCIU-Emp. Ret. Fund v. MNG Enters., Inc.*, 51 F.4th 1092, 1097 (9th Cir. 2022).

Robinhood's interpretation of part (ii) makes all other parts superfluous. Robinhood does not identify *any* swap that would not come within its reading of part (ii).

Robinhood asserts (Br. 54-56) that because the Special Rule allows the CFTC to prohibit contracts involving "gaming," those contracts must be "swaps" under the CEA. That is wrong, because the Special Rule is not

30

limited to "swaps"; it applies to "agreements, contracts, transactions, or swaps." 7 U.S.C. § 7a-2(c)(5)(C)(i). Further, the Special Rule is a backstop that allows the CFTC to prohibit trading in contracts that are "contrary to the public interest"; it does not define "swap." *Id.*

Importantly*,* the CFTC has exercised its Special-Rule authority to categorically *ban* contracts involving "gaming" on DCMs. 17 C.F.R. § 40.11(a). The CFTC did that specifically to "prevent gambling through the futures markets." Provisions Common to Registered Entities, 76 Fed. Reg. 44776-01, 44786 (July 27, 2011) (internal quotation marks omitted). Robinhood thus cannot rely on the Special Rule to *require* trading its sports bets on DCMs on the theory that they are "swaps." Citing 17 C.F.R. § 40.11(c), Robinhood argues (Br. 25 at n.4) that the regulation does not categorically prohibit gaming contracts but only subjects them to case-by-case review. But the terms of the regulation are clear and unequivocal: DCMs "shall not list" any contracts that "involve[], relate[] to, or reference[]" "gaming, or an activity that is unlawful under any State or Federal Law." 17 C.F.R. § 40.11(a). Section 40.11(c) merely confirms that if a DCM lists such a contract, the CFTC may review it and order it taken down. ER-34 n.13. The Special Rule thus does not help Robinhood.

31

### c. Robinhood's interpretation is inconsistent with Congress's purposes and the CFTC's guidance

Interpreting "swap" to cover sports betting is not consistent with Congress's purposes in enacting the Dodd-Frank Act.

Congress added "swaps" to the CEA to strengthen regulation of financial markets following the 2008-2009 financial crisis, because unregulated credit default swaps had exacerbated the crisis. Br. 39. *see Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 172-73 (D.D.C. 2012). Congress "aimed Dodd-Frank at systemic risks in the financial sector that undermined U.S. financial stability." ER-22.

The Dodd-Frank Act was not about regulating sports or election betting. "Congress was bringing risky financial products out of the shadows," not "enabling nationwide gambling." ER-26. Sports betting did not contribute to the financial crisis; indeed, at the time, it was illegal everywhere but Nevada. *See Murphy*, 584 U.S. at 462. Congress did not mention gaming in the definition of "swaps," and the legislative record nowhere evidences a discussion of regulating sports bets as swaps. And Congress added the Special Rule to ensure that gambling does *not* occur on CFTC-regulated DCMs. *See* 156 Cong. Rec. S5906-07 (July 15, 2010) (colloquy between Senators Feinstein and Lincoln explaining that sports bets should not be on DCMs because they "would not serve any real commercial purpose" and "would be used solely for gambling").

Notably, the CFTC has rejected a maximalist reading of "swap." In 2012, it promulgated a regulation defining "swap" to exclude "consumer and commercial arrangements that historically have not been considered swaps"—such as "traditional insurance products," "mortgages," "automobile loans," and "employment contracts"—even though these products could fall within an expansive interpretation of Section 1a(47)(ii). Further Definition of "Swap," 77 Fed. Reg. 48208-01, 48212, 48246-50 (Aug. 13, 2012); *see* 17 C.F.R. § 1.3. The CFTC explained that those contracts historically were regulated by States, and that there was no indication that Congress "intended" for those contracts "to be regulated as swaps." 77 Fed. Reg. at 48212 & n.29; *see id.* at 48246.

That reasoning applies equally to sports bets. *See* ER-20-23. Sports bets do "not involve risk-shifting arrangements with financial entities"—the hallmark of a swap. 77 Fed. Reg. at 48248. They are consumer transactions that people enter into "primarily for personal [entertainment] purposes" and that "historically have not been considered to involve swaps." *Id.* at 48246-47. Like insurance and mortgages, sports bets historically have been regulated by the States. *Murphy*, 584 U.S. 484. There is no indication that Congress intended for them to be regulated as "swaps." ER-22.

### 3. Robinhood's Contracts Are Not "Option[s]" or "Contracts of Sale of a Commodity for Future Delivery"

Robinhood contends (Br. 60-63) that even if its contracts are not "swaps," they are "option[s]" or "contracts . . . for future delivery" of a type of "commodity" (an "excluded commodity") under Section 2(a)(1)(A). That made-for-litigation position, which Robinhood barely developed below, *see* ER-27n.8, is wrong.

As an initial matter, Robinhood should be estopped from making this argument, because Kalshi, the entity whose contracts it offers, told the CFTC that all of its contracts are "swaps." When a DCM self-certifies a new contract for trading, it must identify whether the contract is a swap, option, or future. *See* 17 C.F.R. § 38.4(b). The statutory definition of "swap" expressly excludes futures and options, *see* 7 U.S.C. § 1a(47)(B)(i), and the CFTC has different certification requirements for each contract type, *see* 17 C.F.R. pt. 38, App'x C. Kalshi self-certified all of its contracts as "swaps"— not futures or options—in order to list them for trading. CFTC, *Designated Contract Market Products—KEX*, bit.ly/3YPbRoo (visited February 6, 2026). Robinhood cannot now make a contrary argument to this Court. *See Rissetto v. Plumbers & Steamfitters Loc. 343*, 94 F.3d 597, 604 (9th Cir. 1996) (judicial estoppel applies to representations made to an agency).

In any event, Robinhood's argument is wrong for three reasons. First, its contracts do not involve excluded commodities. The relevant definition

34

of "excluded commodity" requires "an occurrence, extent of an occurrence, or contingency" that is "associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iii). This definition is more restrictive than that of "swap," because it requires actual (not merely potential) economic consequences. Because Robinhood's contracts are not swaps, they are also not contracts in excluded commodities, as is required for either a future or an option. ER-27-28; *see* 7 U.S.C. § 2(a)(1)(A).

Robinhood's contracts are not options. An "option" is a contract that "grants to the purchaser 'the right, for a specified period of time, to either buy or sell the subject of the option at a predetermined price.'" *White Pine Tr.*, 574 F.3d at 1226 (internal quotation marks omitted) (citing 7 U.S.C. § 1a(36)); *see Saberi v. CFTC*, 488 F.3d 1207, 1210 n.2 (9th Cir. 2007). Robinhood does not explain how its contracts confer any such right, and they do not—the buyers of its contracts have no right to buy or sell the outcomes of the events that are the subject of those contracts.

Robinhood's contracts are also not "contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). They are wagers on the outcomes of events, not promises to deliver those outcomes. *See* ER-30-31. Robinhood argues (Br. 63) that a future does not require actual delivery and can instead be cash settled, but the contract still must involve something that can be delivered. *Fisher v. Dean Witter Reynolds, Inc.*, 526 F. Supp. 558, 559-60 (E.D. Pa. 1981). For example, an interest-rate future is based on

interest-bearing Treasury notes that can be delivered. *See id.* Here, nothing is nor could be delivered.

### 4. Robinhood's Position Would Require All Sports Betting to Be Regulated Only by the CFTC

The implications of Robinhood's position are extreme. Under Robinhood's definitions, all sports wagers would qualify as "swaps" (or futures or options). ER-24-25. The CEA *requires* that all consumer swaps, options, and futures be traded on CFTC-regulated DCMs. 7 U.S.C. §§ 2(e), 6(a), 6c(c); 17 C.F.R. § 33.3(a). And according to Robinhood, the CEA's "exclusive jurisdiction" over swaps, options, and futures traded on DCMs means that no State can regulate them. So if Robinhood were correct, the CFTC would be the Nation's *sole* regulator for sports betting.

That would mean that when Congress added "swaps" (or futures or options) to the CEA, it took away the longstanding police power of the States and Tribes to regulate sports betting, *see Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d at 737, and gave it all to the CFTC. And Congress supposedly wanted the CFTC to decide company-by-company how much sports betting to allow, based on which DCMs it certifies and which contracts it chooses to review.

And then apparently no one noticed this sea change until 2025—not even the Supreme Court, which recognized and reinforced the States' power to regulate sports betting in *Murphy*. 584 U.S. at 484. The result would be

36

that all sports betting now must be conducted on DCMs, and the licensed sportsbooks operating without DCM registrations (which is to say, all of them) are violating federal law—as are their millions of customers. ER-30-31; *N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.*, No. 2:25-CV-00978-APG-BNW, *2025 WL 2916151, at \*1 (D. Nev. Oct. 14, 2025)*, at \*9 & n.12. This Court should not interpret the CEA to produce that absurd result. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

Robinhood's position would necessitate the CFTC to be the nation's only gaming regulator. But under Robinhood's position, there could be no off-exchange sports wagers, because the CEA requires all consumer swaps, options, and futures to be traded on DCMs.

The CEA's language is clear on this point. Section 2(e) makes it "unlawful" for "any person" to "enter into a swap" unless that swap "is entered into on, or subject to the rules of, a [DCM]," except when both parties are regulated financial institutions, major corporations, or similar entities. 7 U.S.C. § 2(e); *see id.* § 1a(18). Section 6(a) makes it "unlawful" for "any person" to "enter into" any transaction involving a future unless the transaction is "conducted on or subject to the rules of a [DCM]." *Id.* § 6(a); *see CFTC v. Frankwell Bullion Ltd.*, 99 F.3d 299, 301 (9th Cir. 1996). And Section 6c(c) directs the CFTC to issue regulations requiring all options be traded on DCMs, 7 U.S.C. § 6c(c), which it has done, *see* 17 C.F.R. § 33.3(a).

37

Thus, there could be no "off-exchange" sports betting under Robinhood's view.

Robinhood cites the CFTC's rulemaking defining "swap," but the CFTC did not set a "bright-line" rule that only traded contracts can be swaps; it explained that one "factor" to consider in determining whether a contract is a swap is whether that type of contract historically has been traded, because that would suggest "risk-shifting arrangements with financial entities." 77 Fed. Reg. at 48247-50. The CFTC emphasized that contracts entered into for "personal" purposes are *not* swaps. *Id.* Sports bets historically have not been traded, do not involve risk-shifting, and are entered into for personal entertainment purposes. ER-22-23.

Further, even if there were some reason to believe that the CEA would not *require* all sports wagers to be traded on DCMs, that would be the practical effect if Robinhood prevails. If sportsbooks could escape all state regulation by listing their bets on DCMs, they would have significant financial motivation to do so. *See* ER-32. Indeed, DraftKings and FanDuel recently decided to forgo licensing in Nevada to offer sports betting on DCMs in other States. ER-35. Thus, in practice, the CFTC still would become the Nation's sole sports-betting regulator.

38

**5.      This Court Can Decide the Threshold Issue of Whether the CEA Applies**

Robinhood argues (Br. 69-73) that federal courts cannot decide in this case whether its contracts are swaps, futures, or options.  Instead, it says, State Defendants must sue the CFTC under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*  But Robinhood brought this lawsuit and invoked the CEA to enjoin State Defendants; of course the courts can decide whether the CEA applies.  ER-12-18.

Nothing in the CEA gives the CFTC the sole authority to determine whether a particular contract is a commodity derivative.  ER-15-16; *Crypto.com*, 2025 WL 2916151, at *6.  Federal courts have the "duty" to "say what the law is"—here, by determining whether a particular contract is a swap, option, or future within the meaning of the CEA.  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803); *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024).  Indeed, the CEA provides that nothing in Section 2 "supersede[s] or limit[s] the jurisdiction conferred on courts of the United States."  7 U.S.C. § 2(a)(1)(A).  Robinhood asserts (Br. 37, 46) that allowing a State to challenge whether a particular contract is a commodity derivative outside of an APA action could lead to non-uniform results, but if a court finally determined that a contract offered by Robinhood is not a swap, that determination would bind Robinhood nationwide.  *See In re Palmer*, 207 F.3d 566, 568 (9th Cir. 2000).

39

Further, there is no agency action that could underlie an APA suit. The APA provides a cause of action to "set aside" an agency's action or to "compel agency action." 5 U.S.C. § 706; *see Plaskett v. Wormuth*, 18 F.4th 1072, 1082 (9th Cir. 2021). Here, Kalshi self-certified the contracts and immediately started trading them through Robinhood, and the CFTC took no action. ER-14. In practice, these contracts often close—because the sporting event concludes—before the 10-day period elapses. In the case of parlays and prop bets, which can be made after a sporting event has already commenced, a contract could open and close during a single evening. The CFTC confirmed that it has not "taken any official action to approve the listing for trading of sports-related event contracts." StateSER-22.

State Defendants also could not seek to compel the CFTC to take action. Nothing in the CEA requires the CFTC to formally approve a contract for trading, or to order a contract delisted from a DCM solely because it is not a commodity derivative. At most, the Special Rule says that the CFTC "may" delist contracts that involve gaming. 7 U.S.C. § 7a-2(c)(5)(C)(i). The CFTC is under no "specific, unequivocal command" that it has not obeyed. *Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068, 1075 (9th Cir. 2016).

Robinhood cites (Br. 69) *Big Lagoon Rancheria v. California*, 789 F.3d 947, 953-54 (9th Cir. 2015) (en banc), but that case is distinguishable. There, California refused to negotiate with an Indian Tribe about its plans

40

to build a casino on lands that the Bureau of Indian Affairs (BIA) had taken into trust for the Tribe. *Id.* at 951. California argued that the BIA lacked authority to take the land into trust and had incorrectly designated the Tribe. *Id.* at 952. But Congress authorizes only the BIA to designate Tribes and to take land into trust for Tribes. 25 U.S.C. §§ 5108, 5131; *see Haaland v. Brackeen*, 599 U.S. 255, 273 (2023). California thus was challenging decisions that only the BIA could make. Here, the CEA does not grant the CFTC sole authority to determine whether a contract is a swap, future, or option, and the CFTC has not made that determination with respect to the contracts Robinhood offers.

More fundamentally, Robinhood's argument (Br. 69) misunderstands State Defendants' interest in this litigation. State Defendants are not seeking to enforce the CEA or police what products are listed on DCMs—they seek only to enforce Nevada gaming law. Robinhood's argument (Br. 73) that the CEA does not allow state authorities to sue DCMs for violations of the CEA, *see* 7 U.S.C. § 13a-2(1), thus misses the mark. Robinhood put at issue whether its contracts are swaps by claiming preemption on that basis, *see* ER-213-221; it cannot turn around and require State Defendants to sue the CFTC to prove that its contracts are not swaps.

Robinhood's position is that once Kalshi self-certifies a contract, that contract is a commodity derivative under the CEA, and if the CFTC fails to act on it, then Kalshi's determination is binding on *everyone*—including this

41

Court. That approach runs roughshod over the authority of the federal courts, *see Marbury*, 5 U.S. at 177, and runs afoul of the private non-delegation doctrine, which prevents private parties from exercising federal authority "without an agency's say-so," *FCC v. Consumers' Rsch.*, 606 U.S. 656, 695 (2025); *see Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

### 2. The CEA Does Not Preempt Nevada's Gaming Law

Even if Robinhood's products were within the CFTC's jurisdiction, Congress did not unambiguously preempt all state regulation of them.

Congress neither hid a sweeping preemption of state gaming law nor legalized nationwide sports betting in a statute aimed at strengthening regulation of financial markets. *Martin*, 793 F. Supp. 3d at 676-86. Indeed, if Robinhood were correct, the Supreme Court's decision in *Murphy v. NCAA*, *supra*, was and is a nullity.

### a. Nevada's Gaming Law is Not Expressly Preempted Under the CEA

An express preemption provision is one that contains "explicit preemptive language" that states an intent to supersede other law and specifies which law is superseded. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203 (1983). Robinhood errantly contends that the CEA's exclusive jurisdiction clause, 7 U.S.C. § 2(a)(1)(A) expressly preempts Nevada's Gaming Laws. (Br. 41). Of course, that provision does not state any intent to supersede Nevada's gaming laws, and

in fact, does not even mention gaming. Robinhood wants the Court to read into the CEA an equivalent provision for Nevada's gaming laws, but the CEA simply does not contain one. Because no such provision exists, express preemption cannot apply.

"Exclusive jurisdiction" is not the language of express preemption. An express preemption provision is one that contains "explicit preemptive language" that states an intent to supersede other law and specifies which law is superseded. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203 (1983). It must state clearly that state law is preempted or that a State may not regulate on the subject. *E.g., Kansas v. Garcia*, 589 U.S. 191, 203 (2020) (construing 8 U.S.C. § 1324a(h)(2), which provides that "[t]he provisions of this section preempt any State or local law"); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1215 (9th Cir. 2020) (construing 42 U.S.C. § 7543(a), which provides that "[n]o State . . . shall adopt or attempt to enforce any standard" other than the federal standard).

The CEA's exclusive jurisdiction provision does not say anything about preemption or state law. *See Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (the CEA "does not expressly preempt state law"). However, elsewhere in the CEA, Congress did include express preemption provisions that use the necessary language of preemption. One provision states that:

43

> This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming in the case of:
>
> (A) an electronic trading facility excluded under section 2(e) of this title; and
>
> (B) an agreement, contract, or transaction that is excluded from this chapter under section 2(c) or 2(f) of this title or sections 27 to 27f of this title, or exempted under section 6(c) of this title (regardless of whether any such agreement, contract, or transaction is otherwise subject to this chapter).

7 U.S.C. § 16(e)(2). Congress elected to expressly preempt *some* "State or local law[s] that prohibit[ ] or regulate[ ] gaming"—specifically those cross-referenced in § 16(e)(2), as well as state insurance laws to the extent they govern swaps. *Id.* § 16(h). Robinhood does not contend that Nevada's laws it claims are preempted fall within § 16(e)(2) or (h). Robinhood does not contend it is an "electronic trading facility excluded under section 2(e) of this title," and the sports events contracts at issue here are not covered by the cross-referenced provisions in § 16(e)(2), which instead refer to section 2(c) (which covers agreements, contracts, and transactions in foreign currency, government securities, and certain other commodities), section 2(f) (which covers qualifying hybrid instruments that are predominantly securities), or sections 27 to 27f (which covers banks and banking products), and section 6(c) (which exempts certain DCMs from regulation for public interest purposes).

Congress's decision to expressly preempt state gaming laws for certain transactions and state-insurance laws for swaps—compared to its silence as

44

to all others—makes clear that Congress did not intend to regulate so comprehensively as to exclude all Nevada gaming law. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) ("Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted."); *see also Freightliner Corp. v. Myrick*, 514 U.S. 280, 288, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) (explaining that where a statute expressly defines its "the pre-emptive reach," that supports an "inference"—not a "rule"—that Congress did not impliedly preempt state laws that fall outside the express preemption provision).

### b. Nevada's Gaming Law is Not Subject to Field Preemption Under the CEA

Field preemption applies where federal law "so thoroughly occupies a legislative field" that it leaves "no room" for state regulation. *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 733 (9th Cir. 2016). Even if a statute suggests some preemptive intent, courts should "avoid interpreting the scope of the preempted field too broadly." *Martin*, 793 F. Supp. 3d at 680 (quoting *Sikkelee v. Precision Airmotive Corp.*, 882 F.3d 680, 689 (3d Cir. 2016)); *see Medtronic*, 518 U.S. at 484. Nothing shows that Congress intended to preempt state *gaming* law in particular. *Martin*, 793 F. Supp. 3d at 680.

45

> **1.** *The CEA's text does not show a clear intent to preempt state gaming law*

Robinhood's argument (Br. 41-45) also rests almost entirely on Section 2(a)(1)(A), the CEA's "exclusive jurisdiction" provision, taking the most expansive view of that provision as possible. But courts do not read statutory provisions in isolation, *Sackett v. EPA*, 598 U.S. 651, 674 (2023), or read preemptive provisions expansively, *Altria*, 555 U.S. at 77, especially in areas of traditional state regulation, *Medtronic*, 518 U.S. at 485. When read in context, it is clear that this provision has a more modest scope.

Section 2(a)(1)(A) says nothing about state gaming law. As the Supreme Court explained, Congress enacted this provision "only to consolidate federal regulation of commodity futures trading in the [CFTC]"—to "separate the functions of the [CFTC] from those of the [SEC]" and other federal agencies. *Merrill Lynch*, 456 U.S. at 386-87. As more thoroughly described above, the CEA contains narrow express-preemption provisions—which confirm that Section 2(a)(1)(A) is not a broad preemption provision. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 289 (1995) (express-preemption provision supports an inference that Congress did not impliedly preempt state laws outside of that provision).

The CEA's express-preemption provisions make clear that preemption does not extend to all state gaming law. Field preemption does not apply.

Robinhood has essentially two responses. First, it cites (Br. 42)

decisions where "exclusive jurisdiction" supposedly means preemption. But those decisions involved federal statutes that conferred "exclusive jurisdiction" over a wide range of state and local railroad regulation and all matters pertaining to participation in Olympic Games. Statutes that use "exclusive jurisdiction" confirm that the term does not broadly preempt state law, particularly when there is a separate express-preemption provision. *E.g.*, 30 U.S.C. § 1254(a)(3) (providing that the Secretary of the Interior has "exclusive jurisdiction" over surface coal mining when he or she adopts a federal plan for a State); *id.* § 1254(g) (separately providing that the federal plan "shall preempt[] and supersede[]" state regulation).

Robinhood cites (Br. 45 n. 7) the savings clause in Section 2(a)(1)(A). That clause states that, "[e]xcept as hereinabove provided" (in the "exclusive jurisdiction clause"), "nothing contained in this section shall [] supersede or limit" the "jurisdiction conferred" on "regulatory authorities under the laws" of "any State." 7 U.S.C. § 2(a)(1)(A). According to Robinhood (Br. 45), this clause shows that the exclusive-jurisdiction provision has preemptive effect. But the clause equally suggests the opposite, because "[a] savings clause generally 'negates the inference that Congress left no room for state causes of action.'" *Martin*, 793 F. Supp. 3d at 682 (quoting *Int'l Paper Co. v. Oullette*, 479 U.S. 481, 492 (1987)). And even if the savings clause suggests that the CEA has some preemptive effect, it does not support the view that the preempted field includes *gaming*.

47

### 2. *The CEA contains no comprehensive regulatory scheme for gaming*

The CEA does not contain a comprehensive regulatory scheme for gaming. Indeed, it lacks the most basic features of such a scheme. The CEA does not require licensing or background checks, indicate what bets are allowed, contain protections against insider betting or unfair bets, or provide for basic consumer protections (such as age restrictions or measures to address problem gaming and organized crime). The CEA requires DCMs to be certified, but then allows trading based on self-certifications. 7 U.S.C. §§ 6a(a), 13.

The CFTC has recognized that it does not "ha[ve] the statutory mandate nor specialized experience appropriate to oversee" gaming. 89 Fed. Reg. at 48976. It is not plausible to think that Congress intended for the CFTC to act as a gaming regulator—much less as the Nation's exclusive sports-betting regulator—without giving the CFTC the basic tools of gaming regulation. Such a delegation also would run afoul of the nondelegation doctrine because Congress provided no "intelligible principle" to guide the regulation of gaming. *Consumers' Rsch.*, 606 U.S. at 673.

Robinhood contends (Br. 54) that the Special Rule shows an intent to bring gambling under the jurisdiction of the CFTC. That is incorrect. The Special Rule is a safety-valve provision that allows the CFTC to require DCMs to delist contracts that are contrary to the "public interest," not a

48

broad authorization to regulate gaming. 7 U.S.C. § 7a-2(c)(5)(C)(i). Notably, the Special Rule is not limited to gaming, but also applies to contracts involving "war," "assassination," and "terrorism." *Id.* It does not show that Congress intended for the CFTC to regulate gaming generally, any more than war, assassinations, or terrorism. Further, the Special Rule allows the CFTC to bar contracts involving conduct that is "unlawful" under "State law." *Id.* That "reflects an affirmative intent to *preserve* state laws," rather than supplant them. *Martin*, 793 F. Supp. 3d at 680. Robinhood cannot rely on the Special Rule to *authorize* sports betting on DCMs when the CFTC has exercised its authority under the Rule to categorically *ban* "gaming" on DCMs. 17 C.F.R. § 40.11(a).

Robinhood's remaining arguments miss the mark because they do not address whether the CEA preempts *gaming* regulation. Robinhood argues that the CEA's history and case law show that Congress intended for the CEA to preempt state regulation of commodity-futures markets, and that the CEA contains a comprehensive scheme for regulating commodity-futures trading. Br. 32. But the decisions Robinhood cites address *bona fide* commodity derivatives; none addresses sports wagers "guised" as commodity derivatives. *Crypto.com*, 2025 WL 2916151, at *11. Further, the decisions that "carefully focused on the scope of Congress's preemptive intent" recognized "that intent had limits." *Martin*, 793 F. Supp. 3d at 682; *see, e.g.*, *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*, 977 F.2d

49

1147, 1156 (7th Cir. 1992) (concluding that the CEA preempts only state laws that "directly affect trading on or the operation of a futures market"—which Nevada's licensing requirements do not). Robinhood's cited materials simply do not show that Congress intended to preempt the field of gaming. *Martin*, 793 F. Supp. 3d at 684 n.5.

Commodity-futures regulation and gaming regulation are different fields with different regulatory needs and policy goals. *See* 89 Fed. Reg. at 48982-83. Commodity-futures markets serve an important function in our Nation's economy—they allow commercial sellers and buyers of commodities to manage financial risk by trading with investors. *See* 7 U.S.C. § 5(a). Although some people previously characterized commodity-futures trading as speculation akin to gambling (and indeed, some States attempted to regulate it under state gaming laws), this trading is permitted so that commodity-futures markets, which are critical to the flow of goods in the Nation's economy, may efficiently function. *See Merrill Lynch*, 456 U.S. at 358-59. The CFTC regulates trading to curb excess speculation and ensure that prices reflect economic reality. *See* 7 U.S.C. § 6(a).

In contrast, sports betting is a form of entertainment. The millions of people who gamble on sports do not seek to hedge existing financial risks; they *create* the risk by betting. *See* p. 26, *supra.* Gaming is regulated as a form of entertainment to ensure that it is fair and free of criminal elements, and to protect the public (especially young people and problem gamers).

50

*Greater New Orleans Broad. Ass'n*, 527 U.S. at 185. The CEA simply does not contemplate that type of regulation.

### c. There is no evidence that Congress intended to federalize all sports betting

There is no indication that Congress sought to preempt all state gaming law and make the CFTC the Nation's sole sports-betting regulator. "Had Congress intended such a sea change in the regulatory landscape, it surely would have said so," because Congress does not "hide elephants in mouseholes." *Whitman*, 531 U.S. at 468; *see* ER-24, 54; *Martin*, 793 F. Supp. 3d at 684.

Federalizing sports betting would massively upset the federal-state balance. Gaming is a longstanding area of state regulation, *see Flynt*, 131 F.4th at 932, and federal law historically has respected state authority in this field, *Greater New Orleans Broad. Ass'n*, 527 U.S. at 185. Yet the "necessary implication" of Robinhood's position is that all sports wagers can be regulated only by the CFTC. *Crypto.com*, 2025 WL 2916151, at *9. Congress does not make major changes to the "usual constitutional balance of federal and state powers" without clearly saying so. *Bond*, 572 U.S. at 858-59 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).

Further, federalizing sports betting would have "vast economic and political" consequences. *West Virginia*, 597 U.S. at 716 (internal quotation marks omitted). Sports betting is a $14-billion-a-year industry that is both

"controversial" and "immensely popular." *Murphy*, 584 U.S. at 460, 484. Thus, under the major-questions doctrine, there would need to be "clear congressional authorization" for the CFTC to take exclusive regulation of sports betting. *West Virginia*, 597 U.S. at 732 (internal quotation marks omitted). Robinhood points to no such authorization.

Robinhood's only response (Br. 63) is that ruling for State Defendants would allow States to regulate commodity-futures markets. But Nevada is not seeking to regulate interest-rate swaps or pork futures. State Defendants forthrightly acknowledged that state attempts to regulate *bona fide* commodity derivatives would be preempted. ER-166; *see Martin*, 793 F. Supp. 3d at 681. This case involves only Robinhood's sports and election contracts—classic forms of gambling that have long been regulated by the States.

### d. Robinhood's view would require impliedly repealing other important federal laws

Robinhood's view of the CEA would require finding that Congress impliedly repealed other federal laws, including the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 *et seq.*, and the Wire Act, 18 U.S.C. § 1084. *Martin*, 793 F. Supp. 3d at 683. There is a strong presumption against such repeals by implication. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018).

The IGRA gives Tribes the "exclusive right" to determine whether and

52

to what extent to allow gaming that is permitted under federal and state law on tribal land, 25 U.S.C. § 2701(5), and it contains a comprehensive scheme to regulate that gaming, *see id.* § 2710. Robinhood's view would completely override the Tribes' authority and disrupt that scheme, because under Robinhood's view, Congress gave the CFTC the exclusive authority to determine how much sports betting to allow nationwide, including on tribal land. *Martin*, 793 F. Supp. 3d at 683.

The Wire Act makes it a federal crime to use interstate wire communication facilities, including the internet, to place bets or wagers on "any sporting event," except where such wagers are legal in both the sending and receiving State. 18 U.S.C. § 1084(a). Companies that offer online betting geofence their customers to comply with this provision. Yet under Robinhood's view, customers could engage in sports betting wherever they are, with no regard for state law—thus nullifying the Wire Act. *Martin*, 793 F. Supp. 3d at 683.

The IGRA and Wire Act confirm both that Congress knows how to regulate gambling, and that it generally has deferred to state judgments in doing so.

### 2. Conflict Preemption Does Not Apply

Neither form of conflict preemption (impossibility or obstacle) applies.

> **a. It is not impossible for Robinhood to comply with Nevada law and the CEA**

Impossibility preemption applies when it would be "impossible to comply with both federal and state law." *Am. Apparel & Footwear Ass'n v. Baden*, 107 F.4th 934, 943 (9th Cir. 2024). That is not true here. Robinhood could become licensed and comply with Nevada law, as other online betting companies have; it just refuses to do so. *See Martin*, 793 F. Supp. 3d at 686. Although Nevada law has some differences from the CEA—for example, Nevada bans gaming under age 21, and Robinhood allows 18-year-olds to gamble, ER-34—state law can be more protective than federal law; that does not show a conflict. *See Wyeth v. Levine*, 555 U.S. 555, 573 (2009).

Robinhood identifies (Br. 46-47) no Nevada regulation that it says it cannot follow.

Further, Robinhood is only in this position because it chose to operate in Nevada without becoming licensed and despite the legal risks, apparently without any plan for stopping its operations. ER-32-33. Robinhood cannot manufacture preemption by violating state law and then claiming it would be impossible to stop.

> **b. Enforcing Nevada gaming law does not pose an obstacle to the CEA's objectives**

Obstacle preemption applies when enforcing state law "stands as an obstacle" to Congress's objectives. *Am. Apparel*, 107 F.4th at 943. It likewise does not apply here. There is no evidence of a congressional

54

purpose to allow sports gambling on DCMs. *See* pp. 48-53, *supra.* And even if Congress intended to allow sports betting on DCMs, Robinhood could obtain a Nevada license (as other sportsbooks have) and then continue to offer its wagers.

Robinhood argues (Br. 46-47) that requiring it to comply with Nevada gaming law would frustrate the CEA's supposed goal of "uniform" regulation of derivatives markets. But uniformity is a field-preemption argument, not a conflict-preemption argument. *See, e.g., Montalvo v. Spirit Airlines*, 508 F.3d 464, 471 (9th Cir. 2007); *Martin*, 793 F. Supp. 3d at 685; Conflict preemption assumes that States may regulate, and may regulate nonuniformly. *See Wyeth*, 555 U.S. at 575.

Congress knows how to preempt state law when it wants to do so. Robinhood conspicuously does not cite these provisions of the CEA. Nor can Robinhood cite a similar provision of the CEA preempting all state gaming law; it simply does not exist.

## C. The Balance of Hardships Weighs Against Robinhood

Even if the Court believes that the case presents serious legal questions, an injunction is not warranted because the balance of hardships does not tip sharply in Robinhood's favor. The most Robinhood can say is that it will have to continue not operating in Nevada during the pendency of the litigation—which pales in comparison to the severe and ongoing harm to Nevada, its gaming industry, and the public.

55

### 1. Robinhood Identifies No Irreparable Harm

The District Court carefully considered and rejected Robinhood's asserted harms. ER-5; ER-32-33. Robinhood, like Crypto.com, has already agreed to temporarily restrict operations in Nevada, including closing existing contracts—the very things Robinhood asserts would cause it irreparable harm. ER-69.

***Harms from lost profits.*** Robinhood asserts (Br. 74-75, 31) that it will be irreparably harmed by lost profits. However, Robinhood's claimed harms are self-inflicted. Robinhood started trading sports-event contracts despite the CFTC's express prohibition on those contracts. *See* 17 C.F.R. § 40.11(a). Then it chose to forge ahead with an untested preemption theory, even though the District Court previously warned Kalshi that it was "proceeding at its own risk and creating its own harms." ER-23. Robinhood's "self-inflicted" harms are not irreparable as a matter of law. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020).

***Harms from closing contracts.*** Robinhood asserts (Br., 75-76) that it would face financial and reputational harm from closing existing contracts with Nevada users. However, Robinhood is to blame to the extent that any loss of goodwill occurs pending its appeal. Since September 30, 2025, the CFTC directed Robinhood to warn its customers about the various lawsuits and the risks they pose. StateSER-22. To the extent Robinhood complied with that directive, Robinhood's customers already knew

56

Robinhood's offerings potentially constituted unlicensed wagers and sports pools in violation of Nevada gaming laws that may need to be unwound. Conversely, to the extent Robinhood adopted Kalshi's approach, continuing to advertise that "sports-related event contracts" were legal in all fifty states, any loss of goodwill pending Robinhood's appeal is self-inflicted, speculative, and cannot be proximately tied to the appeal.

As for Robinhood's customers, they were on notice that offering gaming contracts was contrary to CFTC's regulation at 17 C.F.R. § 40.11(a) and that the legal landscape under which Kalshi and Robinhood have been operating could change depending on court rulings in the various lawsuits and enforcement proceedings by the states. If customers continued trading in Kalshi's products through Robinhood, they, like Robinhood and Kalshi, proceeded at their own risk.

***Enforcement action.*** Submitting to a state enforcement proceeding "typically does not constitute irreparable harm," because Robinhood could raise any potential defense. *John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 203 (D.D.C. 2017). Here, that proceeding simply would seek an order from the state court requiring Robinhood to comply with Nevada gaming law or stop operating in Nevada. NRS § 463.343. As to criminal proceedings, a prosecutor would have to investigate and independently decide to seek criminal charges, then secure an indictment from a grand jury or file an information following a preliminary examination. NRS §§ 172.015,

173.035. Robinhood would be able to raise defenses and have all of the protections that apply to criminal proceedings, which further undermines its claim of irreparable harm.

### 2. The Balance of Equities and Public Interest Favor State Defendants

Every day Robinhood operates in violation of Nevada law imposes "substantial irreparable harms to the Board, the State of Nevada, the gaming industry in this state, and the public interest." ER-33.

***Enforcement of state law.*** A State "suffers a form of irreparable injury" "[a]ny time" it is "enjoined by a court from effectuating statutes enacted by representatives of its people." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648, 656 (9th Cir. 2025) (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025)). Preventing State Defendants from enforcing Nevada gaming law intrudes on Nevada's sovereignty and the democratic will of its people. ER-33.

***Harm to the State's economy and finances.*** Licensing fees are vital to Nevada's public fisc. *Sacco v. State*, 105 Nev. 844, 847 (1989). Nevada collected $1.2 billion in gaming taxes last year, which fund core public services. Am. Gaming Ass'n, *State of the States 2025*, at 85 (May 13, 2025), perma.cc/J27S-WLSB. Unlicensed gaming threatens that revenue, by evading taxes and diverting business from licensed sportsbooks that pay taxes. Robinhood argues that Nevada gaming revenue increased after

Robinhood offered sports-related event contract to its Nevada customers. Br. 80. However, Robinhood ignores that the increases were during football season and Nevada gaming revenue would have increased more but for Robinhood diverting business from Nevada's licensed sportsbooks.

***Harm to Nevada's gaming industry.*** Nevada has a sovereign interest in ensuring a fair and competitive gaming industry. ER-34-35. Allowing Robinhood to bypass Nevada regulation would give Robinhood a massive and unfair competitive advantage over its competitors and would greatly disrupt Nevada's gaming industry. *Id.*

The harm increases significantly the longer Robinhood operates. Robinhood's profit from unlicensed gaming incentivizes others to enter into prediction markets instead of becoming (or remaining) licensed—indeed, two competitors already have done so. ER-35. Other sportsbooks could follow suit, "unleashing even more unregulated gambling and devastating the Nevada economy and related tax revenues." ER-35-36.

Robinhood's operations also threaten the integrity of gaming. Nevada law permits wagers only with sufficient safeguards to prevent insider betting. *E.g.*, Nev. Gaming Reg. 22.1205. The recent scandals in professional baseball and basketball show the importance of those safeguards. ER-27n.7. Robinhood offers sports betting without them—for which it has drawn criticism from sports leagues. *See* Kendall Baker, *NCAA President Charlie Baker on Sports Betting*, Yahoo! Sports (Dec. 11, 2025),

perma.cc/DDS6-XDDF; Testimony of Jeff Miller (NFL), H. Comm. on Agric., 119th Cong. (Dec. 11, 2025), perma.cc/Z5X3-L9WR.

***Harm to the public.*** An injunction would allow Robinhood to continue evading state laws protecting the public. Nevada law prohibits people under 21 from gaming, NRS § 463.350(1)(a); Robinhood allows anyone over 18 to bet, ER-34. Nevada law requires licensees to offer deposit-limit tools and to prominently display responsible-gaming resources. Nev. Gaming Reg. 5.225(18)(a)-(b). "[N]either DCMs nor the CFTC is equipped to address those issues the same way state gaming regulators and licensed entities are." ER-34.

Robinhood asserts (Br. 40, 76) that State Defendants are not harmed because the State Defendants in the Kalshi Case did not immediately appeal the initial Kalshi preliminary-injunction decision and agreed to not enforce against Crypto.com pending appeal. But State Defendants consistently have sought to resolve the litigation as quickly as possible because of the harms from Robinhood's operations. And when Kalshi "greatly expanded" its operations, State Defendants sought dissolution of the preliminary injunction. ER-33. A delay in seeking "judicial protection" does not negate an irreparable injury, especially "in the context of ongoing, worsening injuries." *Arc of Cal. v. Douglas*, 757 F.3d 975, 990-91 (9th Cir. 2014). Further, State Defendants only agreed not to enforce against Crypto.com (a much smaller competitor) and Robinhood pending appeal

60

because they ceased offering sports-event contracts to Nevada residents.

Dkt. 250-4 in Kalshi Case.

## CONCLUSION

The Court should affirm.

Dated: February 6, 2026                    Respectfully submitted,


AARON D. FORD                              /s/ *Ryan Andersen*
  Attorney General of Nevada              **ANDERSEN BEEDE**
Jessica E. Whelan                          **WEISENMILLER**
  Chief Deputy Solicitor General—         Ryan A. Andersen, Esq.
  Litigation                              Nevada Bar No. 12321
State of Nevada,                           Email: *ryan@abwfirm.com*
  Office of the Attorney General          Mark M. Weisenmiller, Esq.
1 State of Nevada Way, Suite 100           Nevada Bar No. 12128
Las Vegas, NV 89119                        Email: *mark@abwfirm.com*
jwhelan@ag.nv.gov                          Michael N. Beede, Esq.
                                           Nevada Bar No 13068
                                           Email: *mike@abwfirm.com*
                                           3199 E Warm Springs Rd., Ste 400
                                           Las Vegas, Nevada 89120
                                           Phone: 702-522-1992
                                           Fax: 702-825-2824

61

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Circuit Rules 27-1(1)(d) and 32-3 because it contains 13,824 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 27-1(1)(d).

Pursuant to Federal Rule of Appellate Procedure 27(d)(1)(E), this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 Century Schoolbook 14-point font.

Dated: February 6, 2026          /s/ *Ryan A. Andersen*
                                   Ryan A. Andersen

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 6, 2026. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: February 6, 2026        /s/ *Ryan A. Andersen*

                                           Ryan A. Andersen